IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COXCOM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-394-KAJ |
| | ) | |
| USA VIDEO TECHNOLOGY, CORP. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## COXCOM'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, STAY, OR TRANSFER

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
William M. Lafferty (#2755)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
   Attorneys for Plaintiff Coxcom, Inc.

OF COUNSEL:
Mitchell G. Stockwell
Candice C. Decaire
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA  30309-4530
(404) 815-6214

September 13, 2006

## TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT                                                                1

II.   STATEMENT OF FACTS                                                                 2

      A.    COXCOM'S DELAWARE ACTION                                                     2

      B.    U.S. VIDEO'S TEXAS ACTION                                                    3

      C.    U.S. VIDEO'S PREVIOUS ACTION IN THE DISTRICT OF
            DELAWARE                                                                     4

III.  ARGUMENT                                                                           5

      A.    U.S. VIDEO'S MOTION MUST BE DENIED BECAUSE
            VENUE IS NOT PROPER IN THE EASTERN DISTRICT OF
            TEXAS                                                                        5

            1.    The Eastern District of Texas Does Not Have Specific
                  Personal Jurisdiction Over Coxcom                                      7

            2.    The Eastern District of Texas Does Not Have General
                  Personal Jurisdiction Over Coxcom                                      7

      B.    THE "FIRST-FILED" RULE DOES NOT REQUIRE
            DISMISSAL OR STAY                                                            8

      C.    TRANSFER TO THE EASTERN DISTRICT OF TEXAS IS
            NEITHER APPROPRIATE NOR WARRANTED                                           10

            1.    Coxcom's Choice of Forum Must Be Given Paramount
                  Consideration                                                         11

            2.    U.S. Video Has Not Sustained Its Burden of Establishing
                  The Need for Transfer                                                  11

IV.   CONCLUSION                                                                        14

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ace Capital  v. Varadam Foundation*, 392 F. Supp. 2d 671 (D. Del. 2005) .................................13

*Brandon v. Interfirst Corp.*, 858 F.2d 266 (5th Cir. 1988) ..........................................................15

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)..................................................................8

*Cashedge, Inc. v. Yodlee, Inc.*, 2006 WL 2038504, C.A. No. 06-170-JJF
      (D. Del.  July 19, 2006).........................................................................................................12

*Data General Corp. v. Johnson,* 78 F.3d 1556 (Fed. Cir. 1996) ..................................................15

*Genentech, Inc. v. Eli Lilly Co.*, 998 F.2d 931 (Fed. Cir. 1993)...................................................10

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ...................................9

*Hoffer v. InfoSpace.com, Inc.*, 102 F. Supp. 2d 565 (D.N.J. 2000) .............................................12

*Hoffman v. Blaski*, 363 U.S. 335 (1960) ........................................................................................7

*Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 58 USPQ2d 1774 (Fed.Cir.
      2001) .......................................................................................................................................8

*International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945) ............................................9

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995) ..............................................6, 7, 13

*Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194 (Fed. Cir. 2003)................................9

*Textron Innovations, Inc. v. The Toro Company*, 2005 WL 2620196
      (D. Del. 2005) .......................................................................................................................11

*Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.*, 2005 WL 441077, C.A.
      No. 04-360-JJF (D. Del. Feb. 15, 2005) ..............................................................................12

*U.S. Video Tech. Corp. v. MovieLink, LLC*, 354 F. Supp. 2d 507 (D. Del.
      2005) ............................................................................................................................. passim

*U.S. Video Tech. Corp. v. Comcast, et* al., Eastern District of Texas Civil
      Action No. 06-cv-239 .............................................................................................................4

<u>Statutes</u>

28 U.S.C. § 1391............................................................................................................................7

28 U.S.C. § 1400............................................................................................................................7

28 U.S.C. § 1404 (a) ............................................................................................ passim

D. Del. L.R. 3.1 ...........................................................................................................3

Other Authorities

Wright & Miller, Fed. Prac. & Proc. Juris. 2d .........................................................7, 15

Defendant U.S. Video Technology Corp.'s ("U.S. Video") Motion to Dismiss or Stay or Transfer, filed contemporaneously with its Answer and Counterclaims to Plaintiff Coxcom, Inc.'s ("Coxcom") Complaint, should be denied.  In essence, U.S. Video contends that the suit it filed against Coxcom's affiliate Cox Communications, Inc. ("CCI") in the Eastern District of Texas is the appropriate vehicle for deciding whether Coxcom's video-on-demand services infringe.  U.S. Video's motion fails as a matter of law because a case cannot be transferred to a district in which neither venue nor jurisdiction would have been proper when the suit was filed.

## I.    SUMMARY OF ARGUMENT

A.    Dismissal, stay, or transfer are neither warranted nor possible, because U.S. Video cannot show that there is personal jurisdiction over Coxcom in the Eastern District of Texas, where U.S. Video seeks to litigate this matter.  Moreover, Coxcom's claims for declaratory judgment and U.S. Video's counterclaim for infringement are the only claims presently filed in any court concerning Coxcom's alleged infringement of the '792 patent.  U.S. Video brought suit in the Eastern District of Texas against Cox Communications, Inc. ("CCI"), Coxcom's affiliate that also has no ties to Texas.  Despite being served with Coxcom's Complaint in this action over two months ago, and receiving CCI's August 14, 2006 motion to dismiss for lack of jurisdiction, U.S. Video did not even attempt to bring claims against Coxcom until its August 29, 2006 motion for leave to amend.  (CCI has opposed that motion on the ground that it is both untimely and futile, *see* CCI response attached as Exhibit A.)

B.    Texas courts cannot exercise jurisdiction over Coxcom.  Even assuming otherwise, the "first-filed" rule on which U.S. Video relies so heavily does not dictate transfer. The "first-filed" rule is not absolute, but gives way to the same considerations relevant to a

motion to transfer pursuant to 28 U.S.C. § 1404 (a), including judicial efficiency and economy, convenience of the litigants and witnesses, and the extent to which the allegedly "first-filed" action was motivated by forum shopping. Those considerations support denying U.S. Video's motion to dismiss, stay, or transfer Coxcom's Complaint. First, this Court is already familiar with the technology and the patent at issue and previously has construed and applied the very same claim of the patent that is at issue. *See U.S. Video Tech. Corp. v. MovieLink, LLC*, 354 F. Supp. 2d 507 (D. Del. 2005). Second, there are no countervailing private interests supporting transfer, as U.S. Video previously informed this Court in resisting transfer in the MovieLink case (*see* Exhibit B). Third, U.S. Video's attempts now to litigate infringement of the '792 patent in the Eastern District of Texas, while seeking transfer out of the District of Delaware, appear to be a deliberate attempt to "forum shop" and avoid this Court.

## II.    STATEMENT OF FACTS

### A.    Coxcom's Delaware Action

Coxcom, a Delaware corporation, filed its Complaint for Declaratory Judgment (D.I. 1) on June 19, 2006, seeking declaratory judgments of non-infringement, invalidity, and/or unenforceability of the '792 patent that U.S. Video has asserted against alleged video-on-demand providers in the Eastern District of Texas. Coxcom's Complaint for Declaratory Judgment is related under D. Del. L.R. 3.1 to prior litigation that U.S. Video brought in this Court because Coxcom's Complaint and U.S. Video's prior litigation, *U.S. Video Tech. Corp. v. MovieLink, LLC*, 354 F. Supp. 2d 507 (D. Del. 2005), both involve the question of whether provision of video-on-demand services infringes the '792 patent. Coxcom seeks a declaration, among other things, that its operation of digital cable systems in which Coxcom provides its subscribers with

digital set-top boxes to enable access to video-on-demand services does not infringe the '792 patent (D.I. 1).

Coxcom's Delaware action is the first -- and only -- action of record to which Coxcom and U.S. Video are parties.  Indeed, the only claims by U.S. Video against Coxcom are U.S. Video's counterclaims for Coxcom's alleged infringement, filed in this matter on August 10, 2006 (D.I. 9).  Although U.S. Video on August 29, 2006, moved for leave to amend the complaint it brought against Coxcom's affiliate, Cox Communications, Inc., in Texas to add Coxcom,[1] U.S. Video previously chose not to file any claims against Coxcom, except the counterclaims it asserted in this action.  CCI has opposed U.S. Video's August 29 motion as futile because there is no jurisdiction over Coxcom.

B.    U.S. Video's Texas Action

U.S. Video, a Connecticut corporation, filed suit in the Eastern District of Texas on June 13, 2006, against CCI, alleging that video-on-demand services provided via a digital cable system and digital set-top boxes infringe the '792 patent.  As set out in CCI's August 14, 2006 motion to dismiss (attached as Exhibit B), CCI is not a proper defendant.   CCI does not, and has not, provided digital cable services or the allegedly infringing "video on demand" services to Texas customers.  Moreover, the Texas court does not have personal jurisdiction over CCI.

On August 29, 2006, U.S. Video moved to amend to add Coxcom to the Texas matter, but like CCI, Coxcom itself does not own or operate any cable television business in

---

[1]    Note that U.S. Video amended its Texas complaint once already on August 18, 2006, but chose not add Coxcom.  *See U.S. Video Tech. Corp. v. Comcast, et al.*, Eastern District of Texas Civil Action No. 06-cv-239.

Texas (Coxcom sold its Texas assets in late 2003) and neither offers nor has offered video-on-demand services in Texas.  Because Coxcom does not have "minimum contacts" with Texas so as to confer personal jurisdiction, neither jurisdiction nor venue is proper in Texas.  *See* Exhibit A.

Judge Clark, who presides over the Eastern District of Texas case, has found that U.S. Video's evidence "is inadequate to support a finding of personal jurisdiction." *See* Order of September 8, 2006, attached as Exhibit C.  Judge Clark authorized, however, a limited Rule 30(b)(6) deposition on the issue of CCI and its affiliates' contacts with Texas.  That deposition and any supplemental briefing by U.S. Video must be completed by October 20, 2006. *See* Exhibit C.

C.    U.S. Video's Previous Action in the District of Delaware

In April 2003, U.S. Video filed a complaint in this Court, alleging that video-on-demand services provided by MovieLink LLC infringed claim 1 of the '792 patent (hereinafter "Delaware action").  *See USA Video Tech. Corp.,* 354 F. Supp. 2d at 509-13.  This Court evaluated the parties' evidence, including expert reports on claim construction and the accused technology, and in January 2005 construed claim 1 of the '792 patent, finding that it required a "central unit" to begin and control the timing of a video download.  *Id.* at 509-11, 514.  This construction substantially limited the scope of the claim that U.S. Video asserted by making clear that user-initiated downloads were outside the scope of the patent.  *Id.* at 514-16.  The Court found that MovieLink did <u>not</u> infringe claim 1 of the '792 patent, because MovieLink's technology involved user-initiated downloads.  *Id.* at 515-16.

Contrary to U.S. Video's present assertions, the decisions rendered in U.S. Video's previous action in this Court are highly relevant to and potentially determinative of the

claims U.S. Video is attempting to assert against third parties in the Eastern District of Texas. U.S. Video's claims in its Eastern District of Texas complaints concern a system and method for video-on-demand services – the very same technology at issue in U.S. Video's previous action in this Court.  In both U.S. Video's previous action in this Court and U.S. Video's actions in Texas, the issue is whether the accused video-on-demand technology infringes claim 1 of the '792 patent.   The issue previously decided by this Court – that "initiates" in claim 1 means "begins" and requires that a "central unit" rather than a user must initiate a download – is likewise potentially determinative of U.S. Video's claims that digital cable set-top boxes, by which a subscriber may select and initiate a video download, infringe claim 1 of the '792 patent.  Indeed, as indicated in the joint proposed schedule submitted on September 11, 2006, Coxcom intends to move for summary judgment on the basis of this Court's previous construction of "initiates" in claim 1 of the '792 patent (D.I. 19).

Likewise, this Court's previous decision -- in U.S. Video's favor -- denying transfer pursuant to 28 U.S.C. § 1404(a) is highly relevant in evaluating of U.S. Video's present motion for transfer.  Indeed, U.S. Video previously made sworn representations that private and public interest factors did not support transfer out of the District of Delaware and should now be estopped from arguing otherwise.

## III.    ARGUMENT

### A.    U.S. Video's Motion Must Be Denied Because Venue Is Not Proper In The Eastern District of Texas

The first step in a court's analysis of a transfer motion is to determine whether venue would be proper in the district to which transfer is sought.  *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  Only if venue would have been proper in the proposed transferee district when the complaint was filed does the court move on to evaluate the interests

of justice and the convenience of witnesses and parties. *Id.*; 28 U.S.C. § 1404(a). The burden of showing that transfer is appropriate is on the moving party and all inferences are in favor of the plaintiff's choice of forum. *Jumara*, 55 F.3d at 879.

Venue in patent suits is proper: (a) where the defendant resides, which for corporate defendants includes any forum in which they are amenable to personal jurisdiction, or (b) where the defendant has infringed and has a regular and established place of business. 28 U.S.C. §§ 1391, 1400. Both (a) and (b) necessarily entail personal jurisdiction over the defendant under the constitutional "minimum contacts" test; venue is not proper if there is no personal jurisdiction. *See* discussion *infra*. Indeed, a case may not be transferred to a district in which the defendant would not have been subject to personal jurisdiction at the time the suit was filed. *See Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960); *see also* Wright & Miller, Fed. Prac. & Proc. Juris. 2d § 3845.

Coxcom does not "reside" in Texas, because it is not amenable to personal jurisdiction in Texas. Coxcom has no place of business in Texas, much less a regular and established place of business, and does not provide the allegedly infringing video-on-demand services in Texas. Coxcom has no "minimum contacts" with Texas as required for the constitutional exercise of personal jurisdiction. *See infra.* Accordingly, the Eastern District of Texas does not have personal jurisdiction over Coxcom.

Coxcom is, however, subject to personal jurisdiction in Delaware because it is incorporated here (D.I. 1 at 1). Delaware, therefore, is the proper forum for Coxcom's suit.

As discussed and supported in the briefing attached as Exhibit A (and specifically the Supplemental Declaration of John Spalding attached to Exhibit A), Coxcom is neither subject to specific nor general personal jurisdiction in the Eastern District of Texas. U.S. Video has

adduced no evidence that venue would have been proper in Texas when Coxcom filed its Complaint because U.S. Video cannot show that venue would have been proper in Texas.

### 1. The Eastern District of Texas Does Not Have Specific Personal Jurisdiction Over Coxcom

Specific jurisdiction requires the plaintiff to show that the defendant "has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-76 (1985)). Specific jurisdiction must be based on activities that are related to the stated cause of action. *Burger King*, 471 U.S. at 472-73. Coxcom does not offer and has not ever offered or provided the allegedly infringing video-on-demand services in Texas. Indeed, Coxcom does not offer or provide digital cable services to any Texas subscribers. *See* Exhibit A. Accordingly, Coxcom is not subject to specific personal jurisdiction in Texas for purposes of U.S. Video's allegations that video-on-demand services provided via a digital cable network infringe claim 1 of U.S. Video's '792 patent. There is no nexus between any activities of Coxcom in Texas (there are none) and the subject matter of Coxcom's suit for declaratory judgment (noninfringement and invalidity of the '792 patent).

### 2. The Eastern District of Texas Does Not Have General Personal Jurisdiction Over Coxcom

General personal jurisdiction is predicated on proof of "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). However, these contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely different from those activities," *International Shoe Co. v. State of Washington*, 326 U.S. 310,

318 (1945), that is, they must be extensive, regular contacts, both qualitatively and quantitatively more substantial than the contacts required for specific personal jurisdiction. The contacts required for general personal jurisdiction need not be specifically related to the substance of the case, but must constitute a course of purposeful contacts with the forum state, such that it is fair, reasonable, and foreseeable that the defendant may be haled into Texas court. *See, e.g., Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003) (substantial, systematic, continuous contacts may support general jurisdiction).

As set out and supported by sworn declaration in Exhibit A, Coxcom is not incorporated in Texas and is not registered to do business in Texas. Coxcom does not do business in Texas and does not own any property in Texas. Coxcom has <u>no</u> contacts with Texas, much less the sort of continuous, purposeful contacts that would support general jurisdiction. *See* Exhibit A.

Because the Eastern District of Texas does not now -- and did not at the time U.S. Video's complaint was filed -- have personal jurisdiction over Coxcom, it is not a "district or division in which [U.S. Video's] case might have been brought." 28 U.S.C. § 1404(a). For that reason alone, U.S. Video's motion to transfer should be denied. Likewise, because neither Coxcom's request for declaratory judgment nor U.S. Video's counterclaims against Coxcom can properly be litigated in the Texas court, neither dismissal nor stay is appropriate.

B.     The "First-Filed" Rule Does Not Require Dismissal or Stay

To the limited extent that the "first-filed" rule could be construed to support U.S. Video's motion, the circumstances of record warrant abrogating the rule. The Federal Circuit has instructed that equitable "considerations of judicial and litigant economy, and the just and

effective disposition of disputes" trump the "first-filed" rule.  *Genentech, Inc. v. Eli Lilly Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993).

Relevant factors to be considered in evaluating whether to apply the "first-filed" rule dovetail with the factors relevant to determining whether transfer under 28 U.S.C. § 1404(a) is in the interests of justice, and specifically include (a) judicial efficiency and economy, (b) convenience of the parties and witnesses, and (c) the extent to which the "first-filed" action appears to be motivated by forum-shopping.  *Id.* at 937-38.  As further discussed below, those considerations weigh in favor of denying U.S. Video's motion:

- Judicial economy and just and effective disposition of disputes militate in favor of permitting this case to proceed before the Court that previously construed the same claim of the same patent here at issue, especially given that Coxcom intends to file for summary judgment on the basis of this Court's previous claim construction (D.I. 19, ¶ 11).

- Judicial economy, just and effective disposition of disputes, and the convenience of the parties further support refusing to permit U.S. Video now to assert contentions inconsistent with its previous successful argument <u>against</u> transfer out of the District of Delaware.  *See* Exhibit D, U.S. Video's opposition to transfer in the *MovieLink* matter; *see also Textron Innovations, Inc. v. The Toro Company*, C.A. No. 05-486-GMS, 2005 WL 2620196 (D. Del. Oct. 14, 2005) (finding that it was difficult to find inconvenience to a party that had "chosen this forum in order to litigate" over 25 years earlier).

- Insofar as the plaintiff, Coxcom, is a Delaware corporation and U.S. Video has previously chosen to bring suit in the District of Delaware and specifically argued

that the District of Delaware is a convenient and economical forum, given U.S. Video's Connecticut residence and limited resources (*see* Exhibit D), litigant economy and convenience are served by allowing this case to proceed before this Court.

Contrary to U.S. Video's representation, the policy favoring resolution of suits involving the same parties and the same issues before one court does not support granting U.S. Video's motion.  U.S. Video's Texas action alleging infringement of claim 1 of the '792 patent does <u>not</u> involve the same parties because Coxcom is not a defendant in the Texas litigation.  Also Coxcom may not be sued in Texas (*see* section A *supra*).  Indeed, the policy for consistent and efficient resolution supports <u>denying</u> U.S. Video's motion to take this proceeding out of this Court, given that this Court previously resolved U.S. Video's suit against MovieLink, alleging that the same video-on-demand technology infringed the same claim of the same patent.  That all of the actions that U.S. Video cites concerning the '792 patent, whether filed in Texas or in Delaware, are in their very early stages renders considerations such as the progress of discovery, simplification of issues, or tactical disadvantage inapplicable -- *i.e.*, none of those additional factors weighs for or against dismissal, stay, or transfer.

C.    Transfer to The Eastern District of Texas Is Neither Appropriate Nor Warranted

It is not necessary for the Court to consider whether the interests of justice and the convenience of the parties and litigants weigh for or against transfer because U.S. Video has not sustained its initial burden of proving that venue would have been proper in the Eastern District of Texas when Coxcom filed its Complaint.  Further evaluation of whether the interests of justice support U.S. Video's motion, however, only bolsters the case for denying U.S. Video's motion for dismissal, stay, or transfer.

### 1.    *Coxcom's Choice of Forum Must Be Given Paramount Consideration*

Third Circuit law requires that a plaintiff's choice of forum is a "paramount concern" in deciding whether transfer under 28 U.S.C. § 1404(a) is appropriate.  *See Hoffer v. InfoSpace.com, Inc.*, 102 F. Supp. 2d 565, 573 (D.N.J. 2000) (listing citations).  Even greater deference is accorded a plaintiff's choice of forum when that forum is the plaintiff's home state, *id*. (listing cites), and/or the plaintiff has a "rational and legitimate" reason to choose to litigate in that state.  *See, e.g., Cashedge, Inc. v. Yodlee, Inc.*, 2006 WL 2038504, C.A. No. 06-170-JJF (D. Del.  July 19, 2006).  The fact that Coxcom is incorporated in Delaware constitutes a rational and legitimate reason to choose to litigate in Delaware.  *Id.; see also Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.*, 2005 WL 441077, C.A. No. 04-360-JJF (D. Del. Feb. 15, 2005).  Accordingly, Coxcom's choice of forum should be given "paramount consideration," *id*., and "not lightly disturbed."  *Jumara*, 55 F.3d at 879.

### 2.    *U.S. Video Has Not Sustained Its Burden of Establishing The Need for Transfer*

To establish that transfer is appropriate -- and leaving aside the insurmountable venue and jurisdiction problem -- U.S. Video must show that the asserted advantages of a move to Texas outweigh the paramount consideration to be accorded Coxcom's choice of forum.  *See Ace Capital v. Varadam Foundation*, 392 F. Supp. 2d 671, 673 (D. Del. 2005).  The Court must "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."  *Jumara*, 55 F.3d at 879.  The Third Circuit has outlined six private interest factors and six public interest factors that may be relevant to this analysis.  *Id.*

As shown below, none of the private interest factors favor transfer:

(1)     Plaintiff Coxcom's choice of forum, as discussed above, strongly supports denying U.S. Video's motion for transfer;

(2)     Defendant U.S. Video's current expressed preference should be disregarded, both because it does not weigh nearly so significantly as Coxcom's choice of forum and because U.S. Video took a contrary position in arguing against transfer in the previous *MovieLink* litigation;

(3)     U.S. Video's infringement claims "arose" wherever (a) U.S. Video, as alleged owner of the patent at issue, resides -- *i.e.*, Connecticut, (b) wherever Coxcom, the alleged infringer, resides -- *i.e.*, Delaware, or (c) wherever Coxcom's alleged acts of infringement took place -- *i.e.*, not in Texas, where Coxcom does not provide and has not provided video-on-demand (*see* 28 U.S.C. §1404(a));

(4)     The parties' convenience in light of their respective financial and physical condition does not favor transfer.  Indeed, U.S. Video previously argued that its financial condition supported denying transfer out of Delaware, citing its 10Q to support the notion that transfer to district far from its home state of Connecticut would inflict undue hardship.  *See* Exhibit D at 11.  U.S. Video's financial condition has not appreciably changed since then.  *See* Form 10-K filed March 23, 2006 by USA Video Interactive Corp – USVO, listing USA Video Technologies, Corp. as a wholly-owned subsidiary, at page 3, and claiming 2005 revenue of $18,800.00, assets of $89,599.00, and losses of $958,250.00 at page 19; *see also* Form 10-Q filed August 14, 2006, listing total current assets of $10,145.00 – attached as Exhibit E;

(5)     U.S. Video has not shown, and is not able to show, that any witnesses will be unavailable in Delaware;

- 12 -

(6)      U.S. Video has not shown, and is not able to show, that any books or records are unable to be produced in Delaware.

The six public interest factors likewise do not favor transfer:

(1)      This Court's judgment would be enforceable against either party.

(2)      As U.S. Video itself previously argued to resist transfer, and as further supported by this Court's familiarity with the technology, patent, and claim at issue, the ease, expediency, and cost of trial do not weigh against transfer.

(3)      U.S. Video has not shown that "relative court congestion" renders the Eastern District of Texas a preferable forum.

(4)      U.S. Video has asserted that there are no local interests in the patent infringement controversy.   To the contrary, Delaware's interest in determining the rights of Delaware residents such as Coxcom supports denying U.S. Video's motion.

(5)      The public policies of the state of Delaware favor denying U.S. Video's motion, insofar as those policies favor determining the rights of Delaware residents in Delaware courts.

(6)      The familiarity of the judge with applicable state law does not factor into this patent infringement matter.  The Court's general familiarity with the meaning of the claim of the patent at issue, which is a matter of law, further supports denying U.S. Video's motion.

Accordingly, under the analysis prescribed by the Third Circuit, both private and public interest factors weigh in favor of denying U.S. Video's motion and permitting this matter to proceed before this Court.  Even aside from failing to show that the Eastern District of Texas would have been a proper forum when Coxcom filed its Complaint, U.S. Video has not sustained its burden of showing that the District of Delaware is an inappropriate or inconvenient forum.

- 13 -

Finally, U.S. Video should be estopped, by its own sworn admissions, from contesting the convenience or appropriateness of the Delaware forum.  U.S. Video previously insisted in the *MovieLink* litigation that the District of Delaware was the appropriate venue in which to bring its infringement claims based on the '792 patent, because the District of Delaware was its "home district."  *See* Exhibit D.  When a party has succeeded in obtaining a ruling on the basis of its factual and legal arguments, that party may not turn to a different court and seek an inconsistent advantage by pursuing an incompatible argument.  *See Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed."); *see also* Wright & Miller, 18B Fed. Prac. & Proc. Juris. 2d § 4477 (discussing judicial estoppel or "preclusion of inconsistent positions").[2]  Indeed, U.S. Video should be judicially estopped from taking any inconsistent position concerning venue in Delaware.  Because the Delaware court ruled in favor of U.S. Video and denied MovieLink's motion to transfer, *see* Order of January 9, 2004, attached as Exhibit F, U.S. Video may not now turn to this Court and assert inconsistent venue arguments.

## IV.   CONCLUSION

U.S. Video's motion to dismiss, transfer, or stay should be denied.  As a matter of law, transfer is not permitted unless jurisdiction and venue would have been proper in the district to which transfer is sought when the suit was filed, 28 U.S.C. § 1404(a), and U.S. Video has not and cannot show that Coxcom would have been subject to personal jurisdiction in the Eastern

---

[2]   Judicial estoppel protects the finality of decisions and promotes consistency of disposition by preventing a party from "playing fast and loose" with the judicial system and taking contradictory positions to serve its self interests.  *See Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988).

District of Texas when the Complaint was filed.  Neither the "first-filed" rule nor any of the considerations applicable to evaluating a motion to transfer cure this fatal defect in U.S. Video's motion.  Moreover, neither the "first-filed" rule nor any of the considerations applicable to evaluating a motion to transfer otherwise support U.S. Video's motion.  Considerations of judicial and litigant economy and just and fair resolution of disputes favor permitting this action to proceed in this Court, which is already familiar with the technology, patent, and even specific patent claim at issue and is the forum choice of Plaintiff Coxcom, a Delaware corporation.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

William M. Lafferty (#2755)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
 *Attorneys for Plaintiff Coxcom, Inc.*

OF COUNSEL:

Mitchell G. Stockwell
Candice C. Decaire
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA  30309-4530
(404) 815-6214

September 13, 2006

536923

## <u>CERTIFICATE OF SERVICE</u>

I, Rodger D. Smith II, hereby certify that on September 13, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Richard K. Herrmann
> MORRIS, JAMES, HITCHENS & WILLIAMS

I also certify that copies were caused to be served on September 13, 2006, upon the following in the manner indicated:

### <u>BY HAND</u>

Richard K. Herrmann
MORRIS, JAMES, HITCHENS & WILLIAMS
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801

### <u>BY FEDERAL EXPRESS</u>

Edward W. Goldstein
GOLDSTEIN, FAUCETT & PREBEG, LLP
1177 West Loop South, Suite 400
Houston, TX  77027

*/s/ Rodger D. Smith II*
Rodger D. Smith II (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Wilmington, DE  19801
(302) 658-9200
rsmith@mnat.com

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | ) ) ) ) ) ) ) ) ) | Case No. 2:06-CV-239-(RC) |
| Defendant(s). | ) ) | |

## COX COMMUNICATIONS, INC.'S CONSOLIDATED
## (1) REPLY IN SUPPORT OF ITS MOTION TO DISMISS
## AND (2) OPPOSITION TO PLAINTIFF'S MOTION TO AMEND

Mitchell G. Stockwell
Leroy M. Toliver
Candice C. Decaire
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E.
Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
(404) 815-6555 (Facsimile)

Michael E. Jones
Allen F. Gardner
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500 (75702)
P.O. Box 359
Tyler, Texas 75710
(903) 597-8311
(903) 593-0846 (Facsimile)

## I.   **Introduction**

Plaintiff ("U.S. Video") mischaracterizes the arguments advanced in Cox Communications, Inc.'s ("Cox") motion to dismiss for lack of personal jurisdiction. In addition, Plaintiff improperly seeks to file an untimely, and ultimately futile, amended complaint adding Coxcom, Inc. ("Coxcom") as a party. Cox should be dismissed from this action and Plaintiff's motion to amend should be denied because neither Cox nor Coxcom are properly subject to this Court's jurisdiction.

First, U.S. Video endeavors to conflate Cox and its affiliates, and never adequately responds to Cox's showing of an absence of minimum contacts. U.S. Video does not even address the controlling case law Cox cited that holds that contacts of Cox's affiliates may not be used to show personal jurisdiction over Cox absent evidence sufficient to pierce the corporate veil. Despite this failure, U.S. Video proceeds to cite registrations with the Texas secretary of state of Cox affiliates or "doing business as" registrations by entities that are not even related to Cox. Such evidence has no bearing on Cox's contacts with Texas and cannot suffice to demonstrate jurisdiction.

Second, U.S. Video's belated effort to replead its allegations and add Coxcom should be rejected as futile and untimely. U.S. Video's effort to amend has no bearing on whether this Court has jurisdiction over Coxcom's parent, Cox. In addition, U.S. Video's motion to amend to add Coxcom as a party should be rejected because Coxcom itself does not have sufficient minimum contacts with Texas to confer personal jurisdiction. Coxcom has never offered video-on-demand services in Texas. Coxcom sold and transferred its Texas assets to another entity, Cox Southwest Holdings, L.P., which itself has since sold those assets. Thus, not only are there

1

no Coxcom connections or assets in Texas that suffice for general personal jurisdiction, there also are presently no Cox affiliates with material assets in Texas.

Cox's motion to dismiss or transfer should be granted and Plaintiff's untimely motion to amend to add Coxcom should be denied so that the issue of whether Coxcom's video-on-demand services infringe Plaintiff's '792 patent can be decided in the Delaware suit. [1]  Only in Delaware are jurisdiction and venue proper and the Delaware action, filed two months before U.S. Video's untimely attempt to amend, is the vehicle by which the substance of U.S. Video's complaint should be addressed.

## II. Argument

### A. U.S. Video Has Neither Demonstrated that Cox Has "Minimum Contacts" With Texas Sufficient to Show General Jurisdiction Nor Otherwise Justified Pursuing its Claims Against Cox in Texas.

1. U.S. Video has not pointed to any legally relevant contacts to sustain personal jurisdiction.

Cox's opening motion explained why Cox is not subject to specific personal jurisdiction. U.S. Video's response does not challenge that point, but rather argues that there are sufficient contacts between Cox and Texas to establish the minimum contacts required for general jurisdiction. U.S. Video's response, however, entirely ignores the controlling law Cox cited concerning the nature of the contacts required to sustain general jurisdiction. The Supreme Court has emphasized that the question is not whether "any" contacts exist, but whether the contacts are of a kind necessary to sustain general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1983) (the inquiry is whether the contacts "constitute the **kind** of **continuous and systematic general business contacts** the Court found to exist in" an earlier case) (emphasis added; citation omitted).

---

[1] *Coxcom, Inc. v. USA Video Technology Corp.*, C.A. No. 1:06-cv-00394 –KAJ (D. Del).

2

Contrary to U.S. Video's claims, exhibits A through C of its Response neither satisfy the governing standard for minimum contacts nor "detail . . . Cox's business dealings with Texas."

First, U.S. Video asserts that because Cox still owns a franchise in Henderson, Texas, it has sufficient contacts for personal jurisdiction. Aside from the fact that property ownership alone does not justify exercising personal jurisdiction (*Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977)), Cox is the entity U.S. Video sued in this case and Cox does not and has not owned the Henderson franchise. *See* Ex. D, Supplemental Declaration of John Spalding ("Spalding Supp. Dec."), at ¶¶4-5. As Mr. Spalding explains, the Henderson, Texas cable franchise is operated by a third party under a Management Agreement, but is held in the name of Cox Southwest Holdings, L.P., solely because Henderson city would not consent to an outright transfer. *Id.* Such a fact is not the kind of contact to justify haling Cox into a Texas court. *Compare Helicoperos*, 466 U.S. at 417 (holding that the "unilateral activity of another party or third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction").

Second, U.S. Video attempts to make much of the fact that the Henderson franchise operates under a "Cox Communications" name and cites to its exhibit A, a March 10, 2005 press release concerning SORPESA! television programming soon to be available in many states, including Texas, that mentions "Cox Communications." All of these are simply examples of Cox's affiliates using a "Cox Communications" "doing business as" name. Ex. D, ¶7. As explained in Cox's opening brief, courts have uniformly held that an affiliate's use of a parent's name does not subject that parent entity to personal jurisdiction. U.S. Video has not challenged that caselaw because it has no basis for so doing.

3

Likewise, U.S. Video's Response Exhibit B -- concerning various "Texas Fictitious Business Names" records – has nothing whatsoever to do with Cox or Coxcom. The printouts relating to Cablevision of Pflugerville, Cablevision of Leander, Cebridge Telecom TX, and Cable Midland, Inc. clearly show, under "Other Name Information," that "Cox Communications" (or, in the case of Cable Midland, Inc., "Cox Communications West Texas") was an assumed name of these other entities and do not demonstrate any legally relevant connection to Cox or Coxcom. *See* pages 2-12 of Response Exhibit B. The printout at pages 12-13 of Response Exhibit B concerns "Carol Cox Communications," owned by Carol Cox of Houston, Texas, and is not even remotely probative of Texas jurisdictional contacts by Cox or Coxcom. Pages 13 – 15 of Response Exhibit B list various "fictitious" or "doing business as" "Cox Communications" assumed business names, but add nothing to the jurisdictional inquiry (nor does the Nevada UCC record included on page 15). The property record printouts at pages 16-20 of U.S. Video's Response Exhibit B are similarly irrelevant, because they do not show ownership of Texas property by Cox or Coxcom, but rather show that various property owners purported to be divisions of some entity doing business as "Cox Communications."

Mr. Spalding has reviewed the above information and confirms that the listings submitted by U.S. Video are simply "doing business as" entries. Ex. D, ¶¶2-3, 7. As he confirms, Cox has not done business in Texas in the last ten years and the assets that were used in Texas by its affiliates were sold off. *Id.*, ¶5. Cox has no property and no business in Texas.

Finally, the record printouts attached as U.S. Video's Response Exhibit C do not help U.S. Video's cause; to the contrary, they demonstrate that Coxcom does **not** have a Texas presence. Each of the printouts in Exhibit C clearly show under "Other Name Information" that to the extent "Coxcom, Inc." was an "Other Name," it became **<u>inactive</u>** on December 31, 2003,

4

long before this action was filed. The printout at pages 14-15 of Exhibit C, showing data from the Arkansas Secretary of State, is totally irrelevant to the question of Texas jurisdiction.

Even if the actions of Cox's affiliates were relevant to jurisdiction over Cox (they are not, *see infra*), the **only** Cox affiliate that has operated or owned any property in Texas in recent years is Cox Southwest Holdings, L.P. – and Cox Southwest Holdings, L.P. sold its Texas assets pursuant to an Asset Transfer Agreement dated October 31, 2005. Ex. D, ¶5.

> 2. Cox's status as a defendant in other lawsuits is irrelevant, but in any event U.S. Video fails to present the full picture of those cases.

U.S. Video makes a strange assertion that "Cox has not argued jurisdiction in other Texas lawsuits." Nowhere does U.S. Video explain why this point is relevant to assessing jurisdiction over Cox, despite the controlling law Cox cited that requires courts to assess the alleged contacts to determine whether they are of the type necessary to sustain general jurisdiction. Legally, U.S. Video's argument is wholly irrelevant because each of the lawsuits U.S. Video cites involve situations where Cox was a defendant – in other words, every suit involved "unilateral activity of another party" – the plaintiff -- rather than a choice by Cox to avail itself of this State's laws and protections. *Helicoperos*, 466 U.S. at 417. Such choices by other parties cannot sustain jurisdiction over Cox.

Even setting aside that issue, U.S. Video's further attempts to fog the relevant issues by citing to other lawsuits filed in Texas against Cox or its affiliate Coxcom fail to present the whole story. Plaintiff in the *Rembrandt Technologies* matter has agreed voluntarily to dismiss Cox -- because it recognizes that Cox is not a proper defendant -- and Coxcom has not yet been required to answer or respond to that complaint. *See* Ex. E. Similarly, Plaintiffs in the *Forgent Networks* matters voluntarily dismissed Cox, because Cox has no Texas presence. *See* Ex. F (attaching Notices of Voluntary Dismissal). As to the presence of Coxcom in the *Forgent*

5

*Networks* suit, that matter is being defended by Coxcom's suppliers (Motorola and Scientific Atlanta), who are defending and indemnifying Coxcom. They control the defense of the suit and chose to litigate the *Forgent Networks* matter in Texas because that is where their other customers were sued. Ex. G, at 2-4. Under the circumstances, these other lawsuits do not show that Cox or Coxcom have sought to avail themselves of Texas's laws and courts and thus do not help U.S. Video meet its burden of showing jurisdiction over either Cox or Coxcom.

> 3. Overall, U.S. Video has not shown the assertion of jurisdiction over Cox, as opposed to dismissal or transfer to Delaware, would comport with "fair play" or achieve "substantial justice."

Cox does not believe that U.S. Video has come close to showing the type and amount of minimum contacts sufficient to justify exercising jurisdiction over Cox. Even more, U.S. Video has not justified that litigation in this forum against Cox would "comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (even where "it has been established that a defendant purposefully established minimum contacts within the forum State," the court must consider the contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"). Other factors to consider in evaluating whether "fair play and substantial justice" are served by exercising jurisdiction include "the burden on the defendant"; "the forum State's interest in adjudicating the dispute"; "the plaintiff's interest in obtaining convenient and effective relief"; and "the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *Id.* at 477 (citations omitted).

Because any contacts between Cox and Texas shade toward the "none" side of a "slim to none" equation, *Burger King's* emphasis on examining "fair play and substantial justice"

6

strongly favors dismissal of this case or, at minimum, transfer to Delaware. Moreover, the relevant "other factors" also favor dismissal or at least transfer.

Transfer may be appropriate because venue in Texas cannot be sustained where Cox has insufficient contacts with Texas. *See* 28 U.S.C. §§ 1391, 1400 (venue is proper where defendant is subject to personal jurisdiction, or where defendant has infringed and has a regular, established place of business). The burden to Cox of litigating a case where it has no contacts or ties is self-evident. Likewise, it is evident that Texas has no stake in the outcome of this dispute. Of more import, however, is the fact that Delaware is a jurisdiction that can efficiently resolve U.S. Video's claims with minimal burden to both parties. As noted in Cox's draft scheduling report for the Delaware court (attached as exhibit H, at ¶19), Cox believes an early summary judgment motion premised on Judge Jordan's claim construction is appropriate. U.S. Video's speculation that Judge Jordan may not preside over all proceedings in the District of Delaware because he may be appointed to the Third Circuit Court of Appeals does not obviate the fact that his expertise in dealing with the patent in suit may be sought early in the case so as to avoid burdening the parties with a potentially unnecessary and unwarranted lawsuit. Further, note that Cox proposes trial in the Delaware case for March, 2008, close to the February, 2008 trial date set by this Court's initial schedule. Ex. H, at ¶18. Thus, U.S. Video will achieve the same efficient and timely resolution of its claims in Delaware as before this Court.

Finally, given that U.S. Video has identified only tenuous and legally irrelevant contacts, this Court should simply transfer the matter to Delaware for consolidation with the action filed there by Coxcom, rather than granting U.S. Video's unsupported and unjustified request for

7

jurisdictional discovery.[2] As explained below, the Delaware action remains the appropriate vehicle for resolving the parties' disputes – including U.S. Video's core averment that Cox too should be liable for allegedly trespassing on U.S. Video's patent rights.

### B. U.S. Video's Effort to Amend the Complaint to Include Coxcom should be Rejected as Untimely and Futile.

U.S. Video attempts to prop up its opposition by mischaracterizing Cox's motion to dismiss – stating that Cox argues that its affiliate Coxcom provides the allegedly infringing video-on-demand services and is the proper party to be sued. That incorrect assertion is the genesis of U.S. Video's motion to amend.

Cox has previously noted that any motion to amend should not relate back and thus cannot be used to favor this venue over Coxcom's appropriate and earlier declaratory judgment action. Cox's Brief, at 10-11. In addition, however, U.S. Video's motion to amend should be denied as futile because this Court lacks jurisdiction over Coxcom. *See, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962); *Overseas Inns S.A.P.A. v. United States*, 911 F.2d 1146, 1150-51 (5th Cir. 1990). In the context of a motion for leave to amend, the Fifth Circuit has defined "futility" to mean that an amended complaint would fail to state a claim for which relief may be granted. *See Stripling v. Jordan Production Company, LLC*, 234 F.3d 863, 873 (5th Cir. 2000). Absent personal jurisdiction over Coxcom, this Court cannot grant relief.

As confirmed in Mr. Spalding's supplemental declaration, Coxcom has insufficient contacts with Texas to support either general or specific jurisdiction over Coxcom.[3] As

---

[2] To the extent relevant to U.S Video's action against Cox, contentions concerning the timing of Coxcom's filing of a declaratory judgment action in Delaware further support transfer. Coxcom filed its Declaratory Judgment in Delaware, where jurisdiction and venue are proper as to all parties, on June 19, 2006. U.S. Video didn't move to add Coxcom to this action until August 29, 2006. Coxcom's action is thus the "first filed" action and the appropriate forum in which to evaluate whether Coxcom's video-on-demand services infringe the '792 patent.

explained further below, Coxcom provides neither cable television nor video-on-demand services in Texas (ex. D, ¶3), and the operating company that previously owned Texas cable assets was a different entity that sold those assets in 2005. *Id.*, ¶5. Because U.S. Video cannot show that the Court has personal jurisdiction over Coxcom, it would be futile to allow U.S. Video to amend its complaint.

      1.    U.S. Video has effectively conceded that there is no basis to exercise specific personal jurisdiction over Coxcom.

Despite Cox's opening brief explaining that no Cox entity has ever offered video-on-demand services in Texas, U.S. Video has submitted nothing to rebut that point.[4] Thus, for the reasons explained in Cox's opening brief at 8-9, there is no basis for finding contacts sufficient to establish specific personal jurisdiction over Coxcom.

      2.    U.S. Video has not shown facts sufficient to establish general personal jurisdiction over Coxcom.

As explained in Cox's opening brief at 6-8, finding general jurisdiction requires proof of a heightened level and different type of forum contacts than those needed for specific jurisdiction. U.S. Video's presentation of "facts" sufficient to show jurisdiction over Coxcom is woefully flawed and insufficient to establish jurisdiction. *See* Section A, *supra.* For the reasons noted above, U.S. Video cannot rely on those "facts" to assert a sufficient basis for general jurisdiction over Coxcom.

---

[3] Independently, as explained in Cox's Brief, U.S. Video cannot justify Long Arm service of process on Coxcom. That issue is not entirely ripe since no service has been made, but the same analysis applies and would suggest futility of any amendment.

[4] Contrary to U.S. Video's assertion as to what Cox argued, Cox's opening brief noted only that Coxcom was the entity that operated video-on-demand services – although it does so in other regions of the country. Cox explicitly stated that **neither Cox nor its affiliates provide, nor have provided, video-on-demand services in Texas.** Cox also explained that it had no Texas presence and, even if affiliate contacts were relevant, Cox's affiliates sold their Texas assets. *See* Docket Entry No. 30 ("Cox's opening Brief"), at 2-3, 8; *see also* Spalding Declaration, submitted therewith).

9

Independently, Coxcom shows through Mr. Spalding's supplemental declaration that it has insufficient contacts with Texas to support general jurisdiction. First, Cox Southwest Holdings, L.P. is the only Cox affiliate that has owned any property in Texas since January 1, 2004. Second, Cox Southwest Holdings, L.P. sold that property pursuant to the October, 2005 agreement. Ex. D. There are thus insufficient substantial and continuous jurisdictional contacts to confer general jurisdiction over Coxcom.

> 3. U.S. Video's generalized averments about actions of Cox affiliates and other lawsuits do not suffice to show jurisdiction as a matter of law.

As explained in Cox's opening brief, even if the actions of Cox's affiliates were relevant, they would not confer personal jurisdiction over Cox for purposes of this suit. U.S. Video never challenged or addressed caselaw Cox cited showing **its affiliates' actions do not suffice to establish jurisdiction over Cox**. And, none of those actions related to the infringement alleged by U.S. Video because neither Cox nor its affiliates, including Coxcom, have provided video-on-demand services in Texas. Thus, overall, U.S. Video cannot meet its burden of showing facts sufficient for jurisdiction.

## III. Conclusion

Cox's motion to dismiss for lack of personal jurisdiction should be granted. Plaintiff's belated and futile effort to add Coxcom should be denied. In the alternative, Plaintiff's claim against Cox should be severed for transfer to the District of Delaware for consolidation with Coxcom's pending action there.

Respectfully submitted, this 6th day of September 2006.

_____/s/ Mitchell G. Stockwell_____
Mitchell G. Stockwell

10

Georgia Bar No. 682912
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX  75710-0359
Telephone:  903-597-8311
Facsimile:  903-593-0846

**Attorneys for Cox Communications, Inc.**

US2000 9482841.1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| USA VIDEO TECHNOLOGY CORPORATION,<br><br>        Plaintiff(s),<br><br>v.<br><br>TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP,<br><br>        Defendant(s). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. 2:06-CV-239-(RC) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a correct copy of the foregoing was served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3) on September 6, 2006. Any other counsel of record will be served by first class U.S. Mail.

/s/ Mitchell G. Stockwell

# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, Plaintiff(s), v. TIME WARNER INC.; COX COMMUNICATIONS, INC.: CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, Defendant(s). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No.: 2-06CV-239 (RC) |

## SUPPLEMENTAL DECLARATION OF JOHN SPALDING

1.      I, John Spalding. am employed by Cox Communications, Inc.. as Vice President, Government Affairs.  My responsibilities include oversight of mergers and acquisitions and corporate records with respect to Cox Communications, Inc. and its affiliates / subsidiaries.

2.      Cox Communications. Inc. was incorporated in Delaware, has its principal place of business in Atlanta, Georgia, and does not do business in Texas.  Indeed, for at least the past ten years, Cox Communications, Inc. has not done business in Texas.  Cox Communications, Inc. has no assets in Texas.  Cox Communications, Inc. does not provide, and for at least the past ten years has not provided, cable television services or "video-on-demand" services in Texas.

3. Cox Communications, Inc.'s affiliate / subsidiary CoxCom, Inc. does not do business in Texas and has no assets in Texas. CoxCom, Inc. does not provide cable television services or "video-on-demand" services in Texas.

4. As of December 31, 2003 / January 1, 2004, Cox Southwest Holdings, L.P. assumed ownership of all of the assets of any of Cox Communications, Inc.'s affiliates / subsidiaries that then owned assets in Texas.

5. Cox Southwest Holdings, L.P. sold all of its Texas assets under an Asset Transfer Agreement dated October 31, 2005. The sale closed on May 5, 2006. The sole exception to the sale was the Henderson, Texas cable television franchise, which is under third party management pursuant to a Management Agreement dated May 5, 2006. Cox Southwest Holdings, L.P. was not able to transfer the Henderson franchise, which expires in 2007, solely because the Henderson city government withheld its consent to the transfer.

6. None of the affiliates / subsidiaries of Cox Communications, Inc. have ever provided "video-on-demand" services in Texas.

7. I have reviewed the records attached to Plaintiff's Response to Cox Communications, Inc.'s Motion to Dismiss. Those records do not relate to Cox Communications, Inc., but rather to various entities "doing business as" "Cox Communications" and, in at least one case, to an entity that is completely unrelated to Cox Communications, Inc. or any of its affiliates / subsidiaries. I note also that Plaintiff attached at least one record pertaining to Arkansas, rather than Texas.

2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September $\underline{6}$, 2006.

John Spalding

# Exhibit E

## Reed, Jan

**From:** Reed, Jan
**Sent:** Thursday, August 31, 2006 2:41 PM
**To:** 'jcarter@McKoolSmith.com'
**Subject:** RE: Notice of Voluntary Dismissal.DOC

Thanks Jeff!

> **From:** jcarter@McKoolSmith.com [mailto:jcarter@McKoolSmith.com]
> **Sent:** Thursday, August 31, 2006 11:33 AM
> **To:** Reed, Jan
> **Cc:** Stockwell, Mitch; Decaire, Candice; Toliver, Buddy
> **Subject:** RE: Notice of Voluntary Dismissal.DOC
>
> Jan,
>
> The motion to dismiss is fine. Although not necessarily required by Rule 41(a)(1), In the past, the court has requested a proposed order. I have enclosed such an order for your consideration. Thank you for your help.
>
> Jeff
>
>
>
>
>
> -----Original Message-----
> **From:** Reed, Jan [mailto:JReed@kilpatrickstockton.com]
> **Sent:** Wednesday, August 30, 2006 10:57 AM
> **To:** Jeff Carter
> **Cc:** Stockwell, Mitch; Decaire, Candice; Toliver, Buddy
> **Subject:** Notice of Voluntary Dismissal.DOC
>
>> Mr. Carter,
>>
>> Mitch Stockwell asked me to forward the attached Notice of Voluntary Dismissal to you.
>>
>> Thanks,
>>
>> Jan Reed
>>
>> 
>> KILPATRICK
>> STOCKTON LLP
>> Attorneys at Law
>>
>> Jan E. Reed, Paralegal
>> Kilpatrick Stockton LLP

9/6/2006

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | ) **Case No. 2-06CV-223 LED** |
| | ) |
| CHARTER COMMUNICATIONS, INC., | ) |
| CHARTER COMMUNICATIONS | ) |
| OPERATING, LLC, COX | ) |
| COMMUNICATIONS, INC., COXCOM, | ) |
| INC., COX ENTERPRISES, INC., CSC | ) |
| HOLDINGS, INC., and CABLEVISION | ) |
| SYSTEMS CORPORATION | ) |
| | ) |
| | ) |

## NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE, PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(1)

Pursuant to Federal Rule of Civil Procedure 41(a)(1), Plaintiff voluntarily dismisses without prejudice its allegations against Defendants Cox Enterprises, Inc. and Cox Communications, Inc.

Respectfully submitted, this 29th day of August, 2006.

| | |
|---|---|
| Jeffrey A. Carter | Mitchell G. Stockwell |
| McKool Smith-Dallas | Lead Attorney |
| 300 Crescent Court | Georgia Bar No. 682912 |
| Suite 1500 | Candice C. Decaire |
| Dallas TX  75201 214/978-4006 | Georgia Bar No. 209815 |
| Fax:  214-978-4044 | KILPATRICK STOCKTON LLP |
| | 1100 Peachtree St NE |
| **Attorneys for Plaintiff** | Suite 2800 |
| **Rembrandt Technologies, LP** | Atlanta GA  30309-4530 |
| | Telephone:  404-815-6214 |
| | Facsimile:   404-815-6555 |

Robert M. Parker
State Bar #15498000
Robert C. Bunt
State Bar #00787165
PARKER & BUNT P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas  75702
Tel:  903-533-9288
Fax:  903-533-9687
**Attorneys for Plaintiff
Rembrandt Technologies, LP**

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX  75710-0359
Telephone:  903-597-8311
Facsimile:  903-593-0846
**Attorneys for Cox Communications, Inc.,
Coxcom, Inc., and Cox Enterprises, Inc.**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES,, LP | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. 2-06CV-223 LED |
| v. | ) | |
| | ) | |
| CHARTER COMMUNICATIONS, INC., | ) | |
| CHARTER COMMUNICATIONS | ) | |
| OPERATING, LLC, COX | ) | |
| COMMUNICATIONS, INC., COXCOM, | ) | |
| INC., COX ENTERPRISES, INC., CSC | ) | |
| HOLDINGS, INC., and CABLEVISION | ) | |
| SYSTEMS CORPORATION | ) | |

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this **NOTICE OF VOLUNTARY DISMISSAL**

**WITHOUT PREJUDICE, PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE**

**41(A)(1)** was filed electronically in compliance with Local Rule CV-5(a) and

contemporaneously served upon all counsel who have consented to electronic service.  Other

counsel shall be served by first class mail.

_____

Candice Decaire

US2000 9471344.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 2:06-CV-223 LED |
| | § | |
| CHARTER COMMUNICATIONS, INC.; | § | |
| CHARTER COMMUNICATIONS OPERATING, | § | |
| LLC; COX COMMUNICATIONS, INC.; | § | JURY TRIAL REQUESTED |
| COX ENTERPRISES, INC.; COXCOM, INC.; | § | |
| CSC HOLDINGS, INC. and CABLEVISION | § | |
| SYSTEMS CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## ORDER
### DISMISSING WITHOUT PREJUDICE DEFENDANTS
### COX ENTERPRISES INC. AND COX COMMUNICATIONS, INC.

Plaintiff Rembrandt Technologies, LP ("Rembrandt") filed a "Notice of Voluntary Dismissal Without Prejudice, Pursuant to Federal Rule of Civil Procedure 41(a)(1)" to dismiss Defendants Cox Enterprises, Inc. and Cox Communications, Inc. from this action. After considering the Notice and finding that neither Cox Enterprises, Inc. nor Cox Communications, Inc., has filed an answer or a motion for summary judgment in this action, the Court hereby dismisses, without prejudice, the allegations against Cox Enterprises, Inc. and Cox Communications, Inc.

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| FORGENT NETWORKS, INC.<br>**Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| ECHOSTAR COMMUNICATIONS | § | |
| CORPORATION, ECHOSTAR DBS | § | |
| CORPORATION, ECHOSTAR | § | |
| TECHNOLOGIES CORPORATION, | § | **C.A. NO.: 2-05CV-318 (LED)** |
| ECHOSPHERE LIMITED LIABILITY | § | |
| COMPANY, DIRECTV GROUP, INC., | § | |
| DIRECTV, INC., DIRECTV | § | |
| ENTERPRISES, LLC, DIRECTV | § | **JURY TRIAL DEMANDED** |
| OPERATIONS, LLC, CHARTER | § | |
| COMMUNICATIONS, INC., COX | § | |
| COMMUNICATIONS, INC. COXCOM, | § | |
| INC., COMCAST CORPORATION, | § | |
| COMCAST STB SOFTWARE DVR, LLC, | § | |
| TIME WARNER CABLE, INC., and | § | |
| CABLE ONE, INC. | § | |
| **Defendants.** | § | |

NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE
OF DEFENDANT COX COMMUNICATIONS, INC

Based on the representation presented by John P. Spalding (see attached Exhibit

A), Plaintiff Forgent Networks, Inc. hereby voluntarily dismisses without prejudice Defendant

Cox Communications, Inc. from this lawsuit pursuant to Rule 41(a)(1) of the Federal Rules of

Civil Procedure. Because Cox Communications, Inc. has not yet filed an answer or motion for

summary judgment in this action, Rule 41(a)(1) allows this voluntary dismissal without further

action of the Court.

Date: _____ 9/1/05

Respectfully submitted,

Gregory M. Luck
Michael T. McLemore
Thomas W. Sankey
GODWIN GRUBER LLP
5 Houston Center
1401 McKinney Street, Suite 2700
Houston, TX 77010
(713) 425-7400 - Telephone
(713) 425-7700 - Facsimile

Carl R. Roth
The Roth Law Firm, P.C.
115 North Wellington, Suite 200
P. O. Box 876
Marshall, Texas 75671
Telephone: (903) 935-1664
Facsimile: (903) 935-1797

COUNSEL FOR PLAINTIFF
FORGENT NETWORKS, INC.

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **FORGENT NETWORKS, INC.** §<br>**Plaintiff,** §<br>§<br>**v.** §<br>§<br>**ECHOSTAR COMMUNICATIONS** §<br>**CORPORATION, ECHOSTAR DBS** §<br>**CORPORATION, ECHOSTAR** §<br>**TECHNOLOGIES CORPORATION,** §<br>**ECHOSPHERE LIMITED LIABILITY** §<br>**COMPANY, DIRECTV GROUP, INC.,** §<br>**DIRECTV, INC., DIRECTV** §<br>**ENTERPRISES, LLC, DIRECTV** §<br>**OPERATIONS, LLC, CHARTER** §<br>**COMMUNICATIONS, INC., COX** §<br>**COMMUNICATIONS, INC. COXCOM,** §<br>**INC., COMCAST CORPORATION,** §<br>**COMCAST STB SOFTWARE DVR, LLC,** §<br>**TIME WARNER CABLE, INC., and** §<br>**CABLE ONE, INC.** §<br>**Defendants.** § | **C.A. NO.: 2-05CV-318 (LED)**<br><br><br>**JURY TRIAL DEMANDED** |

## NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE
## OF DEFENDANT COX COMMUNICATIONS, INC

Based on the representation presented by John P. Spalding (see attached Exhibit A), Plaintiff Forgent Networks, Inc. hereby voluntarily dismisses without prejudice Defendant Cox Communications, Inc. from this lawsuit pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure. Because Cox Communications, Inc. has not yet filed an answer or motion for summary judgment in this action, Rule 41(a)(1) allows this voluntary dismissal without further action of the Court.

Date: _____ 9/1/05

Respectfully submitted,

Gregory M. Luck
Michael T. McLemore
Thomas W. Sankey
GODWIN GRUBER LLP
5 Houston Center
1401 McKinney Street, Suite 2700
Houston, TX 77010
(713) 425-7400 - Telephone
(713) 425-7700 - Facsimile

Carl R. Roth
The Roth Law Firm, P.C.
115 North Wellington, Suite 200
P. O. Box 876
Marshall, Texas 75671
Telephone: (903) 935-1664
Facsimile: (903) 935-1797

COUNSEL FOR PLAINTIFF
FORGENT NETWORKS, INC.

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FORGENT NETWORKS, INC.

    Plaintiff,

    v.

ECHOSTAR COMMUNICATIONS
CORP., et al.

    Defendants.

No. 2:05-cv-00318 LED

**MOTION TO COORDINATE PRETRIAL PROCEEDINGS WITH**
*SCIENTIFIC-ATLANTA, INC. ET AL. v. FORGENT NETWORKS, INC.,*
**No. 6:05-cv-00343**
**BY DEFENDANTS COXCOM, INC.; COMCAST CORPORATION;**
**COMCAST STB SOFTWARE DVR, LLC; TIME WARNER CABLE INC.;**
**AND CABLE ONE, INC. AND MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 2

ARGUMENT ....................................................................................................... 4

    I.    THE DECLARATORY JUDGMENT ACTION AND THE PRESENT
        ACTION SHOULD BE COORDINATED AS TO PRETRIAL
        PROCEEDINGS. ...................................................................................4

    II.   THE CUSTOMER-SUIT DOCTRINE CALLS FOR FOCUSING
        DISCOVERY AGAINST THE REAL PARTIES IN INTEREST......................5

    III.  TO THE EXTENT POSSIBLE, THE DECLARATORY JUDGMENT
        ACTION SHOULD BE TRIED FIRST. ...........................................................7

CONCLUSION..................................................................................................... 8

## INTRODUCTION

Defendants CoxCom, Inc.; Comcast Corporation; Comcast STB Software DVR, LLC; Time Warner Cable Inc.; and Cable One, Inc., (collectively, the "Moving Defendants") are accused in this case of infringing a patent alleged to cover digital video recording devices used by subscribers of cable systems. The Moving Defendants here are covered by indemnity and defense obligations owed by Scientific-Atlanta, Inc. ("S-A") and Motorola, Inc. ("Motorola"), manufacturers of the digital video recording devices. S-A and Motorola filed last week an action in this District (Tyler Division) seeking a declaratory judgment that the patent in this suit is invalid, not infringed, and not enforceable against S-A, Motorola, or its customers (the "Declaratory Judgment Action"). *Scientific-Atlanta, et al. v. Forgent Networks, Inc.,* 6:05-cv-00343 (E.D. Tex.) (a copy of that complaint is attached hereto as Exhibit A).

Because the Declaratory Judgment Action involves the same accused technology and the same patent present in this case, the Moving Defendants believe it is appropriate for all pretrial proceedings (including discovery, claim construction, and summary judgment, and other pretrial motion proceedings) to be coordinated to eliminate unnecessary duplication of effort by the Court or the parties. In addition, because S-A and Motorola (collectively, the "Declaratory Judgment Plaintiffs") are providing a defense and indemnity to the Moving Defendants in this case, the Moving Defendants further request that the discovery by Plaintiff Forgent in this case be directed to the Declaratory Judgment Action Plaintiffs in the first instance. As explained in more detail below, the customer-suit doctrine and the complex indemnity arrangements in the case make such a discovery approach essential to avoid waste and delay. Finally, to the extent the Declaratory Judgment Action is able to proceed to trial sooner than this case, the

Moving Defendants request that the trial in this case be scheduled after the conclusion of the Declaratory Judgment Action trial.

For these reasons and those set forth in greater detail below, the Moving Defendants hereby respectfully request that the Court enter an order:

(1)    Setting a joint scheduling conference in this matter and the Declaratory Judgment Action;

(2)    Directing that pretrial proceedings, including discovery, claim construction, and summary judgment motions, in this matter and the Declaratory Judgment Action be coordinated and conducted concurrently;

(3)    Directing that Plaintiff Forgent seek discovery from the Declaratory Judgment Action Plaintiffs prior to seeking discovery from the Moving Defendants; and

(4)    Setting this matter for trial, if necessary, after the conclusion of any trial in the Declaratory Judgment Action.

## STATEMENT OF FACTS

On July 14, 2005, Plaintiff Forgent sued satellite broadcasters Echostar and DirecTV (naming various Echostar and DirecTV entities) along with cable system operators Charter Communications, Inc.; Cox Communications, Inc.; CoxCom, Inc.; Comcast Corporation; Comcast STB Software DVR, LLC; Time Warner Cable Inc.; and Cable One, Inc. here in the Marshall Division of Eastern District of Texas. Forgent claims that the satellite broadcasters and the cable companies infringe U.S. Patent No. 6,285,746 B1, entitled "Computer Controlled Video System Allowing Playback During Recording," (the "'746 Patent"). The Complaint alleges that cable and satellite receiver digital video recording devices sold or leased by the Defendants infringe the '746 Patent.

- 2 -

Upon receipt of the Complaint, all of the Moving Defendants sought and received indemnity for the infringement claim from S-A and Motorola, who manufacture digital video recording devices for the Moving Defendants. On September 19, 2005, in response to the litigation initiated against their customers, the Moving Defendants, S-A and Motorola filed the Declaratory Judgment Action against Forgent in the United States District Court for the Eastern District of Texas, Tyler Division. In the Declaratory Judgment Action, S-A and Motorola seek a declaratory judgment that the '746 Patent is invalid, unenforceable, and not infringed by S-A's and Motorola's digital video recording devices, and that Forgent be enjoined from suing S-A, Motorola, and their customers.

S-A and Motorola are manufacturers and suppliers of electronic products, which include digital video recording devices used in the cable industry (Exh. A ¶¶ 2, 3). The Moving Defendants supply audio, video, and data over cable networks. S-A and Motorola supply the Moving Defendants with digital receiving devices, which the Moving Defendants provide in turn to their end user-subscribers (*id.* ¶¶ 13, 14). The digital receivers at issue in this case contain a hard disk that can record and play back audio and video signals received from the cable head end, and it is that feature which is accused of infringement by Forgent.

None of the Moving Defendants manufacture the digital video recording devices. Under the contracts by which the Declaratory Judgment Action Plaintiffs supply the Moving Defendants with the accused products, S-A and Motorola must provide a defense and indemnity to the Moving Defendants with respect to the accused equipment and have the right to control that defense. All but one of the Moving Defendants are supplied by

- 3 -

and indemnified by both Motorola and S-A.[1]  Thus, the Cox, Comcast, and Time Warner

Cable Defendants are being supplied with two separate defenses (with two different sets

of local counsel and two different sets of lead counsel) by S-A and Motorola.  In addition,

the Moving Defendants have retained counsel at their own expense.  Thus, the unusual

indemnity situation requires as many as five law firms for a single Moving Defendant.

    All Defendants in this case answered Forgent's Complaint on September 19,

2005, the same day that S-A and Motorola filed the Declaratory Judgment Action.  S-A

and Motorola did so in order to protect their customers and confront Forgent directly as

the real party in interest with respect to this equipment.  The co-pendency of the

Declaratory Judgment Action with this proceeding calls for coordination of all pretrial

proceedings, as explained below.  In addition, both the procedural posture of this case

and the applicable law call for Forgent to direct its discovery demands (with respect to

the Moving Defendants) in the first instance to S-A and Motorola.  Similar considerations

call for the Court to place the Declaratory Judgment Action ahead of this proceeding for

purposes of trial.

**ARGUMENT**

**I.    THE DECLARATORY JUDGMENT ACTION AND THE
PRESENT ACTION SHOULD BE COORDINATED AS TO
PRETRIAL PROCEEDINGS.**

    This Court has broad discretion to control pretrial proceedings to make them more

efficient and to conserve resources.  *See Union City Barge Line, Inc. v. Union Carbide*

*Corp.*, 823 F.2d 129, 135 (5th Cir. 1987) (district court has broad discretion to control its

own docket).  Coordination between this case and the Declaratory Judgment Action is the

process that makes the most sense.  Both suits involve the same questions with respect to

---

[1]    Cable One, Inc. is supplied and indemnified solely by Motorola.

- 4 -

the Moving Defendants: whether the accused S-A and Motorola devices infringe the '746 Patent, whether the asserted claims are valid, and whether the patent can be enforced by Forgent. Without coordination, the parties and the Court would be faced with duplicate discovery, claim construction, and summary judgment motions on issues common between the two cases.

In addition, given that both cases are at their early stages, coordination of pretrial proceedings is particularly appropriate. The Court can hold a single conference pursuant to Rule 16(f) of the Federal Rules of Civil Procedure in both cases and set a scheduling order that provides the same dates for disclosures, discovery cut-off, and the like, for both proceedings.[2] To avoid any delay, the Declaratory Judgment Action can accelerate as necessary to join the schedule for this case (even if that requires holding an earlier scheduling conference in that case than it might otherwise receive).

## II.     THE CUSTOMER-SUIT DOCTRINE CALLS FOR FOCUSING DISCOVERY AGAINST THE REAL PARTIES IN INTEREST.

When a patent owner elects to sue customers, rather than the manufacturers, of an accused product, the patent owner often loses the right to proceed with that suit where the manufacturers file a declaratory judgment action. "The customer-suit exception allows a court to stay a first-filed suit against customers when the manufacturer brings a later-filed declaratory judgment action." *Ciena Corp. v. Nortel Networks, Inc.*, No. 2:05-CV-14, 2005 WL 1189881, at *9 (E.D. Tex. May 19, 2005) (citing *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990) and *Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735, 737-38 (1st Cir. 1997)) (a copy of the *Ciena Corp.* case is attached hereto as Exhibit B).

---

[2]     Moving Defendants understand that Judge Davis, the presiding judge in this case, has also been assigned to the Declaratory Judgment Action. This assignment further facilitates the coordination of pretrial proceedings between the two cases.

ATL01/12041062v5

"Underlying the customer-suit doctrine is the preference that infringement determinations should be made in suits involving the true defendants in the plaintiff's suit, *i.e.*, the party that controls the product's design, rather than in suits involving secondary parties, *i.e.*, customers." *Ciena Corp.*, 2005 WL 1189881, at *9.    Priority is given to the manufacturers' action because of the recognition that the manufacturer, not the customer, is the true party in interest. *Id.* "[I]t is a simple fact of life that a manufacturer must protect its customers, either as a matter of contract, or good business, or in order to avoid the damaging impact of an adverse ruling . . . ." *Katz*, 909 F.2d at 1464.

The customer suit-doctrine would even justify a complete stay of the case against the Moving Defendants in favor of the Declaratory Judgment Action. S-A and Motorola clearly are the true parties in interest in this litigation because they control the design of the digital video recorders they manufacture and are in the best position to challenge the assertion of the patent against their products.

Even though the relevant authority plainly justifies it, the Moving Defendants do not seek a complete stay of this proceeding. The Moving Defendants recognize the presence of other Defendants who are not provided indemnity or defense by non-parties. The Moving Defendants do believe, however, that neither the Court nor the parties should be put to any unnecessary burdens with respect to discovery in this case. Accordingly, the Moving Defendants ask that Plaintiff Forgent conduct its discovery against S-A and Motorola in the first instance, and seek discovery from the Moving Defendants only when the information cannot reasonably be obtained from S-A or Motorola.

Rule 26 of the Federal Rules of Civil Procedure calls for the Court to limit "the frequency or extent of use of the discovery methods otherwise permitted by these rules"

ATL01/12041062v5

if the Court "determines that (i) the discovery sought is . . . obtainable from some other source that is more convenient, less burdensome, or less expensive . . . ." Fed. R. Civ. Proc. 26(b)(2). This is just such a case. Most of the witnesses and documents relevant to the issues of validity and infringement are primarily located at the principal places of businesses of the manufacturers. Compared to the Moving Defendants, S-A and Motorola are in a far superior position to address the technical issues raised by this patent. Indeed, S-A and Motorola have deliberately sued Forgent in this District precisely to make sure that their customers are not unduly burdened by unnecessary discovery.

There are obvious instances in which discovery against the Moving Defendants that could be obtained from the Declaratory Judgment Action Plaintiffs would be quite wasteful. For example, if Forgent sought a 30(b)(6) deposition of each of the Moving Defendants on the technology in the digital video recording devices, at least four separate depositions involving six separate law firms would be required.[3] Simply scheduling the depositions would be problematic. Forgent could accomplish essentially the same thing with two depositions, one each of S-A and Motorola. Discovery will be faster, less expensive, and more efficient if Forgent directs its discovery to S-A and Motorola in the first instance.

### III.    TO THE EXTENT POSSIBLE, THE DECLARATORY JUDGMENT ACTION SHOULD BE TRIED FIRST.

S-A and Motorola have no interest in delaying a resolution of this dispute. Indeed, they filed the Declaratory Judgment Action in the division of this Court (Tyler)

---

[3]       The Cox, Comcast, Time Warner Cable, and Cable One companies would each require their own separately hired counsel (four different law firms) plus the counsel supplied each by Motorola and S-A (two law firms).

ATL01/12041062v5

Case 1:06-cv-00390... Case 2:05-cv-00239-RH... Document 1-2 Document... Filed 09/... Filed 09/06/2006... Page 11 of 1...

Case 2:05-cv-00318-LED     Document 51-1     Filed 09/30/2005     Page 10 of 14

which has more capacity to try cases than the division in Marshall due to the facilities available. Permitting the Declaratory Judgment Action to be set for trial ahead of this proceeding can allow the infringement, validity, and enforceability issues to be addressed sooner than they would otherwise be if the case proceeded in Marshall. The Declaratory Judgment Action is also simpler, having only three parties and focused on the devices manufactured for cable subscribers.[4] At the same time, because the Declaratory Judgment Action raises inequitable conduct issues not pled by either Forgent or the satellite broadcast defendants, the Declaratory Judgment Action is the more comprehensive of the two. Accordingly, the Moving Parties submit that a trial in the Declaratory Judgment Action should proceed ahead of this case.

## CONCLUSION

For the reasons set forth herein, Defendants CoxCom, Inc.; Comcast Corporation; Comcast STB Software DVR, LLC; Time Warner Cable Inc.; and Cable One, Inc., hereby respectfully request that the Court enter an order:

(1) Setting a joint scheduling conference in this matter and the Declaratory Judgment Action;

(2) Directing that pretrial proceedings in this matter and the Declaratory Judgment Action be coordinated and held concurrently, with discovery sought in and applicable equally to both actions;

---

[4]     The cable operators, for example, utilize an entirely different set of suppliers and technology than the Echostar and DirecTV Defendants (collectively, the "Satellite Defendants"), who broadcast their signals via satellite. Accordingly, the requested relief also allows the Moving Defendants an opportunity to have their issues tried in the Declaratory Judgment Action without the involvement of the satellite digital recording devices and the concomitant potential jury confusion.

- 8 -

(3) Directing that Plaintiff Forgent seek discovery from the Declaratory Judgment Action Plaintiffs prior to seeking discovery from the Moving Defendants; and

(4) Setting this matter for trial, if necessary, after the conclusion of any trial in the Declaratory Judgment Action.

<u>Position of the Non-Moving Defendants.</u>  Counsel for the Moving Defendants has conferred with counsel for Defendant Charter and counsel for the Satellite Defendants regarding the relief requested herein. Defendant Charter does not have any objections to the requested relief.  The Satellite Defendants do not object to the proposed coordination of pretrial proceedings and initial focus of discovery as set forth in enumerated items 1-3 above.  With respect to item 4 (the Moving Defendants' request that the Declaratory Judgment Action be tried first), the Satellite Defendants do not support this request and believe it is premature at this time to make a determination regarding the order of trial.

- 9 -

Respectfully submitted, this 30th day of September, 2005.

/s/_____
Deron R. Dacus
State Bar No. 00790553
Ramey & Flock LLP
100 East Ferguson
Suite 500
Tyler, Texas 75702
Phone: 903-597-3301
Fax: 903-597-2413
derond@rameyflock.com

Michael E. Jones
State Bar No. 10929400
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500
Tyler, Texas 75702
Phone: 903.597.8311
Fax: 903.593.0846

ATTORNEYS FOR DEFENDANT
COXCOM, INC.; TIME WARNER CABLE INC.;
COMCAST CORPORATION; AND COMCAST
STB SOFTWARE DVR, LLC.

ATL01/12041062v5

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FORGENT NETWORKS, INC.

    Plaintiff,

    v.

ECHOSTAR COMMUNICATIONS
CORP., et al.

    Defendants.

No. 2:05-cv-00318 LED

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Therefore, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed.R.Civ.P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy via email transmission, facsimile and/or U.S. Mail this 30th day of September, 2005.

/s/
Deron R. Dacus

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FORGENT NETWORKS, INC.

    Plaintiff,

      v.

ECHOSTAR COMMUNICATIONS
CORP., et al.

    Defendants.

No. 2:05-cv-00318 LED

## CERTIFICATE OF CONFERENCE

The following certificate is submitted pursuant to Local Rule 7(h). Counsel for the Moving Defendants has conferred with Plaintiff's counsel in a good faith attempt to resolve the matter without court intervention. Plaintiff's counsel, however, did not agree to the coordination requested in this motion. Therefore, this motion is opposed by Plaintiff's counsel.

/s/ _____
Deron R. Dacus

# Exhibit H

## Stockwell, Mitch

| | |
|---|---|
| **From:** | Stockwell, Mitch |
| **Sent:** | Friday, September 01, 2006 12:35 PM |
| **To:** | Edward W. Goldstein (egoldstein@gfpiplaw.com) |
| **Cc:** | Decaire, Candice |
| **Subject:** | Cox v. USVO |
| **Attachments:** | 9475390_1.pdf |

Ed: I've attached a proposed scheduling order for the Delaware action for your consideration.

On a related note, I would like to file a reply in support of Cox's motion to dismiss and consolidate the reply with our opposition to your motion to amend to add Coxcom.  Our reply is presently due next Tuesday.  I wonder if you could give us a one day extension to file the consolidated reply/opposition?  I'd like to file both of those together since they are obviously linked to the ultimate outcome.



KILPATRICK
STOCKTON LLP
Attorneys at Law

Mitchell G. Stockwell
Kilpatrick Stockton LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309-4530
t 404 815 6214
f 404 541 3403

Confidentiality Notice:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This transmission, and any attachments, may contain confidential attorney-client privileged information and attorney work product. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. Please contact us immediately by return e-mail or at 404 815 6500, and destroy the original transmission and its attachments without reading or saving in any manner.

9/6/2006

WORKING DRAFT DATED 08/31/06

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COXCOM, INC. | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | C.A. No. 1:06cv00394-KAJ |
| | ) | |
| USA VIDEO TECHNOLOGY, CORP. | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

### [proposed] SCHEDULING ORDER

This _____ day of _____, 2006, the Court having conducted an initial Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(a) on September 14, 2006, and the parties having determined after discussion that the matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1. <u>Rule 26(a)(1) Initial Disclosures</u>. Unless otherwise agreed to by the parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) within five days of the date of this Order. If they have not already done so, the parties are to review the Court's Default Standard of Electronic Documents, which is posted at http://www.ded.uscourts.gov (see Orders, etc., Policies & Procedures, Ad Hoc Committee for Electronic Discovery), and is incorporated herein by reference.

2. <u>Joinder of Other Parties and Amendment of Pleadings</u>. All motions to join other parties, and to amend or supplement the pleadings shall be filed on or before February 16, 2007.

3.     Discovery.

a.     Limitation on Hours for Deposition Discovery.  Each side is limited to a total of 70 hours of taking fact testimony by deposition upon oral examination.

b.     Location of Depositions.  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district.  Exceptions to this general rule may be made by order of the Court.  A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

c.     Discovery Cut Off.  All discovery in this case shall be initiated so that it will be completed on or before August 10, 2007.  The Court encourages the parties to serve and respond to contention interrogatories early in the case.  Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

d.     Disclosure of Expert Testimony.  Unless otherwise agreed to by the parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony on issues on which they bear the burden of proof on or before ninety days before the date of the completion of discovery, and file a supplemental disclosure to contradict or rebut evidence on the same subject matter identified by another party sixty days before the date for the completion of discovery.   To the extent any objection to expert testimony is made pursuant to the principles announced in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless

- 2 -

**DRAFT**

otherwise ordered by the Court.

      e.     <u>Discovery Disputes</u>.  Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference.  Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter, not to exceed three pages, outlining the issues in dispute and its position on those issues.  (The Court does not seek extensive argument or authorities at this point; it seeks simply a statement of the issue to be addressed and a summary of the basis for the party's position on the issue.)  Not less than twenty-four hours prior to the conference, any party opposing the application for relief may file a letter, not to exceed three pages, outlining that party's reasons for its opposition.  Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court will order it.  Disputes over protective orders are to be addressed in the first instance in accordance with this paragraph.

      4.     <u>Application to Court for Protective Order</u>.  Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.  Should counsel be unable to reach an agreement on a proposed form of order, the counsel must first follow the provisions of Paragraph 3(e) above.

      Any proposed order should include the following paragraph:

> <u>Other Proceedings</u>.  By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this order who becomes subject to a motion to

- 3 -

**DRAFT**

disclose another party's information designated "confidential" [the
parties should list any other level of designation, such as "highly
confidential," which may be provided for in the protective order]
pursuant to this order shall promptly notify that party of the motion
so that the party may have an opportunity to appear and be heard
on whether that information should be disclosed.

5.   Papers Filed Under Seal.  When filing papers under seal, counsel should deliver to

the Clerk an original and one copy of the papers.

6.   Settlement Conference.  Pursuant to 28 U.S.C. § 636, this matter is referred to the

United States Magistrate for the purpose of exploring the possibility of a settlement.

7.   Interim Status Report.  On March 14, 2007, counsel shall submit a letter to the

Court with an interim report on the nature of the matters in issue and the progress of discovery to

date.

8.   Status Conference.  On March 21, 2007, the Court will hold a Rule 16(a), (b) and

(c) conference by telephone with counsel beginning at 4:30 p.m.  Plaintiff's counsel shall initiate

the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the interim status

report or to this order, they may so notify the Court in writing before the conference is scheduled

to occur, and the conference will be taken off the Court's calendar.

9.   Tutorial Describing the Technology and Matters in Issue.  The parties shall provide

the Court by August 24, 2007, a tutorial on the technology at issue.  In that regard, each party

may submit a videotape of not more than 30 minutes.  The parties may choose to present the

tutorial in person.  In either event, the tutorial should focus on the technology in issue and should

not be used to argue the parties' claims construction contentions.  If the parties choose to file

- 4 -

videotapes, they should be filed under seal as part of the Court's file, subject to any protective order in effect. Each party may comment, in writing (in no more than 5 pages) on the opposing party's videotape tutorial. Any such comment shall be filed within ten (10) days of submission of the videotapes.

10. <u>Case Dispositive Motions</u>. All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before September 7, 2007. Briefing will be presented pursuant to the Court's Local Rules.

11. <u>Claim Construction Issue Identification</u>. If the Court does not find that a limited earlier claim construction would be helpful in resolving the case, on April 30, 2007, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court. Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted pursuant to paragraph 12 below. The parties Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions. A copy of the patent(s) in issue as well as those portions of the intrinsic record relied upon are to be submitted with this Joint Claim Construction Chart. In this joint submission, the parties shall not provide argument.

12. <u>Claim Construction</u>. Issues of claim construction shall be submitted to the Court no later than July 31, 2007 to be considered by the Court in conjunction with the parties'

summary judgment motions.

13.    <u>Hearing on Claim Construction</u>.  Beginning at 2:00 p.m. on October 18, 2007, the Court will hear evidence and argument on claim construction and summary judgment.

14.    <u>Applications by Motion</u>.  Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk.  Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

15.    <u>Pretrial Conference</u>.  On January 28, 2008, the Court will hold a Final Pretrial Conference in Chambers with counsel beginning at 10:00 a.m.  Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3).  The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before January 25, 2008.

16.    <u>Motions *in Limine*</u>.  Motion *in limine* shall not be separately filed.  All *in limine* requests and responses shall be set forth in the proposed pretrial order.  Each party shall be limited to five *in limine* requests, unless otherwise permitted by the Court.  The motion and response thereto shall contain the authorities relied upon, and no single *in limine* request shall have more than five pages of argument associated with it.  No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted by the Court.

17.    <u>Jury Instructions, Voir Dire, and Special Verdict Forms</u>.  Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed voir dire,

**DRAFT**

instructions to the jury, and special verdicts and interrogatories three full business days before the final pretrial conference. That submission shall be accompanied by a computer diskette (in WordPerfect format) which contains a copy of these instructions and proposed voir dire and special verdicts and interrogatories.

18. <u>Trial</u>. This matter is scheduled for a seven-day jury trial beginning at 9:30 a.m. on March 5, 2008. For the purpose of completing pretrial preparations, counsel should plan on each side being allocated a total of 20 hours to present their case.

19. <u>Other issues</u>. This Court has already construed the term "initiates" in Claim 1 of U.S. Patent No. 5,130,792 in the litigation captioned *USA Video Tech. Corp. v. Movielink LLC*, 354 F. Supp. 2d 507 (D. Del. 2005), *aff'd* 2006 U.S. App. LEXIS 14699 (Fed. Cir. June 7, 2006). In light of the court's construction of that term, Plaintiff believes that the accused products do not infringe the patent-in-suit as a matter of law. Plaintiff thus intends to file papers seeking summary judgment of noninfringement early in this case.

_____
UNITED STATES DISTRICT JUDGE

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORP., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2-06cv-239 |
| v. | ) ) | Honorable Ron Clark |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS INC.) COMCAST CABLE; COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | ) ) ) ) ) ) ) ) | JURY |
| Defendants. | ) ) | |
| _____ ) | | |

## COX COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE, TO TRANSFER VENUE TO THE DISTRICT OF DELAWARE AND BRIEF IN SUPPORT THEREOF

OF COUNSEL:
Matthew B. Lehr
Suong T. Nguyen
Duane Nash
Yiping Liao
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park CA 94025
Telephone: 650-752-2000
Facsimile: 650-752-2111

Mitchell G. Stockwell
Lead Attorney
Georgia Bar No.
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA 30309-4530
Telephone: 404-815-6214
Facsimile: 404-815-6555

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX 75710-0359
Telephone: 903-597-8311
Facsimile: 903-593-0846
**Attorneys for Cox Communications, Inc.**

# TABLE OF CONTENTS

Page

I.    Undisputed Material Facts ................................................................................3

II.   Issues Presented ..............................................................................................5

III.  Argument .........................................................................................................5

    A.    U.S. Video Cannot Sustain Its Burden Of Proving Personal
        Jurisdiction Over Cox .............................................................................5

        1.    Cox Has Not Committed a Tortious Act Within Texas and
             Cannot be Subject to Jurisdiction Under Texas' Long Arm
             Statute. ......................................................................................5

        2.    Cox Has Insufficient Contacts With Texas Under
             Constitutional Due Process Requirements To Support
             General Personal Jurisdiction. ...................................................6

        3.    Cox is Not Subject to Specific Jurisdiction Because it has
             No Contacts with Texas Related to U.S. Video's Claim. ...........................8

        4.    Actions of Cox's Affiliates Do Not Matter for Personal
             Jurisdiction Purposes. ................................................................9

    B.    If Plaintiff May Pursue this Action Against Cox, Delaware is the
        Appropriate Forum .................................................................................11

        1.    Cox's Lack of Jurisdictional Contacts Renders Texas an
             Improper Forum for this Action .................................................11

        2.    Delaware is the Proper, More Convenient Forum for
             Resolving Plaintiff's Claims. ....................................................12

IV.   CONCLUSION ...............................................................................................13

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995) ......................... 7

*Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000) ...................... 6

*Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925) ........................ 9

*Carmichael v. United Techs. Corp.*, 835 F.2d 109, 111 (5th Cir. 1988) ...................... 5

*Coastal Plains, Inc.*, 1779 F.3d 197, 205-06 (5th Cir. 1999) ....................... 12

*Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996) .......................... 12

*Dunn v. Svitzer*, 885 F. Supp. 980, 987 (S.D. Tex. 1995)................................ 9

*Entek Corp. v. Southwest Pipe and Supply Co.*, 683 F. Supp. 1092, 1104-05 (N.D. Tex. 1988)............................................................... 9

*Frito-Lay, Inc. v. Proctor & Gambell Co.*, 364 F. Supp. 243, 250 (N.D. Tex. 1973) ................................................................ 6

<u>Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metro. Bottling Co.</u>, 785 F. Supp. 514 (E.D. Pa. 1992) ..................................... 10

*Hargrave v. Fibre Board Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) ........................ 9

*Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984) ................... 7

*Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001)................................. 5

*International Shoe Co. v. Washington*, 326 U.S. 310,. 316 (1945) ...................... 8

*J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D. N.Y. 2001) ............................................................... 10

<u>Naxon Telesign Corp. v. GTE Information Sys., Inc.</u>, 89 F.R.D. 333 (N.D. Ill. 1980) ............................................................... 11

*Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998) ................................................................ 9

*Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977)................................. 7

*Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1200 (Fed. Cir. 2003)............................ 7

US2000 9429628.2

Tandy Corp. v. Comus Int'l, Inc., 704 F. Supp. 115 (N.D. Tex. 1987) (Mahon, J.) .................. 5, 7

*USA Video Tech. Corp. v. MovieLink LLC*, 354 F. Supp. 2d 507, 509-13 (D. Del. 2005) ........................................................................................................... 3, 4

*Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1301 (S.D. N.Y. 2003) ................................... 10

**Rules**

Fed. R. Civ. P. 15 ............................................................................................................... 10

Fed. R. Civ. P. 21 ............................................................................................................... 12

Federal Rule of Civil Procedure 12(b)(2) ............................................................................. 1, 13

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, <br><br> Plaintiff(s), <br><br> v. <br><br> TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, <br><br> Defendant(s). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No.: 2-06CV-239 (RC) |

## COX COMMUNICATIONS, INC.'S MOTION TO DISMISS
## FOR LACK OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE,
## TO TRANSFER VENUE TO THE DISTRICT OF DELAWARE
## AND BRIEF IN SUPPORT THEREOF

Defendant Cox Communications, Inc. ("Cox") moves to dismiss Plaintiff's claims against it under Federal Rule of Civil Procedure 12(b)(2) because this Court lacks personal jurisdiction over Cox. In the alternative, Cox moves to transfer venue to the District of Delaware, pursuant to 28 U.S.C. §1404(a).

First, Plaintiff has sued the wrong company. Cox is a Delaware corporation, headquartered in Atlanta, Georgia. Cox only provides services in Georgia. Cox is not in the business of providing the video-on-demand services the Complaint alleges infringe Plaintiff's patent. Cox does not own or operate and has never owned or operated cable systems in Texas; does not offer or provide and has never offered or provided video-on-demand services in Texas; and does not otherwise reside or operate in Texas. Cox does not have the minimum contacts

with Texas sufficient to support personal jurisdiction and there is thus no basis for this Court to exercise personal jurisdiction over Cox. Therefore, Plaintiff's Complaint should be dismissed with prejudice.

Second, Plaintiff has sued in the wrong forum. Venue over U.S. Video's purported claims against Cox is not appropriate in Texas. Neither Cox nor U.S. Video have ties to Texas that could invoke any local interest. The District of Delaware is the court that has most recently considered and ruled upon key patent claim construction issues that will be raised in addressing U.S. Video's complaint. Venue is proper in Delaware, where plaintiff has previously sued on the patent at issue and where Cox is incorporated. The public interest in judicial economy and avoidance of conflicting decisions thus militates for transfer. Moreover, U.S. Video previously resisted transfer of venue on the ground that Delaware was the appropriate and more convenient venue for litigating the same patent U.S. Video now asserts. Having prevailed in that argument, U.S. Video is estopped from arguing that Delaware would be an inconvenient forum in which to litigate.

Finally, one of Cox's affiliates, CoxCom, Inc. does offer cable communications services, albeit not in Texas. But it is an independent entity and it has long been settled that a subsidiary's contacts with a forum state do not give rise to personal jurisdiction over the parent. Moreover, because CoxCom has initiated a declaratory judgment suit in Delaware, judicial economy warrants transferring this suit to that District. Thus, even assuming Plaintiff's claims can go forward against Cox, they should be transferred to Delaware, the most appropriate forum for this matter.

2

## I.   <u>Undisputed Material Facts</u>

1.      Cox is a diversified broadband telecommunications company, incorporated in Delaware, with a principal place of business in Atlanta, Georgia.  (Declaration of John Spalding, attached as Exhibit A, ¶ 2. "Spalding Dec.")

2.      Cox is not registered to do business in Texas.  (*Id.*, ¶5.)  Cox does not provide cable television or video-on-demand services in Texas.  (*Id.*, ¶¶ 4-5.)  Cox does not maintain any place of business, does not have offices, and does not keep any corporate books or records in Texas.  (*Id.*, ¶3.)

3.      CoxCom, Inc. is an affiliate of Cox that initiated a declaratory judgment action against U.S. Video in the District of Delaware.  (Exhibit B.)

4.      Cox's affiliates are party to an Asset Transfer Agreement by which all Texas assets of Cox's affiliates were sold.  (*Id.*, ¶ 4.)  The sole Texas material asset of the affiliates of Cox  that was not transferred was the Henderson, Texas cable television franchise, as to which the city government refused to consent to transfer.  The Henderson, Texas cable television franchise does not offer video-on-demand services and is not managed or operated by any of Cox's affiliates, but rather by a third party, under a Management Agreement.  (*Id.*, ¶¶ 4-7.)

5.      Plaintiff U.S. Video is a Connecticut corporation, with a principal place of business in Connecticut.  (Complaint, ¶ 1.)

6.      In April 2003, U.S. Video filed suit in the District of Delaware contending that video-on-demand services infringed claim 1 of United States Patent No. 5,130,792 ("the '792 patent") entitled "Store and Forward Video System."  *See USA Video Tech. Corp. v. MovieLink LLC*, 354 F. Supp. 2d 507, 509-13 (D. Del. 2005) ("Delaware action").

7. Here, U.S. Video likewise contends that Cox provides "video-on-demand" services that infringe claim 1 of the '792 patent. (Complaint, ¶¶ 11-13, 15.)

8. The Delaware District Court evaluated the parties' evidence, including expert reports on claim construction and the accused technology, and in January of 2005 construed claim 1 of the '792 patent. *USA Video Tech. Corp.,* 354 F. Supp. 2d at 509-11, 514.

9. The Delaware court grappled with numerous motions, including the following: Motion for Summary Judgment of Non-Infringement Relating to U.S. Video's Infringement Allegations for Which No Support in the Record Exists; Motion for Summary Judgment on Non-Infringement, and Alternative Motion for Summary Judgment of Invalidity; Motion for Summary Judgment of Invalidity under 25 U.S.C. § 112 and to Strike Portions of Expert Report; Motion for Summary Judgment as to the Gunter Article and the '792 Patent's Enablement; and Motion to Exclude or Limit Admissibility of the Expert Reports and Testimony of Richard T. Mihran and Joseph A. Konstan. *USA Video Tech. Corp.,* 354 F. Supp. 2d at 508-09.

10. The Delaware court found that the language of Claim 1, which describes a "distribution interface" that "initiates connections over the telephone network," requires that the "distribution interface" <u>begin</u> forming the connection. In other words, a system that involves starting the claimed "connections over the telephone network" by anything other than the claimed "distribution interface," is outside the scope of the '792 patent. *Id*. at 514-15.

11. The Delaware court's construction, which has been upheld by the Federal Circuit, 2006 U.S. App. LEXIS 14699 (Fed. Cir. June 7, 2006), substantially limited the scope of the rights U.S. Video was purporting to assert and resulted in a finding that MovieLink did not infringe claim 1 of the '792 patent. *Id.* at 515-16.

4

## II.    Issues Presented

1.    Are there sufficient "minimum contacts" between Cox and Texas to confer personal jurisdiction over Cox?

2.    In the alternative, should this case be transferred to the District of Delaware pursuant to 28 U.S.C. § 1404(a)?

## III.    Argument

### A.    U.S. Video Cannot Sustain Its Burden Of Proving Personal Jurisdiction Over Cox

U.S. Video has the burden of establishing that Cox has "minimum contacts" with Texas sufficient to establish personal jurisdiction. *See Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001) (Federal Circuit law controls personal jurisdiction issues and requires plaintiff to show personal jurisdiction over defendant in patent case). U.S. Video cannot meet its burden because (i) Cox has not committed any act that would trigger application of the Texas Long Arm Statute to authorize Plaintiff's service of process on Cox, and (ii) Cox lacks constitutional minimum contacts with Texas.[1]

### 1.    Cox Has Not Committed a Tortious Act Within Texas and Cannot be Subject to Jurisdiction Under Texas' Long Arm Statute.

To establish that the service of process Plaintiff made upon Cox was proper, U.S. Video must show that Cox "engages in business" in Texas and that this proceeding "arises out of the business done in this state and to which [Cox] is a party." Tex. Civ. Prac. & Rem. Code Ann., § 17.044(b) (Vernon 1997). Acts which constitute engaging in business comprise contracting with Texas residents or "commit[ting] a tort in whole or in part in" Texas. *Id*. at § 17.042. *See Carmichael v. United Techs. Corp*., 835 F.2d 109, 111 (5th Cir. 1988) (service of process

---

[1]    The absence of personal jurisdiction over Cox requires dismissal under Rule 12(b)(2) (lack of personal jurisdiction), but Rule 12(b)(5) (insufficiency of process) also would direct dismissal upon the same grounds. That is because Plaintiff served pursuant to the Texas Long Arm Statute, which requires personal jurisdiction to exist for service to be proper. *E.g., Tandy Corp. v. Comus Int'l, Inc.*, 704 F. Supp. 115, 116 (N.D. Tex. 1987).

through secretary of state insufficient where "none of the businesses mentioned has agents or officers in Texas or does business in Texas, nor did the cause of action arise from business dealings in Texas."); *Frito-Lay, Inc. v. Proctor & Gambell Co*., 364 F. Supp. 243, 250 (N.D. Tex. 1973) ("amenability to service turns on whether a defendant has 'done business' or 'committed a tort' in the forum") (citations omitted).

Here, Cox has done neither. U.S. Video alleges that Cox wrongfully made, imported, used or sold allegedly infringing video-on-demand services. (Complaint, at ¶14.) Cox, however, does not engage in these acts within Texas. (Spalding Decl., ¶¶3, 4.) Cox thus has not committed any tortious act or engaged in any business within Texas from which this action could arise, thereby rendering improper Plaintiff's service of process upon Cox via the Texas Secretary of State.

### 2. Cox Has Insufficient Contacts With Texas Under Constitutional Due Process Requirements To Support General Personal Jurisdiction.

This Court's personal jurisdiction over a non-resident corporate defendant such as Cox is appropriate only if authorized by the Texas Long Arm Statute, which has been construed to be coextensive with constitutional due process requirements. *See Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). This Court thus must determine (1) if Cox has "purposefully availed [it]self of the benefits and protections" of Texas by establishing "minimum contacts" with Texas; and (2) whether exercising jurisdiction over Cox would "offend 'traditional notions of fair play and substantial justice.'" *Alpine View Co.,* 205 F.3d at 215 (citations omitted).

In evaluating "minimum contacts," the Court may look both to evidence of minimum contacts that would support specific personal jurisdiction – that is, contacts that are related to the subject matter of the litigation, and the more extensive contacts that would support general

jurisdiction – contacts that are unrelated to the instant cause of action. *See Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1200 (Fed. Cir. 2003) (evidence of substantial, systematic, continuous contacts with the forum state may support general jurisdiction ); *Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995) (evidence to support specific jurisdiction includes defendant's activities purposefully directed at the forum, out of which the cause of action arises). Here, U.S. Video has shown no facts sufficient to support either general or specific jurisdiction.

General jurisdiction exists when a court exercises jurisdiction in an action not arising out of Cox's specific contacts with Texas. *Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984). The Court explained that for causes of action unrelated to forum activities, jurisdiction may be proper "when there are sufficient contacts between the State and the foreign corporation." *Id.* at 414. Only the presence of substantial, regular and systematic contacts that are qualitatively different from contacts sufficing for specific jurisdiction allow a defendant to foresee being haled before a Texas court. For example, property ownership does not establish general jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977). Nor does purchasing or selling products within the state alone establish general jurisdiction. *Helicopteros*, 466 U.S. at 418.

Cox is a Delaware corporation that is not registered or even qualified to do business in Texas because it does none here. (Spalding Decl., ¶3.) Cox does not provide services to any customers in Texas. (*Id.*) Cox does not operate or maintain offices or even books or records in Texas. (*Id.*) This case is like the patent case in *Tandy Corp. v. Comus Int'l, Inc.*, 704 F. Supp. at 118-19 (N.D. Tex. 1987, in which the court concluded that it lacked general jurisdiction over a defendant who lacked the kinds of qualitative minimum contacts required by the Supreme Court to satisfy Constitutional due process. The defendant Comus did not lease or own Texas property,

7

was not licensed to do business in Texas, and maintained no bank accounts, phone listings, or employees here. *Id.* Like Comus, Cox has no "continuous and systematic general business contacts" with Texas.

U.S. Video has not alleged any facts relevant to personal jurisdiction, aside from the conclusory (and erroneous) allegation that "Cox is doing business in Texas."[2] (Complaint, at ¶3.) In fact, Cox is <u>not</u> doing business in Texas and has neither the "substantial, systematic, and continuous contacts" that would support general jurisdiction nor the specific, litigation-related contacts that would support specific personal jurisdiction. Cox does not have any property, offices, employees, records, or other assets in Texas. Cox does not offer, sell, or otherwise provide any telecommunications services in Texas, much less digital cable systems services or "video-on-demand" services. *See generally*, Spalding Declaration, Exhibit A. Cox's minimal contacts with Texas are <u>not</u> such that maintenance of U.S. Video's suit would "not offend traditional notions of fair play and substantial justice," because Cox could <u>not</u> reasonably have anticipated being haled into Texas court. *International Shoe Co. v. Washington*, 326 U.S. 310,. 316 (1945) (internal quotation omitted). In short, no substantial contacts between Texas and Cox exist to make reasonable the exercise of personal jurisdiction over Cox.

### 3. Cox is Not Subject to Specific Jurisdiction Because it has No Contacts with Texas Related to U.S. Video's Claim.

U.S. Video likewise cannot carry its burden of establishing minimum contacts necessary to show specific personal jurisdiction because it cannot show any contacts between Cox and Texas that are related to its claims. Only by meeting three requirements can such specific

---

[2]   According to U.S Video, Cox is "organized under the laws of the State of Delaware . . .is doing business in Texas . .  and has a principal place of business in Atlanta, GA,"  Complaint at ¶3, and that Cox "operates digital cable systems in which it provides video-on-demand (VOD) services . . . [and] provides its subscribers with digital set-top boxes to enable access to the VOD services." *Id.* at ¶15.

jurisdiction be shown.  First, the defendant must have "'purposefully directed' its activities at residents of the forum."  *Inamed*, 249 F.3d at 1356.  Second, the claim must "'arise[] out of or relate[] to' the defendant's activities within the forum."  *Id.*  Third, the exercise of personal jurisdiction must be reasonable and fair.  *Id.*  None of these requirements can be shown here.

Undoubtedly, using the accused video-on-demand services within Texas could show that Cox purposefully directed its actions toward Texas residents.  But Cox does not offer such services in Texas – and neither have any of its affiliates.  (Spalding Decl., ¶¶ 3,6,7.)  U.S. Video thus cannot demonstrate any facts that could meet its burden of showing that its claims to arise out of or relate to Cox's alleged, but unproven, actions in Texas.  As a result, there can be no specific personal jurisdiction.

### 4.    Actions of Cox's Affiliates Do Not Matter for Personal Jurisdiction Purposes.

Cox does not do business in Texas.  (Spalding Decl., ¶3.)  It is settled law that the activities of Cox's affiliated companies, some of which have done business in Texas, are irrelevant to determining whether Cox has sufficient contacts with Texas to support jurisdiction.  *See Cannon Mfg. Co. v. Cudahy Packing Co*., 267 U.S. 333 (1925) (subsidiary's acts in North Carolina not imputed to parent for jurisdictional purposes); *Phonometrics, Inc. v. Northern Telecom Inc*., 133 F.3d 1459, 1468 (Fed. Cir. 1998) (Sprint not subject to jurisdiction in Florida despite activities of its United Telephone subsidiary); *Hargrave v. Fibre Board Corp*., 710 F.2d 1154, 1159 (5th Cir. 1983) ("Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there."); *Dunn v. Svitzer*, 885 F. Supp. 980, 987 (S.D. Tex. 1995) ("As long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in the forum may not be attributed to the other.*"); Entek Corp. v. Southwest Pipe and Supply Co*., 683 F. Supp. 1092, 1104-05 (N.D. Tex. 1988) (no jurisdiction over parent corporation for subsidiaries' acts in Texas

9

in the absence of an allegation of a lack of formal separation between parent and subsidiaries and absence of greater control than "normally associated with common ownership and directorship"). Cox and its affiliates share the same name and webpage, but that is insufficient where the Federal Circuit has cautioned in this context that "the corporate form is not to be lightly cast aside." *3D Sys.*, 160 F.3d at 1380-81 (no jurisdiction over out-of-state parent company of alleged infringer). *See also, e.g., Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1301 (S.D. N.Y. 2003) (subsidiary Sprint Spectrum L.P.'s use "Sprint" trade name "was not a sufficient basis for establishing personal jurisdiction" over its parent); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D. N.Y. 2001) (parent's failure to distinguish between itself and subsidiary on webpage and in annual report did not support exercise of personal jurisdiction).

Here, as noted, Plaintiff has simply sued the wrong party. Cox is not responsible for its affiliates' actions and Plaintiff cannot point to the affiliates' contacts to justify this action. U.S. Video has not even alleged, and cannot show, that there is anything other than a normal parent-subsidiary relationship between Cox and its affiliates. It thus cannot ignore the corporate forms.

Moreover, Plaintiff cannot now amend its complaint to add such affiliates – especially where one of Cox's affiliates has already initiated a declaratory judgment action in Delaware, the most appropriate forum for resolving this dispute. *See* Exhibit B. Even if an amendment were sought or allowed, however, such an amendment would not relate back to the filing of plaintiff's original Complaint under Fed. R. Civ. P. 15 because plaintiff could (and should) have known for some time about these others yet purposefully chose not to name them. *See, e.g., Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metro. Bottling Co.*, 785 F. Supp. 514, 516 (E.D. Pa. 1992) (no relation back under Rule 15(c) because "an amendment should relate back only where there has been an error made concerning the identity of the proper party" and

10

the proposed defendant may have believed plaintiff made a deliberate choice rather than a mistake); *Naxon Telesign Corp. v. GTE Information Sys., Inc.*, 89 F.R.D. 333, 337-38 (N.D. Ill. 1980) (filing of patent infringement action against corporate parent did not relate back to original complaint against the parent's subsidiary).

**B.      If Plaintiff May Pursue this Action Against Cox, Delaware is the Appropriate Forum.**

Cox joins and incorporates by reference herein the motion for transfer filed by Defendant Comcast on August 10, 2006.  (Docket Entry No. 18)  Cox's case for transfer is, however, even stronger, given that Cox does nothing in Texas, much less anything relevant to the subject-matter of this case.  There are thus no local interests to counter the clear public interest in efficient and consistent resolution of claims.  The convenience of the parties, neither of which resides or does business in Texas, clearly favors transfer.  Moreover, U.S. Video is estopped by its own sworn assertions in the MovieLink matter from contesting that Delaware is an appropriate and convenient forum.

**1.      Cox's Lack of Jurisdictional Contacts Renders Texas an Improper Forum for this Action.**

Venue in patent suits is proper a) where the defendant resides, which for corporate defendants includes any forum in which they are amenable to personal jurisdiction, or b) where the defendant has infringed and has a regular and established place of business.  28 U.S.C. §§ 1391, 1400.   Cox is not subject to personal jurisdiction in Texas and has no place of business there.   *Supra*.   Cox is, however, subject to personal jurisdiction in Delaware because it is incorporated there.  (Complaint at ¶6.)  Delaware, therefore, is the proper forum for Plaintiff's suit.

11

2. **Delaware is the Proper, More Convenient Forum for Resolving Plaintiff's Claims.**

As stated, Cox has done nothing that would support Plaintiff's claims for infringement. Even if Plaintiff were able to pursue this action against Cox, and even if jurisdiction and venue were proper, this Court may, "[f]or the convenience of parties and witnesses [and] in the interest of justice," transfer this action "to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). This provision and the Federal Rules allow for severing and transferring a cause of action against one defendant to a different forum while maintaining plaintiff's action against other defendants in the original forum. *See* Fed. R. Civ. P. 21 ("Any claim against a party may be severed and proceeded with separately."). At minimum, given the absence of contacts with Texas and in light of the "public and private interest factors" discussed in Comcast's motion, the Court should transfer Plaintiff's claim against Cox to the District of Delaware.

Comcast's motion demonstrated numerous grounds for transfer. In addition, the propriety of transfer is further buttressed by U.S. Video's previous insistence in the *MovieLink* litigation that the District of Delaware was the appropriate venue in which to bring its infringement claims based on the '792 patent, because the District of Delaware was its "home district." When a party has succeeded in obtaining a ruling on the basis of its factual and legal arguments, that party may not turn to a different court and seek an inconsistent advantage by pursuing an incompatible argument. *See Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed"), *In re Coastal Plains, Inc*., 1779 F.3d 197, 205-06 (5th Cir. 1999) (equitable doctrine of judicial estoppel precludes a litigant from

12

taking inconsistent positions in successive litigations); *see also* Wright & Miller, 18B Fed. Prac. & Proc. Juris.2d § 4477 (discussing judicial estoppel or "preclusion of inconsistent positions").[3] Indeed, U.S. Video should be judicially estopped from taking any inconsistent position concerning venue in Delaware.  Because the Delaware court ruled in favor of U.S. Video and denied MovieLink's motion to transfer, see Order of January 9, 2004, attached as Exhibit C, U.S. Video may not now turn to this Court and assert inconsistent venue arguments.

## IV.    CONCLUSION

For the reasons stated above, the Court should grant Cox Communications, Inc.'s Motion to Dismiss For Lack of Personal Jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). Alternatively, the Court should transfer this matter to the District of Delaware, pursuant to 28 U.S.C. § 1404(a).

Respectfully submitted, this 14th day of August, 2006.


OF COUNSEL:
Matthew B. Lehr
Suong T. Nguyen
Duane Nash
Yiping Liao
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park CA  94025
Telephone:  650-752-2000
Facsimile:  650-752-2111

               /s/
Mitchell G. Stockwell
Lead Attorney
Georgia Bar No. 682912
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555

---

[3]    Judicial estoppel protects the finality of decisions and promotes consistency of disposition by preventing a party from "playing fast and loose" with the judicial system and taking contradictory positions to serve its self interests.  *See Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988).

US2000 9429628.2

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX  75710-0359
Telephone:  903-597-8311
Facsimile:  903-593-0846

**Attorneys for Cox Communications, Inc.**

14

# CERTIFICATE OF CONFERENCE

This is to certify that Candice C. Decaire, counsel for Defendants Cox Communications, Inc., has conferred with Edward Goldstein, counsel for Plaintiff, regarding the matters included in this motion. Counsel for Plaintiff states that this motion is OPPOSED.

_____/s/_____
Candice C. Decaire

US2000 9429628.2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORP., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2-06cv-239 |
| v. | ) ) | Honorable Ron Clark |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS INC. COMCAST CABLE; COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | ) ) ) ) ) ) ) ) | JURY |
| Defendants. | ) ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 14th day of August, 2006. Any other counsel of record will be served by first class mail.

_____
/s/
Mitchell G. Stockwell

16

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff(s), | ) ) ) | |
| v. | ) ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | ) ) ) ) ) ) ) ) | Case No.: 2-06CV-239 (RC) |
| Defendant(s). | ) ) ) ) | |

## DECLARATION OF JOHN SPALDING

1.     I, John Spalding, am employed by Cox Communications, Inc., as Vice President,

Government Affairs.  My responsibilities include oversight of mergers and acquisitions and

corporate records.

2.     Cox Communications, Inc. is incorporated in Delaware with its principal place of

business in Atlanta, Georgia.

3.     Cox Communications, Inc. is not registered to do business in Texas, does not operate any

offices in Texas, and does not keep any corporate books or records in Texas.  Cox

Communications, Inc. does not provide cable television services or "video-on-demand" services in Texas.

4.      Under an Asset Transfer Agreement dated October 31, 2005, several of the affiliates of Cox Communications, Inc. sold their Texas assets used in the operation of cable television systems. The sale closed on May 5, 2006.

5.      All material Texas assets of the affiliates of Cox Communications, Inc. were transferred, with the exception of the Henderson, Texas cable television franchise, which is under third party management pursuant to a Management Agreement dated May 5, 2006. The Henderson franchise, which expires in 2007, was not transferred to the buyer solely because the city government withheld its consent to the transfer.

6.      Since the May 5, 2006 sale of the Texas assets, none of the affiliates of Cox Communications, Inc. have offered cable television services in Texas.

7.      None of the affiliates of Cox Communications, Inc. have ever provided "video-on-demand" services in Texas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2006.

John Spalding

2

**Exhibit B**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COXCOM, INC.                        )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        C. A. No. _____
                                    )
USA VIDEO TECHNOLOGY CORP.,         )
                                    )
                Defendant.          )

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Coxcom, Inc. ("Coxcom"), files this original complaint for declaratory judgment relief against Defendant, USA Video Technology Corporation ("USVO"), and avers as follows:

## PARTIES

1.      Plaintiff Coxcom is a corporation organized under the laws of the State of Delaware with its principal place of business at 1400 Lake Hearn Dr., Atlanta, GA 30319.

2.      On information and belief, USVO is a corporation organized under the laws of the State of Connecticut with its principal place of business at 83 Halls Road, P.O. Box 245, Old Lyme, Connecticut 06371.

## JURISDICTION AND VENUE

3.      This action is for declaratory relief of non-infringement, invalidity and/or unenforceability of U.S. Patent No. 5,130,792 ("the 792 patent") that arises under the United States patent laws (35 U.S.C. §§ 101, et. seq.). The Court has subject matter jurisdiction over this action pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202) and 28 U.S.C. §§ 1331 and 1338.

4.     This Court has general and specific personal jurisdiction over USVO because USVO transacts business within this judicial district (Delaware), and because USVO has purposefully availed itself of the laws and protection of the courts in Delaware in filing a prior patent infringement action based on the same 792 patent in the United States District Court for the District of Delaware. This prior patent infringement action was captioned *USA Video Technology Corporation v. Movielink, LLC,* C.A. No. 03-368-KAJ ("USVO v. Movielink litigation").

5.     The USVO v. Movielink litigation related to alleged infringement, invalidity, and unenforceability of the 792 patent. This action related to a declaration that Coxcom has not infringed the 792 patent.

6.     The present action is related to the USVO v. Movielink litigation under Local Rule 3.1(b) because it at least involves the same patent.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 1400(b).

## APPREHENSION OF IMMINENT LEGAL ACTION BY USVO

8.     On June 13, 2006, USVO filed a complaint in the United States District Court for the Eastern District of Texas ("Texas Action") alleging that multiple defendants, including Cox Communications, Inc., an affiliate of Coxcom, infringe the 792 patent by operating digital cable systems in which they provide video-on-demand (VOD) services to their subscribers and by providing their subscribers with digital set-top boxes to enable access to the VOD services. Other defendants in the Texas Action include various other cable television companies. A copy of the 792 patent is attached as

2

Exhibit A. A copy of the complaint filed in the Texas Action (excluding the 792 patent) is attached as Exhibit B.

9.       By virtue of the allegations against Cox Communications, Inc. and other cable television operators, Coxcom has a real and reasonable apprehension that USVO is also intending to file suit against Coxcom alleging infringement of the 792 patent and threatening to seek injunction of Coxcom's business activities of operating digital cable services.

## DECLARATORY JUDGMENT COUNT

## (NONINFRINGEMENT, INVALIDITY AND/OR UNENFORCEABILITY OF THE 792 PATENT)

10.      Coxcom restates and realleges the allegations set forth in paragraphs 1 through 9 above and incorporates them by reference.

11.      Coxcom has not directly infringed, contributed to the infringement, or actively induced the infringement of any claim of the 792 patent, nor has it otherwise committed any acts of infringement on any rights of USVO.

12.      Upon information and belief, the claims of the 792 patent are invalid under 35 U.S.C. §§ 102, 103 and/or 112.

13.      Upon information and belief, the relief sought by USVO is barred by waiver, laches, estoppel or acquiescence and, therefore, the 792 patent is unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Coxcom prays for the following:

1.  A judgment and declaration that Coxcom has not infringed and does not infringe in any manner any claim of the 792 patent, directly, contributorily or by inducement, and has not otherwise infringed or violated any rights of USVO.

2.  A judgment that each claim in the 792 patent is invalid and unenforceable.

3.  An injunction against USVO and its affiliates, subsidiaries, assigns, employees, agents or anyone acting in privity or concert with USVO from charging infringement or instituting any legal action for infringement of the 792 patent against Coxcom or anyone acting in privity with Coxcom, including the divisions, successors, assigns, agents, suppliers, manufacturers, contractors and customers of Coxcom.

4.  A judgment and declaration that this is an exceptional case within the meaning of 35 U.S.C. § 285, entitling Coxcom to an award of its reasonable attorneys' fees, expenses and costs in this action.

5.  A judgment for such other and further relief in law or in equity as this Court deems just or proper.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Mitchell G. Stockwell
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, GA 30309
mstockwell@kilpatrickstockton.com
Tel: (404) 815-6500

Dated: June 19, 2006

By: _____
Richard L. Horwitz (#2246)
Kenneth L. Dorsney (#3726)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
kdorsney@potteranderson.com

Attorneys for Plaintiff CoxCom, Inc.

737550

4

**Exhibit C**

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-368-KAJ |
| | ) | |
| MOVIELINK, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons stated in open court on January 8, 2004,

IT IS HEREBY ORDERED that defendant's Motion to Transfer Case to the

Central District of California (D.I. 28), is DENIED.

UNITED STATES DISTRICT JUDGE

January 9, 2004
Wilmington, Delaware

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff(s), | ) ) | |
| v. | ) ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | ) ) ) ) ) ) ) ) | Case No.: 2-06CV-239 (RC) |
| Defendant(s). | ) ) ) | |

## ORDER GRANTING DEFENDANT COX COMMUNICATIONS INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

After considering Defendant's motion to dismiss and evaluating the issues involved, it is

hereby ORDERED that Plaintiff's action against Cox Communications, Inc. shall be dismissed

for lack of personal jurisdiction.

_____

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff(s), | ) ) | |
| v. | ) ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | ) ) ) ) ) ) ) ) | Case No.:  2-06CV-239 (RC) |
| Defendant(s). | ) ) | |

## ORDER GRANTING DEFENDANT COX COMMUNICATIONS INC.'S MOTION TO TRANSFER TO THE DISTRICT OF DELAWARE

After considering Defendant's motion to dismiss, or in the alternative, to transfer to the District of Delaware, and evaluating the issues involved, it is hereby ORDERED that this action, in its entirety, be immediately transferred to the United States District Court for the District of Delaware.

_____

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | § § § | |
| *Plaintiff*, | § | Civil Action No. 2:06-CV-239 |
| | § | |
| v. | § | |
| | § | JUDGE RON CLARK |
| TIME WARNER CABLE, INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | § § § § § § § § | |
| *Defendants*. | § | |

**ORDER ON DEFENDANTS' MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE
MOTION TO TRANSFER**

Before the court is Defendant Cox Communications, Inc.'s Motion to Dismiss for Lack of

Personal Jurisdiction or, in the Alternative, to Transfer Venue to the District of Delaware [Doc. #

32]. Cox Communications, Inc. ("Cox") states that it does not conduct business in Texas and

that it has no contacts with Texas such that this court can exercise jurisdiction over it. Cox

claims that Plaintiff sued the wrong Cox entity. Plaintiff responds by stating that from public

records it appears Cox and its affiliates conduct business in Texas and it requests limited

discovery on this issue to determine if this court has personal jurisdiction over Cox. Under the

circumstances, the court will allow limited discovery on this issue. The court, therefore, does not

reach the issue of transfer at this time.

1

# I. Background

Plaintiff USA Video Technology ("USVO") filed suit against Comcast Cable Communications, LLC, Comcast of Richardson, LP, Comcast of Plano, LP, and Comcast of Dallas, LP (collectively "Comcast Defendants"), Charter Communications, Inc., Cox Communications, Inc., and Time Warner Cable, Inc. in the Eastern District of Texas, Marshall Division on June 13, 2006. USVO alleges that the Defendants infringe Claim 1 of U.S. Patent No. 5,130,792 (the ` 792 patent). This patent involves systems that communicate video programs to remote locations. This "video-on-demand" process allows a customer to obtain a video program whenever a customer requests it.

Cox states that Plaintiff has sued the wrong company because Cox does not provide "video-on-demand" services and Cox does not own or operate a cable system in Texas. Cox also states that CoxCom, Inc., an affiliate, offers cable communications services. After suit was filed here, CoxCom, Inc. filed a declaratory judgment action in Delaware. Cox itself has not joined in the action in Delaware. Plaintiff filed a separate motion to join CoxCom, Inc. as a Defendant in this suit.

# II. Law and Analysis

## A. Standard of Review for Personal Jurisdiction

Because this a patent case, this court applies the law of the Federal Circuit, rather than that of regional circuits, to determine whether personal jurisdiction exists. *Electronics For Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348 (Fed. Cir. 2003). There are two types of personal jurisdiction – specific and general. *Id.* at 1349. Under general jurisdiction, the exercise of jurisdiction is proper where the defendant has continuous and systematic contacts with the forum

state, even if those contacts are not related to the cause of action.  *Id.* at 1349.

Determining whether specific personal jurisdiction over a nonresident defendant is proper entails two inquiries: (1) whether the long-arm statute of the forum state confers personal jurisdiction over the defendant; and (2) whether the exercise of such jurisdiction by the forum state is consistent with due process.  *Id* at 1349.[1]  Texas' long arm statute has been interpreted to extend to the limits of due process.  *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). Therefore, the question is whether Defendant's contacts with the State are sufficient to satisfy due process. *Electronics For Imaging, Inc.*, 340 F.3d at 1350.

Whether due process is satisfied requires the court to consider whether Defendant has certain "minimum contacts" with the forum state, and whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.  *Electronics For Imaging, Inc.*, 340 F.3d at 1350.  In making this determination, the Federal Circuit has stated that three factors must be considered: (1) whether the defendant purposefully directed its activities at the residents of the forum state, (2) whether the claim arises out of or relates to those activities, and (3) whether assertion of personal jurisdiction is reasonable and fair.  *Id.*  The first two factors correspond with the "minium contacts" analysis and the third factor corresponds with the traditional notions of fair play and substantial justice.  *Id.*  Plaintiff bears the initial burden to prove a prima facie case that Defendant has minimum contacts with the forum state.  *Id.* Defendant bears the burden to show that the exercise of jurisdiction would violate the traditional notations of fair play and

---

[1]The Federal Circuit has stated "the question of which Due Process Clause controls the personal jurisdiction inquiry becomes purely academic because this court, though professing reliance on the Fifth Amendment, applies the Fourteenth Amendment state-contacts test of *International Shoe*."  *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1358 n.*. (Fed. Cir. 1998).

3

substantial justice.  *Id.*

**B. Request for Discovery**

 Plaintiff submitted several documents which show that at one point Cox marketed

products and services in Texas, that Cox owns mineral rights in Texas, and that Cox has several

affiliates which conducted business in Texas and which still own a cable television franchise in

Henderson, Texas.  Defendant Cox states that it does not offer any services in Texas, that Cox's

affiliates are all separate entities, and that the affiliates were all party to an asset transfer

agreement by which all assets in Texas, except the Henderson franchise, were sold as of May 5,

2006.  Plaintiff asserts that discovery is needed to determine the extent and nature of Cox's

contacts with Texas.

 At this stage, the court must resolve any factual conflicts in favor of Plaintiff and view the

evidence in the light most favorable to Plaintiff.  *See Electronics for Imaging, Inc.*, 340 F.3d at

1349.  Discovery is appropriate where the existing record is inadequate to support personal

jurisdiction and a party demonstrates that it can supplement its jurisdictional allegations through

discovery.  *Trintec Industries, Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1283

(Fed. Cir. 2005).

 The record before the court suggests that at one point Cox marketed products and services

in Texas and that Cox's affiliates conducted business in Texas.   The record, however, does not

show the nature and extent of Cox's contacts with Texas.  Plaintiff has not presented evidence

which shows that Cox has continuous and systematic contacts with Texas (for general

jurisdiction), or that Cox marketed or sold any of the accused services or products in Texas (for

specific jurisdiction).  Moreover, the record does not reveal the relationship between Cox's

4

affiliates and Cox.[2]

    While Plaintiff's evidence alone is inadequate to support a finding of personal jurisdiction, Plaintiff did present some evidence that Cox and it affiliates conduct business in Texas.[3]  Under these circumstances, the court will allow Plaintiff to depose the Rule 30(b)(6) corporate representative(s) with knowledge of any business activities conducted by Cox and/or its affiliates in Texas, and the relationship between Cox and its affiliates.  Defendant Cox shall make the Rule 30(b)(6) representative(s) available for deposition(s) by October 6, 2006.  Plaintiff shall have until October 20, 2006 to supplement its response, or Defendant Cox will be dismissed from this case for lack of personal jurisdiction.

    IT IS THEREFORE ORDERED that Plaintiff is allowed limited discovery on the issue of whether this court has personal jurisdiction over Defendant Cox Communications, Inc.  Plaintiff is allowed to depose the Fed. R. Civ. P. 30(b)(6) corporate representative(s) with knowledge of any business activities conducted by Cox Communications, Inc. and/or its affiliates in Texas, and the relationship between Cox Communications, Inc. and its affiliates.  The deposition(s) should be conducted pursuant to the Federal Rules of Civil Procedure.  If more than one deposition is

---

[2]In some circumstances the contacts of an affiliate may be attributed to the parent company for the purposes of establishing minimum contacts with the forum.  *See Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1272 (Fed. Cir. 1998).  In analyzing whether the contacts of an affiliate are imputed to another entity, the Federal Circuit follows the law of other courts of appeals.  *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 285 F.3d 1360, 1380 (Fed. Cir. 2004).  The Fifth Circuit has stated that under Federal and Texas law, a parent company which totally dominates and controls its subsidiary, operating the subsidiary as its business conduit or agent, is liable for the conduct of the subsidiary.  *U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985).

[3]Plaintiff seems to make a separate argument regarding whether this court has personal jurisdiction over CoxCom, Inc.  This argument will be relevant to determining whether this court allows Plaintiff to join CoxCom, Inc. as an additional defendant.

conducted, the total time for these depositions will be limited to ten (10) hours.

IT IS FURTHER ORDERED that Defendant Cox Communications, Inc. shall make the Rule 30(b)(6) representative(s) available for deposition by October 6, 2006. Plaintiff shall have until October 20, 2006 to supplement its response or Defendant Cox Communications, Inc. will be dismissed from this case for lack of personal jurisdiction.

So **ORDERED** and **SIGNED** this **8** day of **September, 2006.**

_____
Ron Clark, United States District Judge

EXHIBIT D

ORIGINAL

(35)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| USA VIDEO TECHNOLOGY CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>MOVIELINK LLC,<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 03-368-KAJ

## PLAINTIFF USA VIDEO TECHNOLOGY CORPORATION'S
## ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANT MOVIELINK'S MOTION TO TRANSFER

MORRIS, JAMES, HITCHENS &WILLIAMS LLP
Richard D. Kirk (#922)
222 Delaware Avenue - 10th Floor
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6960

*Attorneys for Plaintiff*

Of Counsel:

STEPTOE & JOHNSON LLP
J. William Koegel, Jr.
Jeffrey T. Hsu
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
(202) 429-3000

November 19, 2003

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS ....................................................1

II.    SUMMARY OF ARGUMENT ........................................................................2

III.    ARGUMENT ...............................................................................................3

    A.    A Motion for Transfer Is Considered Under the Factors In *Jumara*, and Not the "Center of Gravity" Analysis. ...................................................................3

    B.    USVO's Choice of Forum is Entitled to Deference. ....................................5

        1.    USVO Chose Delaware Because this State has Jurisdiction Over Movielink. ................................................................................6

        2.    Delaware Is a Neutral, Experienced and Convenient Forum for Both Parties. ....................................................................................7

        3.    Movielink Infringes the '792 Patent in Delaware. .......................8

        4.    USVO's Choice of Delaware was Rational. ..................................9

    C.    The Convenience of The Parties and Witnesses As a Whole Does Not Support Transfer to the Central District of California. ...........................................10

        1.    Movielink Would Not Be "Unusually or Oppressively Burdened" by Litigating this Case in Delaware. ..............................................12

        2.    Litigating the Action in Delaware Would Not Be More Inconvenient for Third Party Witnesses. ...........................................................13

    D.    A Transfer to California is Not in the Interests of Justice. ......................14

IV.    CONCLUSION .........................................................................................15

## TABLE OF AUTHORITIES

Ade Corp. v. Kla-Tencor Corp., 138 F. Supp. 2d 565 (D. Del. 2001)....................................4, 7, 13

Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192 (D. Del. 1998) ............................................12

Bordiga v. Directors Guild of America, 159 F.R.D. 457 (S.D.N.Y. 1995) ......................................3

Brunswick Corp. v. Precor Inc., 2000 U.S. Dist. LEXIS 22222 (D. Del. 2000) .............................9

C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556 (D. Del. 1998)................................5, 9, 11, 13

Chase Manhattan Bank v. Freedom Card, Inc., 265 F. Supp. 2d 445 (D. Del. 2003) .................4, 6

Clark v. Burger King Corp., 255 F. Supp. 2d 334 (D.N.J. 2003) ...................................................11

Clopay Corp. v. Newell Companies, Inc., 527 F. Supp. 733 (D. Del. 1981)....................................3

Critikon, Inc. v. Becton Dickinson Vascular Access, 821 F. Supp. 962 (D. Del. 1993)..................5

Datex-Ohmeda, Inc. v. Hill-Rom Services, Inc., 185 F. Supp. 2d 407 (D. Del. 2002) ...............4, 7

Joint Stock Society v. Heublein, Inc., 936 F. Supp. 177 (D. Del. 1996) ............................5, 6, 9, 12

Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995) .................................................. passim

Magee v. Essex-Tec Corp., 704 F. Supp. 543 (D. Del. 1988) .........................................................9

Manzano v. Mid-Atlantic Coca-Cola Bottling Co., Inc., 2000 WL 250226 (E.D. Pa.
    2000) ........................................................................................................................................11

Motorola, Inc. v. PC-Tel, Inc., 58 F. Supp. 2d 349 (D. Del. 1999) ....................................5, 11, 13

Quantel Ltd. v. Adobe Systems, Inc., 1996 U.S. Dist. LEXIS 21651 (D.Del. 1996).....................7

Ricoh Co., Ltd. v. Aeroflex Inc., 279 F. Supp. 2d 554 (D. Del. 2003).........................................3, 4

Ricoh Co. v. Honeywell, Inc., 817 F. Supp. 473 (D.N.J. 1993) .......................................................3

Saint-Gobian Calmar, Inc. v. Nat'l Products Corp., 230 F. Supp. 2d 655 (E.D. Pa. 2002) ............4

Thorn EMI North America, Inc. v. Micron Tech., Inc., 821 F. Supp. 272 (D. Del. 1993) .............8

Waldman v. Delaware Park, L.L.C., 2000 WL 33416863 (D.N.J. 2000)......................................11

Wechsler v. Macke International Trade, Inc., 1999 WL 1261251 (S.D.N.Y. 1999).......................3

Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 157 F.R.D. 215 (D. Del. 1993)........... *passim*

**STATUTES**

28 U.S.C. § 1404(a) .......................................................................................................3

Fed.R.Civ.P. 9(b), 12(b)(6) ............................................................................................2

Fed. R. Civ. P. 26(a) ....................................................................................................12

Fed. R. Civ. P. 45 .........................................................................................................13

Plaintiff USA Video Technology Corporation ("USVO") respectfully submits this memorandum in opposition to Defendant Movielink LLC's ("Movielink") motion to transfer this action to the Central District of California [D.I. 28]. In moving to transfer, Movielink has applied the wrong standard to determine whether a transfer is warranted. Worse yet, under the applicable standard, Movielink has quite clearly failed to meet its heavy burden of overcoming USVO's choice of forum by showing that the balance of conveniences *strongly* favors transfer. The Court should deny the motion.

## I.    NATURE AND STAGE OF PROCEEDINGS

This is an action for patent infringement. USVO is the owner of United States Patent No. 5,130,792 (the "'792 Patent"), entitled "Store and Forward Video System", and issued by the United States Patent and Trademark Office on July 14, 1992. Complaint at ¶ 9 [D.I. 1]. USVO is a small business, based in Connecticut. Complaint at ¶¶ 1-2 [D.I. 1].

Movielink is the owner and operator of a website (<http://www.movielink.com>) accessible on the Internet and World Wide Web that markets, sells and offers for sale services that allow a user to request a movie and have that movie transmitted in digital form to a remote location, via the Internet, to a device such as a personal computer, for storage and playback. Complaint at ¶ 11. Movielink's members – it is a Delaware LLC with its principal place of business in California – are Warner Bros., Paramount Pictures Corp., Metro-Goldwyn-Mayer, Universal Studios, and Sony Pictures Entertainment.

USVO filed its Complaint for patent infringement on April 10, 2003, alleging that Movielink (and the service it offers) has infringed and continues to infringe the '792 Patent. Movielink filed its Answer on May 30, 2003, along with a counterclaim for patent unenforceability. Movielink admitted "that this Court has personal jurisdiction over Movielink because it is formed under the laws of the State of Delaware." Amended Answer, ¶ 7 [D.I. 6].

On June 19, 2003, USVO moved to dismiss Movielink's counterclaim pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) [D.I. 9]. On July 11, 2003, in response, Movielink submitted an Amended Answer and withdrew the counterclaim (the "Amended Answer") [D.I.15]. The initial Rule 16(b) scheduling conference took place on July 16, 2003. Magistrate Judge Thynge then conducted a teleconference in September 2003 to address alternative dispute resolution with the parties. A mediation conference is scheduled for March 31, 2004.

After the Rule 16 teleconference, the parties served initial disclosures on August 25, 2003[ D.I. 24]. Shortly thereafter, USVO sent a draft protective order to Movielink's counsel. Despite reminders by USVO's counsel and statements by Movielink's counsel that it would provide substantive comments on the draft protective order, Movielink has failed to do so. Instead, on November 4, 2003, some 7 months after filing of the Complaint, Movielink filed its motion to transfer. (the "Motion to Transfer").

## II.     SUMMARY OF ARGUMENT

1.     In its Motion to Transfer, Movielink employs a "center of gravity" analysis. That is demonstrably the wrong standard. The Third Circuit uses a different standard, as set forth in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995). Pursuant to *Jumara,* which is consistently applied in this district, a party moving for transfer bears a heavy burden to show that a number of private and public interests dictate a change of venue. This Movielink has failed to do.

2.     Movielink has not met its burden under *Jumara* of showing that the convenience of the parties strongly favors transfer, or that the third party witnesses would be more convenienced in California than in Delaware. USVO's choice of forum is entitled to deference, especially where the defendant has availed itself of the protections of the laws of Delaware by its formation here. Indeed, USVO's choice is entitled to substantial weight because USVO had

legitimate reasons for filing this case in Delaware. Further, the financial condition of the parties

overwhelmingly contradicts transfer. Given Movielink's size and status as an enterprise engaged

in business throughout the United States, litigating in Delaware is not a substantial burden for

Movielink. Nor has Movielink demonstrated that the transfer of this action to California serves

the interest of justice more than conducting the litigation in Delaware. Movielink is incorporated

in Delaware, its infringing activity occurs as much here as anywhere, and this state has an

interest in deciding patent infringement cases involving defendants that avail themselves of the

benefits of Delaware law.

## III.    ARGUMENT

### A.    A Motion for Transfer Is Considered Under the Factors In *Jumara*, and Not the "Center of Gravity" Analysis.

Movielink admits it is subject to the personal jurisdiction of this Court. Amended

Answer, ¶ 7 [D.I. 15]. Rather than dispute that this action was properly brought in Delaware,

Movielink seeks a transfer of venue under 28 U.S.C. § 1404(a).

Movielink first argues that "[i]n patent litigation, the general rule is that the *center of*

*gravity of the accused activity is the preferred forum.*"[1] Mot. to Transfer, at 8 (emphasis added)

[D.I. 29]. Movielink then dedicates most of its argument to the propositions that "Delaware has

no rational connection with this case" and that "California is the center of gravity for this patent

---

[1] To argue that a "center of gravity" analysis should be employed in this District, Movielink extrapolates from Second Circuit case law: an unpublished Southern District of New York opinion -- *Wechsler v. Macke International Trade, Inc.*, 1999 WL 1261251 *3 (S.D.N.Y. 1999) -- which cites another decision issued by that District -- *Bordiga v. Directors Guild of America*, 159 F.R.D. 457, 462 (S.D.N.Y. 1995); and one District of New Jersey case -- *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473 (D.N.J. 1993). This last case, *Ricoh*, cites the District of Delaware decision in *Clopay Corp. v. Newell Companies, Inc.*, 527 F. Supp. 733 (D. Del. 1981); the *Clopay* decision, however, predates *Jumara*, and is therefore subordinate to that holding.

litigation." Mot. to Transfer, at 8, 10 [D.I. 29]. That argument misses the mark, as it is designed to address the requirements of a standard that is inapplicable in this jurisdiction.

The Third Circuit established the controlling standard for analyzing transfer motions in *Jumara* Not surprisingly, *Jumara* is applied generally in this district in deciding motions to transfer. *See, e.g., Chase Manhattan Bank v. Freedom Card, Inc.,* 265 F. Supp. 2d 445, 450 (D. Del. 2003) (Jordan, J.). More specifically, courts in this circuit consistently apply *Jumara* to motions to transfer patent cases. *See, e.g., Ricoh Co., Ltd. v. Aeroflex Inc.,* 279 F. Supp. 2d 554 (D. Del. 2003) (*Jumara* applied to motion to transfer patent action); *Saint-Gobian Calmar, Inc. v. Nat'l Products Corp.,* 230 F. Supp. 2d 655 (E.D. Pa. 2002) (same); *Datex-Ohmeda, Inc. v. Hill-Rom Services, Inc.,* 185 F. Supp. 2d 407, 413 (D. Del. 2002) (same); *Ade Corp. v. Kla-Tencor Corp.,* 138 F. Supp. 2d 565, 568 (D. Del. 2001).

Under *Jumara*, the burden is on the movant to demonstrate that the transfer would serve the convenience of the parties, the witnesses, and the interests of justice. *See Jumara,* 55 F.3d at 879; *Ade Corp.,* 138 F. Supp. 2d at 568. Under *Jumara,* the "private interests" to be considered include:

(i)     plaintiff's forum preference as manifested in the original choice;

(ii)    the defendant's preference;

(iii)   whether the claim arose elsewhere;

(iv)    the convenience of the parties as indicated by their relative physical and financial condition;

(v)     the convenience of the witnesses (to the extent that the witnesses may actually be unavailable for trial in one of the fora); and

(vi)    the location of books and records (to the extent that the files could not be produced in the alternative forum).

- 4 -

*Jumara,* 55 F.3d at 879. The public interests under consideration include the local interest in deciding local controversies at home. *Id.* at 889-880.

Significantly, a party moving for transfer bears a substantial burden. A transfer is warranted only if the moving party can show both: (1) that the transfer would increase the aggregate convenience of the parties and would be in the interests of justice, <u>and</u> (2) that the strength of these factors significantly outweighs the importance of respecting the plaintiff's choice of forum. *Joint Stock Society v. Heublein, Inc.,* 936 F. Supp. 177, 185 (D. Del. 1996). The Court should deny the transfer if the factors are evenly balanced or weigh only slightly in favor of transfer. *Critikon, Inc. v. Becton Dickinson Vascular Access,* 821 F. Supp. 962, 964 (D. Del. 1993). Here, Movielink has failed to recognize, let alone satisfy, its heavy burden. Indeed, application of the *Jumara* factors to this action leads unavoidably to the conclusion that this case belongs in Delaware, not California.

**B.    USVO's Choice of Forum is Entitled to Deference.**

"A plaintiff's choice of forum is a paramount consideration in any determination of a transfer request, and the court should not disturb the plaintiff's choice lightly." *Joint Stock Society,* 936 F. Supp. at 185 (citations omitted); *see also Jumara,* 55 F.3d at 879; *C.R. Bard, Inc. v. Guidant Corp.,* 997 F. Supp. 556, 562 (D. Del. 1998); *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,* 157 F.R.D. 215, 218 (D. Del. 1993). Even where the plaintiff's choice of forum is not its "home turf," that choice is still given paramount consideration.[2] *See Motorola, Inc. v. PC-Tel, Inc.,* 58 F. Supp. 2d 349, 357 n. 10 (D. Del. 1999). And where the choice of forum was

---

[2] "'Home turf' now refers to the forum closest to the plaintiff's residence or principal place of business in which the party can effect personal service over the principal defendant." *Joint Stock Society,* 936 F. Supp. at 186 (citation omitted). To the extent that Movielink asserts that it is not subject to jurisdiction in Connecticut, the Court should regard Delaware as USVO's home turf.

predicated on "legitimate and rational" concerns, "[d]eference is especially due" to that choice. *Joint Stock Society*, 936 F. Supp. at 185-86 (quoting *Waste Distillation Technology, Inc. v. Pan American Resources, Inc.*, 775 F. Supp. 759, 764 (D. Del. 1991)).

USVO chose to file in the District of Delaware for at least three legitimate and rational reasons: (1) jurisdiction over Movielink exists in Delaware because Movielink was formed here; (2) this is a neutral, experienced and convenient forum for both parties; and (3) USVO's claims are related to this forum because Movielink infringes the '792 Patent in Delaware.

> **1.   USVO Chose Delaware Because this State has Jurisdiction Over Movielink.**

Delaware is one of Movielink's "homes." *See Wesley-Jessen Corp.*, 157 F.R.D. at 218 (based on its incorporation in Delaware, "[i]n some senses, Delaware is Visioncare's home.") *See, also, Chase Manhattan Bank,* 265 F.Supp.2d at 450 (choice of forum was rational because one of the parties was incorporated in Delaware).

USVO filed this litigation in Delaware rather than in Connecticut (USVO's principal place of business) in part to mitigate the possibility that meritless jurisdiction or venue motions would delay a hearing, and potential relief, on the merits of its claims. USVO chose this neutral forum precisely because Movielink is incorporated here, USVO could effect personal service on Movielink, and because the infringement occurs as much here as anywhere.

Moreover, Movielink cannot now complain that another corporation has decided to bring suit against it in Delaware. By choosing to form itself in Delaware, Movielink willingly accepted both the benefits and burdens that come with that status:

> In developing their business plans, managers may not be able to anticipate having to defend litigation in all of the states where their corporation does business. They should, however, expect that the corporation may have to respond to litigation both at their principal place of business and in their state of incorporation.

- 6 -

*Wesley-Jessen Corp.*, 157 F.R.D. at 218. Consequently, absent some showing of a unique or unexpected burden, a company should not succeed in arguing that litigation in its state of incorporation is inconvenient. *Ade Corp.*, 138 F.Supp.2d at 572. That is particularly so here, as *each of Movielink's five members is also incorporated in Delaware.*[3]

> **2. Delaware Is a Neutral, Experienced and Convenient Forum for Both Parties.**

Delaware is a neutral forum for both parties. The Central District of California is not. USVO has no presence in that district, a district where Movielink has its principal place of business and where its members, all large movie studios, operate one of the largest local industries. For USVO, Hollywood is not a level playing field.

There is a concomitant advantage to litigating this action here: <u>this district is particularly</u> <u>conversant with patent cases.</u> *See, e.g., Quantel Ltd. v. Adobe Systems, Inc.*, 1996 U.S. Dist. LEXIS 21651 (D.Del. 1996) (denying motion to transfer patent action to California on grounds that, *inter alia*, Delaware courts have substantial experience with patent infringement claims.) Moreover, because this District has a relatively clear body of case law on when a court will transfer a patent case, by filing here rather than in Connecticut, USVO expected that it could avoid the unnecessary and unproductive expense of a battle over a change of venue.

---

[3]    According to the Movielink website, Movielink LLC was formed in August 2001 as a joint venture among Metro-Goldwyn-Mayer Studios, Paramount Pictures ("MGM"), Sony Pictures Entertainment, Warner Bros. and Universal Pictures. Paramount Pictures and Sony Pictures Entertainment are incorporated in Delaware. MGM's filings with the Securities and Exchange Commission ("SEC") indicate that MGM On Demand Inc. (a Delaware corporation) is an investor in Movielink and believed to be a member. MGM SEC Form 10-K for 2002, filed Feb. 10, 2003. Vivendi Universal Entertainment LLLP, which is affiliated with Universal Pictures, also is a Delaware entity and is believed to be a Movielink member. Vivendi Universal S.A., SEC Form 6-K, filed Oct. 1, 2003. On information and belief, either Warner Brothers Entertainment Inc. and/or Warner Home Video, which are part of the Warner Brothers family of companies, are members of Movielink and are incorporated in Delaware. Attached as Exhibit 1 are the Certificates of Incorporation for these Movielink members.

### 3.     Movielink Infringes the '792 Patent in Delaware.

In *Jumara,* the Third Circuit held that the local interest in deciding local controversies at home is an important factor to consider regarding a motion to transfer the action away from that jurisdiction. *Jumara,* 55 F.3d at 889-890.   Delaware clearly has an interest in protecting its economy and citizens from patent infringement that occurs within the borders of its jurisdiction. *See, Datex-Ohmeda,* 185 F.Supp.2d at 413 (transfer of patent action denied because Delaware has an interest in adjudicating action involving Delaware corporation).   Thus, Delaware has an interest in this matter because the infringement of USVO's '792 Patent, via the Internet, occurs through Movielink's offering of digitized video programming (movies) to Delaware citizens via the Movielink.com website. *See Thorn EMI North America, Inc. v. Micron Tech., Inc.,* 821 F. Supp. 272, 275 (D. Del. 1993).

In *Thorn* the court found that the defendant's distribution of allegedly infringing products in Delaware constituted a business transaction under the Delaware long arm statute. *Id.*  The court therefore denied the defendant's motion to dismiss the patent infringement action for lack of personal jurisdiction or to transfer case to Idaho, its state of incorporation.   The court further stated that defendant's distribution efforts were really efforts to market and sell its products to Delaware customers and that "[p]otential acts of patent infringement plainly arose from [defendant's] conduct in Delaware." *Id.*

While the infringing services offered by Movielink are national in scope and affect customers throughout the United States, that does not tilt the balance against Delaware. Movielink implies that the greater number of movie rentals and sales from the Movielink website to residents in California supports a transfer. Mot. to Transfer, fn 9 [D.I. 29].  Sales volume, however, is simply not a factor that informs the Court's decision to transfer a case under *Jumara.* Morever, it is no surprise that Movielink's sales in California are higher than in Delaware, since

- 8 -

Delaware had approximately 0.3%, and California 12%, of the U.S. population in 2001. *U.S. Census Bureau, State and County Quick Facts*, at <http://quickfacts.census.gov/qfd/states/1000.html> (visited on Nov. 14, 2003).

Even if the states' interests are of equal weight, this factor favors the action remaining in Delaware. Simply put, California has no special interest in hearing and deciding this case above or beyond Delaware's interests. This action therefore should remain in Delaware as this Court has experience with patent infringement cases; it has an interest in preventing patent infringement within its jurisdiction; the infringing party is incorporated in Delaware; and the infringement affects the economy and citizens in the state.

### 4.    USVO's Choice of Delaware was Rational.

USVO chose to litigate in Delaware for many of the reasons recognized in this circuit to be "legitimate and rational." Therefore, USVO's "choice of forum 'should be accorded significant weight.'" *Joint Stock*, 936 F. Supp. at 188 (quoting *Waste Distillation Technology*, 775 F. Supp. at 764). *See C.R. Bard*, 997 F. Supp. at 562.

Movielink argues in its motion that "district courts may 'disregard' or give less deference to plaintiff's choice of forum, or may reduce the burden of the moving party in showing inconvenience, especially when the central facts of a lawsuit occur outside the forum state." Mot. to Transfer, at 9. As support for this position, Movielink cites *Brunswick Corp. v. Precor Inc.*, 2000 U.S. Dist. LEXIS 22222, *7 (D. Del. 2000), and *Magee v. Essex-Tec Corp.*, 704 F. Supp. 543, 547-548 (D. Del. 1988). This argument need not detain the court long. In *Magee*, which predates *Jumara*, no infringing activity occurred in Delaware. *See Magee*, 704 F. Supp. at 547. Nor was the plaintiff litigating at or near its residence. *Id.* Finally, the court found that transfer would not substantially inconvenience the plaintiff. *Id.* at 548.

- 9 -

Similarly, the decision in *Brunswick* is easily distinguishable. In that case the plaintiff's residence in Illinois was not only distant from Delaware, but the plaintiff and defendant were already engaged in pending litigation on a related patent in the Western District of Washington, where the defendant sought to have the case transferred. *Brunswick*, 2000 U.S. Dist. LEXIS 222222, *6. Not surprisingly, the court found that where related lawsuits exist "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *Id. (citing Liggett Croup, Inc. v. R. J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 537 (D.N.J. 2000) (citations omitted).

By contrast, here USVO is litigating near its residence, the infringing activity is occurring as much in Delaware as anywhere, there is no related litigation pending elsewhere, and litigating this case in California would substantially prejudice USVO given its limited financial resources, as we now show.

## C. The Convenience of The Parties and Witnesses As a Whole Does Not Support Transfer to the Central District of California.

"[T]he convenience of the parties as indicated by their relative physical and financial condition" is the next factor to be considered in assessing a motion to transfer." *Jumara*, 55 F.3d at 879. Movielink presents absolutely no evidence on this issue. That is not surprising, for it would only reveal a David *versus* Goliath match-up. USVO is a small business. It has but four employees. *See* Declaration of Edwin Molina filed contemporaneously, ¶ 3 (Exhibit 2). According to USVO's most recent Form 10-Q filed with the SEC, USVO has generated no sales for the nine-month period ending September 30, 2003 and sales in the current quarter are expected to be minimal. *Id.* at ¶ 4. For that same period, the company had a net loss of $513,115. *Id.* USVO, however, continues to explore opportunities that it hopes will result in new products for new revenue streams and it recently announced plans to release a new software

- 10 -

product that can be used to deter video content piracy. *Id.* Indisputably, USVO has very limited resources.

Movielink is well aware of USVO's diminutive status and financial condition, as USVO's financial data is publicly available. Given this condition, the transfer of this action to California would substantially prejudice USVO's ability to prosecute this infringement action. It simply lacks the financial resources to litigate in California against a corporate opponent backed by five of the world's largest movie studios. Movielink's financial data is not publicly available, and USVO is not otherwise privy to it. From Movielink's silence and from the identity of Movielink's members, however, the Court can infer that the information, if revealed, would substantiate USVO's contention that Movielink has a vastly superior financial position.

In these circumstances it is beyond cavil that the condition of the parties favors retaining this case in Delaware. While litigating this case in Delaware may be a minor inconvenience for Movielink, litigating it in California would certainly be a major inconvenience for USVO. The courts routinely reject transfer motions where such a disparity exists. *See Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 338 (D.N.J. 2003) (transfer denied in part because "Plaintiffs' physical and financial condition are much more limiting than Defendant's."); *Waldman v. Delaware Park, L.L.C.*, 2000 WL 33416863 *6 (D.N.J. 2000) (transfer denied in part because "the relative physical and financial condition of the parties weighs in favor of plaintiff."); *Manzano v. Mid-Atlantic Coca-Cola Bottling Co., Inc.*, 2000 WL 250226 *3 (E.D. Pa. 2000) (transfer denied; "Looking at the relative financial conditions of the parties, it would be less of a burden for the Defendant corporations to incur the cost of litigating in Philadelphia than it would be for Plaintiff to litigate in Baltimore. Therefore, this factor weighs against granting the transfer."); *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 358 (D.Del. 1999) (transfer

denied in part because defendants' "relative physical and financial position fail to weigh heavily
in favor of transfer.").

**1.    Movielink Would Not Be "Unusually or Oppressively
Burdened" by Litigating this Case in Delaware.**

As this Court has recognized, the ordinary and minor inconveniences involved whenever
a defendant litigates outside of its home district are insufficient to provide a basis for transfer.
Rather, *Movielink* must prove that litigating in Delaware would be "unusually burdensome or
oppressive." *Wesley-Jessen Corp.*, 157 F.R.D. at 218; *C.R. Bard*, 997 F. Supp. at 562 (the
defendant must show that litigating this case in Delaware will impose on it a "unique or unusual
burden."). This Movielink cannot show.

First, Movielink makes no substantiated claim in its motion to transfer that litigating in
Delaware would impose on it a unique or unexpected financial burden. Movielink is not a
"Mom and Pop" operation. It is a limited liability corporation established and backed by the
likes of Warner Brothers, Paramount Pictures Corporation, Metro-Goldwyn-Mayer, Universal
Studios, and Sony Pictures Entertainment, all large movie studios. A corporation with such
backing cannot reasonably claim that litigation in Delaware constitutes a substantial burden.

Second, the argument that a defendant is "unusually or oppressively burdened" simply
because its witnesses and documents are located outside the district, has been rejected in this
District. *See Joint Stock*, 936 F. Supp. at 189. Indeed, the convenience of party witnesses, or
witnesses that are employees of a party, typically carries little weight in a transfer analysis.[4] *See
Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 203 (D. Del. 1998). Furthermore, any

---

[4] To the extent that consideration is given to the convenience of party witnesses, the two
witnesses identified by USVO's Rule 26(a)(1) initial disclosures are officers of USVO and reside
in Connecticut, where USVO has its principal place of business. *See* Plaintiff USA Video
Technology Corp.'s Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a), attached as Exhibit 3.

- 12 -

argument by Movielink regarding the logistical difficulties of litigating in Delaware rather than California rings hollow in this day of electronic documents. As the Court has noted, "technological advances have substantially reduced the burden of having to litigate in a distant forum." *Wesley-Jessen Corp.*, 157 F.R.D at 218. There is no doubt that technology will allow discovery to proceed economically and conveniently for Movielink, itself an advanced-technology company. And Movielink will suffer no oppressive or unique burden by having to send its employees or counsel to Delaware on those rare occasions when they might be required to appear for a deposition or in actual Court appearances (which are likely limited to the trial itself).

Third, to the extent documents relevant to the litigation are located in California, their presence in that state should not be given any weight, given the ability to copy and send documents expeditiously throughout the world. *See Motorola*, 58 F. Supp. 2d at 359; *Ade Corp.*, 138 F.Supp.2d at 570. As Judge McKelvie explained in *Ade Corp.*, "if we look at the issue of documents, where they are stored and how they are produced, there is probably little if any incremental burden on [defendant] in trying this case in Delaware, rather than in California."

Movielink demonstrably will not be unusually or oppressively burdened by having to litigate in Delaware. Movielink's argument boils down to its simple preference to litigate on its "home turf," knowing full well the substantial hardship that transfer would visit on USVO. That preference, however, is simply insufficient to overcome USVO's choice of forum. *See C.R. Bard*, 997 F. Supp. at 562.

### 2. Litigating the Action in Delaware Would Not Be More Inconvenient for Third Party Witnesses.

In any litigation involving parties located and incorporated in different jurisdictions, there will likely be third-party witnesses beyond the subpoena power of the court chosen by the

plaintiff. Procedures are in place to allow the subpoena and deposition of such witnesses through the intervention of the district court that sits where they reside. Fed. R. Civ. P. 45. Very simply, if third party witnesses are unwilling to travel, then depositions can preserve their testimony for trial, as is common practice for litigation of this nature. Correspondingly, the existence of such third party witnesses should not constitute a basis for transferring this action out of the forum selected by the plaintiff.

Movielink has failed to show that transferring this case to California would lead to greater convenience to the third party witnesses identified by USVO. Only one of the twelve third party witnesses identified in USVO's Rule 26(a)(1) initial disclosures resides in California. Two USVO witnesses live in Connecticut -- closer to Delaware than to California. Two others live in Texas, which does not favor California over Delaware. The inventor of the '792 Patent, Mr. Elbert Gene Tindell, resides in Texas; as does Mr. Kenneth C. Hill, the attorney who prosecuted the '792 Patent. *See* Exhibit 3. Indeed, many of the third-party witnesses would be just as, if not more, inconvenienced by transferring this case to California.

**D.    A Transfer to California is Not in the Interests of Justice.**

It would not serve the interests of justice to transfer this case to California. This case has proceeded in this Court since April 2003. Given the record here, it would be fundamentally unfair to effectively require USVO to start over in California. This action is already scheduled for trial and the milestones for a patent action are already established. Indeed, given the facts and circumstances this Court is, under any standard, the most appropriate forum for this case.

## IV.    **CONCLUSION**

For these reasons, the Court should deny Movielink's motion to transfer.

November 19, 2003

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

_____
Richard D. Kirk (Bar I.D. No. 922)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6960

*Attorneys for Plaintiff*
*USA Video Technology Corporation*

Of Counsel:

STEPTOE & JOHNSON LLP
J. William Koegel, Jr.
Jeffrey T. Hsu
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
(202) 429-3000



## Delaware

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "SONY PICTURES ENTERTAINMENT INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE EIGHTEENTH DAY OF NOVEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "SONY PICTURES ENTERTAINMENT INC." WAS INCORPORATED ON THE NINETEENTH DAY OF APRIL, A.D. 1983.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

2007060  8300

030740169

PAGE  1

AUTHENTICATION: 2756330

DATE: 11-18-03

PAGE 1



*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "PARAMOUNT PICTURES CORPORATION" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE EIGHTEENTH DAY OF NOVEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "PARAMOUNT PICTURES CORPORATION" WAS INCORPORATED ON THE TWENTIETH DAY OF SEPTEMBER, A.D. 1966.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

0647106  8300

030740169

AUTHENTICATION: 2756328

DATE: 11-18-03



## *The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "MGM ON DEMAND INC." IS DULY
INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN
GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE NINETEENTH DAY OF
NOVEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "MGM ON DEMAND
INC." WAS INCORPORATED ON THE THIRD DAY OF APRIL, A.D. 2001.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES
HAVE BEEN PAID TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE
BEEN FILED TO DATE.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3376491   8300                                AUTHENTICATION: 2758008

030742515                                          DATE: 11-19-03



PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "VIVENDI UNIVERSAL ENTERTAINMENT
LLLP" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND
IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE NINETEENTH DAY OF
NOVEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "VIVENDI
UNIVERSAL ENTERTAINMENT LLLP" WAS FORMED ON THE FIFTEENTH DAY OF
APRIL, A.D. 2002.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE
BEEN PAID TO DATE.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3478994  8300                          AUTHENTICATION: 2758009

030742515                              DATE: 11-19-03



PAGE   1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WARNER BROS. ENTERTAINMENT INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE NINETEENTH DAY OF NOVEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "WARNER BROS. ENTERTAINMENT INC." WAS INCORPORATED ON THE THIRD DAY OF DECEMBER, A.D. 2002.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3578617  8300

030742515

AUTHENTICATION: 2758011

DATE: 11-19-03

# Delaware

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WARNER HOME VIDEO INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE NINETEENTH DAY OF NOVEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "WARNER HOME VIDEO INC." WAS INCORPORATED ON THE FOURTH DAY OF FEBRUARY, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE NOT BEEN ASSESSED TO DATE.



3621621  8300

030742515

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 2758010

DATE: 11-19-03

# EXHIBIT E
# (PART 1 OF 2)

# Exhibit E



# FORM 8-K

## USA VIDEO INTERACTIVE CORP − USVO

**Filed: March 10, 2006 (period: March 09, 2006)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 8.01**

**Item 9.01**     Financial Statements and Exhibits.

SIGNATURES
Exhibit 99.1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

FORM 8-K
CURRENT REPORT

Pursuant to Section 13 OR 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest reported)        March 6th, 2006

USA VIDEO INTERACTIVE CORP.
(Exact name of registrant as specified in its chapter)

| WYOMING | 0-29651 | 06-15763-91 |
|---|---|---|
| (State or other jurisdiction of incorporation | (Commission File Number) | (IRS Employer Identification No.) |

| 83 Halls Road, Old Lyme, Connecticut | 06371 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code        (860) 434 - 5535

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions.

( )  Written communications pursuant to Rule 425 under the Securities Act (17CFR 230.425)

( )  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

( )  Pre commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR.240.14d-2(b))

( )  Pre-commencement communications pursuant to Rule 13c-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

INFORMATION TO BE INCLUDED IN THE REPORT

Section 8 – Other Events

**Item 8.01  Other Events.**

Doordarshan, India's national public broadcaster and one of the world's largest terrestrial television networks, has taken the lead on a three month trial basis to apply technology to strengthen worldwide efforts to identify video pirates. The trial with Doordarshan was initiated by First Serve Entertainment, which represents the Registrant, and exclusively markets and sells MediaSentinel technology in Asia–Pacific and the Middle East and non–exclusively in other parts of the world.

A copy of the News Release dated March 6th, 2006 is furnished as Exhibit 99.1.

**Section 9 – Financial Statements and Exhibits**

**Item 9.01  Financial Statements and Exhibits.**

Exhibit 99.1     News Release dated March 6th, 2006

### SIGNATURES

Pursuant to the requirements of the *Securities Exchange Act of 1934*, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**USA VIDEO INTERACTIVE CORP.**

Date :  <u>March 6th, 2006</u>                    By :    <u>/s/ Anton J. Drescher</u>
                                                  **Anton J. Drescher,**
                                                  **Corporate Secretary**

---

Exhibit 99.1



For Investor Relations Contact:
Jon Caserta
(877) 425–8347
usvo@blueskyir.com

### <u>INDIAN PBS TO WORLD: HELP IS ON THE WAY!</u>
# DOORDARSHAN GRABS WATERMARKING LEAD WITH USVO'S LEADING EDGE TECHNOLOGY

(Old Lyme, CT – March 6, 2006) – In what's being hailed by international media experts as a wake up call to the rest of the world, Doordarshan, India's national public broadcaster and one of the world's largest terrestrial television networks, has taken the lead on a trial basis to apply technology to strengthen worldwide efforts to identify video pirates.

The trial with Doordarshan was initiated by First Serve Entertainment, which represents USA Video Interactive Corp (OTCBB: USVO; TSX: US; BSE/Frankfurt: USF), and exclusively markets and sells MediaSentinel

technology in Asia–Pacific and the Middle East and non–exclusively in other parts of the world.

According to Munish Gupta, Chief Operating Officer of First Serve Entertainment Inc., Doordarshan's recent decision to deploy digital watermarking in a 3–month trial puts the world on notice that India isn't among nations content to simply wring its hands and do little more than decry the theft and unauthorized reproduction of movies, television broadcasts and similar digital products.

"Hollywood and the world's other media centers have basically been sitting back and complaining that something needs to be done," Gupta says. "Doordarshan is first among the world's large networks and the only nationally–run public broadcaster that's stepped up to the plate to respond to the challenges of media piracy with robust technology that places a unique digital watermark on every single frame of a movie or television broadcast. The message they're sending to the world by implementing MediaSentinel, an anti–piracy workstation developed by USVO, is 'we hear you and help is on the way!'"

India has long been on the U.S. Trade Representative's Special 301 Priority Watch List, as a result of generally weak enforcement of intellectual property laws. According to a 2005 Watch List report, piracy of motion pictures and other intellectual property in India cost the U.S. media producers alone more than $500 million in 2004.

According to K.S. Sarma, CEO of Prasar Bharati, parent company to Doordarshan, MediaSentinel's digital watermarking technology will provide Indian and international law enforcement officials an effective means of tracing and catching pirates. "Prasar Bharati's initiative to watermark media broadcast on Doordarshan should stimulate a wave of interest, not only across China and the rest of Asia, where piracy is believed to cause billions of dollars of losses, but also in the US, which suffers many of those losses," Sarma said. "We are pleased to have this trial period underway to demonstrate the value of this technology to media producers everywhere."

India is the second most populous country in the world, with a population of over one point one billion. The Indian film industry's output is the largest in the world in terms of number of films produced and in number of tickets sold.

"Bollywood," the informal name for the popular Mumbai–based film industry in India, is a strong part of popular culture in India and the rest of the Indian subcontinent, as well as the Middle East, parts of Africa, parts of Southeast Asia, and among South Asians worldwide. During the last 10 years, the Indian government has deregulated electronic media by allowing private and even limited foreign investments stimulating the launch of nearly 100 television channels.

These new channels uplink from India and are beamed via satellite into the country and carried via cable and Direct To Home (DTH) systems. Also, India's film industry today enjoys growing investment by foreign financiers, foreign co–productions and significant revenues from overseas exploitation of films. Government of India's Information and Broadcasting Ministry is planning to set up three high powered Expert Committees to prevent the growing menace of video piracy of feature films.

"We are pleased that the government–owned Doordarshan network, one of the most important broadcasters in the world, has stepped to the forefront to make India a leader in watermarking as forensic tool for anti–piracy efforts," said Edwin Molina, Chief Executive Officer of USVO.  "This is an important move that will likely spur Hollywood and the movie and video products industries in other nations to replicate as a means of furthering worldwide intellectual property rights enforcement in the near future."

**About MediaSentinel™:**
MediaSentinel is an anti–piracy device that embeds SmartMarks––invisible forensic information in every frame of video content––providing the proof courts need to protect intellectual property rights, indicting and convicting the individuals who steal the original material. Its use by producers and distributors of film and television content allows unprecedented, secure access to a wide range of distribution markets and methods which otherwise represent a significant piracy risk. MediaSentinel is available as a stand–alone product or on a pay–as–you–go basis through USVO's certified Anti–Piracy Provider service network.

**About Doordarshan:**
Doordarshan, the national television service of India, is devoted to public service broadcasting. It is one of the largest terrestrial networks in the world. Its network of more than 1400 terrestrial transmitters covers more than 89.6% of India's population. Doordarshan operates 27 Channels – 5 All India Channels, 11 Regional Language Satellite Channels, 8 Hindi Belt Kendras, 1 International Channel and 2 Parliament Channels (DD–Lok Sabha & DD–Rajya Sabha). Except for the Hindi Belt Kendras (DD–14 to DD–17 and DD–19 to DD–22), all other DD Channels broadcast round–the–clock. Prasar Bharati is a statutory autonomous body established under the Prasar Bharati Act. The Board came into existence from 23.11.1997. The Prasar Bharati is the Public Service broadcaster of the country. The objective of public service broadcasting is to be achieved though All India Radio and Doordarshan which earlier were working as independent media units under the Ministry of I&B.  For more information, visit www.ddindia.gov.in.

**About First Serve Entertainment Inc.:**
First Serve Entertainment, Inc. is a California based company with offices in Los Angeles and India, which produces and distributes motion pictures and television programming. First Serve also offers consulting and marketing services to media companies, markets media related products and as well engages in related businesses such as enabling media with technology to offer it to consumers via wired and wireless electronic devices. Besides its well–known Chairman, Vijay Amritraj, First Serve's management includes its Chief Operating Officer, Munish (Max) Gupta, a well–known Asian–American journalist turned entertainment entrepreneur.

**About USA Video Interactive Corp.:**
USA Video Interactive Corp. ("USVO") designs and markets technology for delivery of digital media. USVO developed its SmartMark™ digital watermarking technology to provide a robust means for producers and distributors to invisibly protect their content. USA Video Technology Corp., a wholly owned subsidiary of USVO, holds the pioneering patent for store–and–forward video, filed in 1990 and issued by the United States Patent and Trademark Office on July 14, 1992; it has been cited by at least 165 other patents. USVO holds similar patents in Germany, Canada, England, France, Spain, Italy, and Japan. For more information, visit www.usvo.com.

**USA Video Interactive** Corporate Headquarters Office: 83 Halls Road, Old Lyme, Connecticut, 06371  Telephone (860) 434 – 5535; Facsimile (860) 434 – 5782; Canada Office:  507 – 837 West Hastings Street, Vancouver, BC  V6C 3N6.  Trading symbol on the OTCBB: USVO; Trading symbol on the TSX Venture Exchange US; Trading symbol on the Berlin and Frankfurt Stock Exchanges: USF.  CUSIP 902924208. For more information contact Blue–Sky Solutions, LLC, Jon Caserta, (877) 425–8347, usvo@blueskyir.com

**First Serve Entertainment, Inc. (FSE)** Corporate Headquarters Office: 16501 Sherman Way, Suite 130, Van Nuys, California 914–6, USA. Telephone (818) 988 5299; Facsimile (818) 988 5812; Email: fseusa@pacbell.net. India Office: No. 10/5 A, 13th Avenue, Harrington Road, Chetpet, Chennai 600031, India. Telephone: (+91) 044–28365448/ 28362752; Facsimile: (+91) 044–28363751; Email: fsemaa@vsnl.com.

The press release may contain forward–looking statements.  Actual results may differ materially from those projected in any forward–looking statements.  Investors are cautioned that such forward–looking statements involve risk and uncertainties, which may cause actual results to differ from those described.

MediaSentinel and SmartMark are trademarks of USA Video Interactive Corp.
The names of actual companies and products mentioned herein may be the trademarks of their respective owners.

*The TSX Venture Exchange  has not reviewed and does not accept responsibility for the adequacy or accuracy of this release.*

| | |
|---|---|
| 27 | |
| 93 | |
| 311 | 313 |
| 318 | |
| 325 | 329 |
| 715 | 767 |
| 830 | 869 |
| 973 | 980 |
| 1028 | 1047 |
| 1116 | 1122 |
| ~~1499~~ | ~~1503~~ |
| ~~1625~~ | ~~1629~~ |
| ~~1630~~ | ~~1631~~ |
| ~~1891~~ | ~~1896~~ |
| ~~1929~~ | |
| ~~1968~~ | ~~1970~~ |
| 2086 | 2088 |
| 2146 | |
| 2150 | 2151 |
| 2159 | 2160 |
| 2161 | 2163 |
| 2172 | 2173 |
| 2336 | 2337 |
| 2402 | 2403 |
| 2428 | 2434 |
| 3329 | 3332 |



## Decaire, Candice

| From: | Dial, Audra |
|---|---|
| Sent: | Monday, July 31, 2006 1:42 PM |
| To: | Decaire, Candice |
| Subject: | RE: Coke v. Pepsi (Liqui-box) Pirvilege Log.nrl |

Log looks good.  Take out the highlighted docs.

Can you write a new description for the last entry on the log, which is described as:

E-mail concerning expert witness's
contact information

I don't want them to think that relates to expert witnesses for this litigation because I want them to think we still don't have experts yet.

I think the cover letter sounds ok with a revision noted below.

---

> **From:** Decaire, Candice
> **Sent:** Monday, July 31, 2006 1:36 PM
> **To:** Dial, Audra
> **Subject:** Coke v. Pepsi (Liqui-box) Privilege Log.nrl
>
> Audra - I'd advocate removing the highlighted docs in the attached draft priv log, which belong to the universe of nonresponsive docs.  We've also got a few more docs to produce - I pulled them previously for privilege or as non-responsive, but given the information we've acquired since then, they properly are neither.
>
> I'd like to send the privilege log with a very simple cover letter stating:
>
> **Please find enclosed a copy of our initial privilege log.   In further response to our communications last week, we have located additional documents for production consistent with the rolling production of documents responsive to Coke's First Requests for Production of Documents.  To that end, We have contacted Ms. Alexander to make available the following documents in our Second Supplemental Production: [Bates ranges]., as well as samples of the Liqui-Box Ultra-Nylon, Special Nylon, Standard Nylon, and Metallized helical coil bags.**
>
> What do you think?  I'm yet waiting to hear from Shanta (left messages, played phone tag, left another message telling her specifically what I was worried about -), so there possibly could be more, but I don't think we really need to mention that, do we?
>
> Candice
>
>  KILPATRICK
> STOCKTON LLP
> Attorneys at Law
>
> Candice C. Decaire
> Kilpatrick Stockton LLP

7/31/2006

**Decaire, Candice**

*damags*

| | |
|---|---|
| **From:** | Decaire, Candice |
| **Sent:** | Tuesday, June 20, 2006 9:53 AM |
| **To:** | 'joe.martin@interfaceinc.com'; 'edwin.sammons@interfaceinc.com' |
| **Cc:** | Moore, Steve |
| **Subject:** | Financial info re random tile case |

Hello. I recently began working with Steve Moore and will be assisting with the financial /damages aspect of the random tile cases against Mohawk, Shaw, and CAF. I wanted both to introduce myself (albeit electronically) and also to verify that it is possible to obtain invoice register reports for selected styles (monthly? weekly?), itemizing all of the invoice data (customer, date, yards, price, freight, sales tax, miscellaneous charges, etc.). Our goal is to come to an agreement with opposing counsel as to exactly what financial data is relevant and need be exchanged, such that we will not get bogged down either producing or reviewing a huge amount of financial data.

I shall look forward to hearing from you at your convenience.

Thank you.

Candice



**KILPATRICK STOCKTON** LLP

Attorneys at Law

Candice C. Decaire
Kilpatrick Stockton LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309-4530
t 404 815 6033
f 404 541 3218

Confidentiality Notice:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This transmission, and any attachments, may contain confidential attorney-client privileged information and attorney work product. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. Please contact us immediately by return e-mail or at 404 815 6500, and destroy the original transmission and its attachments without reading or saving in any manner.

7/28/2006


10kWIZARD
SEC POWER SEARCH

# FORM 10-K

## USA VIDEO INTERACTIVE CORP - USVO

**Filed: March 23, 2006 (period: December 31, 2005)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## Part 1

**Item 1**
**Item 2**
**Item 3**
**Item 4**

## Part II

**Item 5**
**Item 6**
**Item 7**
**Item 7A**
**Item 8**
**Item 9**
**Item 9A**

## PART III

**Item 10**
**Item 11**
**Item 12**
**Item 13**
**Item 14**

## PART IV

**Item 15**

## PART I

| | |
|---|---|
| **Item 1.** | Business. |
| **Item 2.** | Properties. |
| **Item 3.** | Legal Proceedings. |
| **Item 4.** | Submission of Matters to a Vote of Security Holders. |

## PART II

| | |
|---|---|
| **Item 5.** | Market for Registrant's Common Equity and Related Stockholder Matters. |
| **Item 6.** | Selected Financial Data. |
| **Item 7.** | Management's Discussion and Analysis of Financial Conditions and Results of Operation. |
| **Item 7A.** | Quantitative and Qualitative Disclosure About Market Risk. |

**Item 8.**        Financial Statements and Supplementary Data.

**Item 9.**        Changes in and Disagreements with Accountants on Accounting and
                   Financial Disclosure.

**Item 9A.**       Controls and Procedures


## PART III

**Item 10.**       Directors and Executive Officers of the Registrant.

**Item 11.**       Executive Compensation.

**Item 12.**       Security Ownership of Certain Beneficial Owners and Management.

**Item 13.**       Certain Relationships and Related Transactions.

**Item 14.**       Principle Accountant Fees and Services


## PART IV

**Item 15.**       Exhibits. Financial Statements to Shareholders and Reports on Form 8-K.

SIGNATURES

Signature

Exhibit 31.1

Exhibit 31.2

Exhibit 32.1

Exhibit 32.2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, DC 20549

# FORM 10−K

X  **ANNUAL REPORT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the fiscal year ended December 31, 2005

OR

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the transition period from _____ to _____.

Commission file number 0−29651

## USA VIDEO INTERACTIVE CORP.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **WYOMING** | **06−1576391** |
| *(State or Other Jurisidiction of Incorporation of Organization)* | *(I.R.S. Employer Identification No.)* |
| **83 Halls Road, PO Box 245, Old Lyme, Connecticut** | **06371** |
| *(Address of principal executive offices)* | *(ZIP Code)* |

**(860) 434−5535**

Registrant's telephone number, including area code:

Securities registered pursuant to Section 12(b) of the Act                    **None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Shares**
*(Title of Class)*

Indicate by check mark if the registrant is a well−known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes        No   X

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes        No   X

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for shorter period that the registrant as required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes  X   No        .

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K or any amendment to this Form 10−K.   X  .

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non−accelerated filer.  See definition of "accelerated filer and large accelerated filer" in  Rule 12b−2 of the Exchange Act.
Large Accelerated filer                Accelerated Filer                Non−accelerated filer              X

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Act).
Yes        No   X .

State the aggregate market value of the voting and non−voting equity held by non−affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter:  $11,381,207

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:
145,123,096.

Documents Incorporated by Reference: **NONE**

2

## TABLE OF CONTENTS

Part 1
Item 1    Business    3
Item 2    Properties    18
Item 3    Legal Proceedings    18
Item 4    Submission of Matters to a Vote of Security Holders    19

Part II
Item 5    Market for Registration's Common Equity, Related Stockholder Matters and Issuer
          Purchases of Equity Securities    19
Item 6    Selected Financial Data    20
Item 7    Management's Discussion and Analysis of Financial Condition and
          Results of Operation    21
Item 7A   Quantitative and Qualitative Disclosures About Market Risk    24
Item 8    Financial Statements and Supplementary Data    25
Item 9    Changes in and Disagreements with Accountants on Accounting and
          Financial Disclosure    25
Item 9A   Controls and Procedures    25

PART III
Item 10   Directors and Executive Officers of the Registrant    25
Item 11   Executive Compensation    27
Item 12   Security Ownership of Certain Beneficial Owners and Management and
          Related Stockholder Matters    31
Item 13   Certain Relationships and Related Transactions    31
Item 14   Principal Accountant Fees and Services    32

PART IV
Item 15   Exhibits, Financial Statement Schedules, and Reports on Form 8−K    33

3

**PART I**

**Item 1. Business.**

*Cautionary Statement*

Certain statements contained in this Annual Report on Form 10−K ("*Report*"), including, without limitation, statements containing the words "*believes*," "*anticipates*," "*estimates*," "*expects*," and words of similar import, constitute "*forward−looking statements*." Readers should not place undue reliance on these forward−looking statements. USA Video's actual results could differ materially from those anticipated in these forward−looking statements for many reasons, including risks described in this Report, including the "*Risk Factors*" section contained in this Item 1, and the other documents USA Video files with the Securities and Exchange Commission ("*SEC*").

**Introduction**

USA Video Interactive Corp. ("*USA Video*" or the "*Company*") designs and markets to business customers streaming video and video–on–demand systems, services and source–to–destination digital media delivery solutions that allow live or recorded digitized and compressed video to be transmitted through Internet, intranet, satellite or wireless connectivity. The Company's systems, services and delivery solutions include video content production, content encoding, media asset management, media and application hosting, multi–mode content distribution, transaction data capture and reporting, e–commerce, specialized engineering services, and Internet streaming hardware.

Although the Company has generated negligible sales for the 2005 year, it continues to explore opportunities that will result in new products for new revenue streams, but there can be no assurances that such efforts will be successful.

The Company's products and services are based on its proprietary rich media delivery infrastructure and software and its Store and Forward Video–on–Demand ("*VOD*") patent. These technologies, together with video compression technology, facilitate the delivery of video to an end user in a timely and interactive fashion.

USA Video has developed a number of specific products and services based on these technologies. These include MediaSentinel™ and SmartMarks™, a process that watermarks digital video content; StreamHQ™, a collection of source–to–destination media delivery services marketed to businesses; EncodeHQ™, a service that digitizes and compresses analog–source video; hardware server and encoder system applications under the brand name Hurricane Mediacaster™; ZMail™, a service that delivers web and rich media content to targeted audiences, and mediaClix™, a service that delivers content similar to Zmail™ but originating from an existing web presence.

The Company was incorporated on April 18, 1986, as "*First Commercial Financial Group Inc.*" in the Province of Alberta, Canada. In 1989, its name was changed to "*Micron Metals Canada Corp.*", which purchased 100% of the outstanding shares of USA Video Inc., a Texas corporation, in order to focus on the digital media business. In 1995, the Company changed its name to "*USA Video Interactive Corp.*" and continued its corporate existence to the State of Wyoming. The Company has five wholly–owned subsidiaries: USA Video (California) Corp., USA Video Corporation, Old Lyme Productions Inc., USA Video Technology Corporation and USVO Inc. USA Video's executive and corporate offices are located in Old Lyme, Connecticut, and its Canadian offices are located in Vancouver, British Columbia.

---

4

**Business Environment**

The cost of bandwidth and supporting equipment, such as cable modems and other broadband connectivity to homes and businesses, is expected to continue to decrease over the next several years, bringing expanded use of high bandwidth applications for video transmission to the general market. Meanwhile, compression technologies continue to improve, allowing delivery of higher quality content using existing connectivity.

**Strategic Plan**

USA Video believes that the expected substantial increases in bandwidth capacity, accompanying decreases in bandwidth cost, increases in consumer computer and video appliance storage capacity, and the proliferation of fast video file transfer techniques will result in an industry focus on downloading as an alternative to streaming as a content delivery mechanism. To position the Company to take advantage of this anticipated shift, USA Video has focused its immediate plans on aggressively protecting its technology ownership rights, including pursuing licensing arrangements and other forms of enforcement and pursuing marketing of its patent–pending digital watermarking technology.

USA Video continues to research and develop its patent–pending digital watermarking technology while pursuing marketing of its new releases of MediaSentinel™ and other related products.

USA Video discontinued the sale of select services from its prototype StreamHQ™ after customers' satisfaction and proof of concept. The Company no longer sells its individual functions of StreamHQ™. USA Video intends to continue to develop and expand its StreamHQ™ services business, while pursuing opportunities to sell replicated StreamHQ™ systems to corporations and organizations that prefer systems solutions to services solutions. To this end, USA Video's future plans include:

- Continuing StreamHQ™ functionality development, particularly the automation of processes and client account management, which allows more efficient delivery of services and expansion of the services client base;

- Scaling the StreamHQ™ infrastructure in modular fashion as necessary to support an increasing number and size of Zmail™ and mediaClix™ campaigns;

- Eventually establishing multiple marketing and distribution channels, particularly in the form of alliances with third parties, including some of the Company's product and service suppliers; and

- Ultimately expanding and enabling the sales and marketing team, to support increased direct marketing to various markets, including advertising, corporate communications, customer service, entertainment, and education.

**Proprietary Technologies**

USA Video's proprietary technologies include its (1) VOD patent, and (2) Digital watermarking piracy deterrence technology; and (3) StreamHQ™ infrastructure, software, and service delivery processes.

- USA Video's VOD Patent (US #5,130,792) (the "*Patent*") as well as patents it has obtained in other countries explicitly covers the rich media delivery model that is becoming more widely accepted as a means of delivering content for education, training, and entertainment; that is, faster−than−real−time download to computer and set−top box hard drives for subsequent content viewing without quality limitations resulting from insufficient or variable bandwidth.  The impact of this Patent becomes more significant as content owners and those that facilitate content delivery adopt this model.

5

- The objective of USA Video's patent−pending Digital Watermarking technology is to deter digital video piracy once a user has been authorized to view a video.  This is one of the major concerns preventing content owners from committing more of their content to the digital medium.  Digital watermarking helps trace content to incidents of piracy, thus deterring piracy.

- The ability of StreamHQ™ to deliver services to clients with market−specific value propositions stems from its scalable, streaming−enabled web infrastructure, the software functionality that resides on this infrastructure (such as innovative asset management and user transaction data capture and reporting), and the processes developed for delivering media campaigns to clients.  By delivering features unique to individual markets, such as advertising, corporate communications and customer service, StreamHQ™ services are differentiated from the generic services delivered by competitors.

**Products and Services**

USA Video's principal products and services are its proprietary rich media delivery infrastructure and software and the VOD Patent.  These technologies, together with video compression technology, facilitate the delivery of video to end users in a timely and interactive fashion.

USA Video has developed a number of specific products and services based on these technologies.  These include:

- MediaSentinel™, digital watermarking technology used to deter piracy of digital content;

- SmartMarks™, are invisible, unremovable, forensic "digital watermarks" imbedded in every video frame to protect digital video from piracy;

- StreamHQ™, a collection of source−to−destination media delivery services marketed to businesses;

- EncodeHQ™, a service that digitizes and compresses analog−source video; hardware server and encoder system applications under the brand name Hurricane Mediacaster™;

- Zmail™, a service that delivers web and rich media content to targeted audiences;

- mediaClix™, a service that delivers content similar to Zmail™, but originating from an existing web presence.

USA Video proposes to grant licenses to use its patented VOD technology on terms comparable to the "*reasonable royalty*" provided for by U.S. patent laws.  Upon successfully licensing its patent, USA Video could earn per−use royalties, meaning that each time a licensed event occurs (e.g. each time a consumer receives a VOD transmission) a specified royalty will be paid to the Company.  Upon suitable negotiated terms, USA Video may also consider bulk−fee licensing agreements, either apart from or in addition to

per-use royalties.

When USA Video's patent-pending digital watermarking technology matures into an enforceable patent, USA Video intends to pursue a similar strategy that it will use for its VOD technology with regard to the rights related to the digital watermarking technology.

USA Video's future plans include the marketing and selling of its StreamHQ™ systems, whereby a customer would purchase an entire system, comprised of hardware assembled by USA Video and software developed and installed by USA Video. After sale and delivery of the system to a customer, USA Video's services to the customer would then include updates of software and service and maintenance of hardware, as necessary, for additional compensation. The services of Zmail™ and mediaClix™ are available to a customer only through the purchase of a StreamHQ™ system.

---

6

As a cost cutting measure, USA Video terminated the operation of its StreamHQ$^{TM}$ infrastructure, which provided individual functionality of StreamHQ$^{TM}$ for small customers, as this service was no longer cost effective or deemed necessary at this time.

**Status of Products and Services**

With regard to its international VOD patent rights, USA Video has been closely monitoring advances in this wide-ranging industry over recent years and has commenced taking the necessary steps to translate this progress into a sustainable stream of royalty revenue. What USA Video originally demonstrated to be technologically feasible in the early 1990s has now become commercially feasible as well, with the continually increasing availability of consumer broadband access and steadily improving data compression technologies.

In view of these developments, USA Video is taking aggressive steps to advance its patent-protected intellectual property rights, which include its patent-pending digital watermarking technology. These steps include active licensing initiatives and, potentially, litigation when necessary, as a final resort if companies infringing on USA Video's patent rights refuse to negotiate in good faith. USA Video has retained leading national legal counsel to advance these patent enforcement initiatives.

Although it is currently focused on protecting its technology ownership rights, including licensing arrangements and other forms of enforcement, USA Video will continue to offer its other products and services, which are all functional, and available.

USA Video has identified an emerging market for global media streaming services, which the Company developed under the brand "*StreamHQ™*". StreamHQ™ allows corporate, education, entertainment, and other types of business or institutional customers to use the Internet or an intranet to deliver rich media content to target audiences by purchasing a StreamHQ™ system. By offering customers a complete source-to-destination service that consolidates web, streaming, and data management functionalities, StreamHQ™ eliminates the need for customers to deal with multiple service providers.

A key service differentiator is user transaction data management, which consists of capture, analysis, and reporting of statistical data that enables the content owner to obtain important feedback on the effectiveness of campaigns. This data includes network performance and utilization statistics, including bandwidth utilization, number of streaming sessions, streaming rates, video quality and packets lost; total number of times the video was viewed; distribution of users who viewed various portions of the video; information on times of media access, length of time media was viewed, and actions taken during viewing (pause, stop, rewind, etc.). Additional StreamHQ™ features include the ability to analyze usage by location; the percentage of users who forwarded the video to other people; the percentage of users who received and viewed the forwarded video email; and categorization of users by operating system, browser type, and connection speed. Additional functionality can be customized to meet specific customer requirements.

Aside from quality streaming, USA Video's overriding goal in its StreamHQ™ development and deployment has been to give customers media asset management features, tools, and information that provide accountability for their streaming expenditures. To that end, the Company has developed and is offering for sale products that provide such a return on the customer's investment. Zmail™ is a rich media email tool that allows businesses, institutions, and organizations to communicate multi-media messages to targeted audiences via the Internet and to receive prompt, valuable feedback on the effectiveness of their communication campaigns. Zmail™ is an opt-in communication method, whereby the recipient is directed to a web-landing page containing an embedded media player and links to amplifying information about the media subject. All user actions within the page are captured, aggregated, and provided to the customer as intuitive statistical and trend reports. Similar to Zmail™, mediaClix™ offers a similar landing page and media content; however, access is from a client's existing web presence rather than an opt-in email. Hurricane Mediacaster™ is a hardware server and encoder system developed by USA Video. An additional encoding service available for customers is

EncodeHQ™, a service that digitizes and compresses analog–source video.

7

## Customers and Markets

The principal market for the Company's services is the business–to–business sector, rather than the individual consumer sector. USA Video's patent rights potentially have broad application to the VOD marketplace. USA Video anticipates that it will conduct licensing negotiations with:

- companies involved in providing and promoting VOD content, such as film content, video advertisements, online gaming video and subscription video;

- companies providing network and other physical infrastructure to enable various VOD applications;

- companies providing VOD–enabling software, including advanced data compression schemes; and

- companies providing VOD–enabling hardware, including consumer hardware such as digital video recording devices.

The market for digital watermarking will to some extent overlap the market for VOD, but the two are not identical. For example, digital watermarking technology may be required by copyright–owning content providers who have concerns about the potential for digital piracy of their material; whereas hardware manufacturers may be less concerned about such issues. Nevertheless, protocols may develop which will require participants in the video industry to embrace some form of digital watermarking. USA Video will follow those developments closely, and, if necessary, take steps to promote and protect its digital watermarking technology.

Additionally, companies within the business–to–business sector, rather than the individual consumer, generally possess the greater financial wherewithal and purpose for purchasing StreamHQ™ systems. The Company's focus is on companies that can benefit from an engaging rich media and web presentation directed at a target audience. The Company's customers for these services have included film companies, event promoters, ministries, travel companies, sports entertainment centers and political candidates.

USA Video's customers for StreamHQ™ systems may also be businesses or organizations that are dissatisfied with response rates from traditional email campaigns, or who have in the past been unable to track the response rate to such traditional email campaigns. Additionally, any business that wishes to increase brand or product awareness in a more cost effective manner than television advertising would be an appropriate candidate for the StreamHQ™ services.

## Sources and Availability of Raw Materials

USA Video assembles its hardware systems from components manufactured by others. The Company specifies, procures, assembles, tests and deploys the various system components according to a precisely developed set of procedures. The Company consults on an as–needed basis, with companies that supply the major materials needed to build its systems. Systems are programmed and configured to meet a wide variety of individual customer requirements.

USA Video procures the materials and hardware to assemble systems and their components from various companies, as needed, and in sufficient quantities to preclude any danger of significant sourcing problems in the immediate future. There are no seasonal limitations on the Company's operations.

8

## Competitive Conditions

The streaming media market is new, rapidly evolving and extremely competitive and the Company expects that competition will intensify in the future. USA Video competes with other companies that provide all or certain aspects of the Company's services, including other streaming media providers, content encoders, video production companies, Internet data management companies, and others, and expects that additional competition in the future will be provided by those types of providers. The Company's current market share is insignificant.

Other companies may also claim to own intellectual property rights relating to the VOD technology space. For example, USA Video is aware of another company which claims to own what could potentially be considered competing VOD patent rights. In this case, however, the U.S. Patent and Trademark Office issued the competitor's first such patent after USA Video's key VOD Patent was issued. Management believes that USA Video's VOD technology is superior in that USA Video's VOD technology has chronological priority over certain patents rights that have been procured by such company; that is, USA Video owns patent rights that are "*prior art*" to the other company's under U.S. patent law.

Phillips, Sarnoff, Verance, KDDI, NextAmp, and other companies large and small are active in the field of digital watermark technologies. The video streaming market is currently dominated by a small number of larger companies, including Real Networks, Microsoft, Yahoo and several others, some of which offer source−to−destination streaming media solutions. Most of USA Video's current and potential competitors have longer operating histories, larger customer bases, greater name recognition and significantly greater financial, marketing and other resources than the Company. In addition, larger, well−established and well−financed entities may acquire, invest in or form joint ventures with online competitors as the use of the Internet and other online services increases. In addition, new technologies and the expansion of existing technologies are expected to result in additional competition.

USA Video is, and will continue to be dependent on vendors and other providers to supply the hardware, software and co−location resources that comprise the Company's products and services. Further, USA Video currently competes with, and expects to compete with in the future, providers of some of its technology or system components. Competition is expected in all areas of business, including pricing, service, product performance, and the Company's ability to keep up with rapidly improving technology, changing market conditions, evolving industry standards and changing customer demands.

**Research and Development**

Prior to 1999, USA Video conducted seven years of research and development of its proprietary VOD technology. In 1999, USA Video's focus shifted to marketing and sales of its products and services, with research and development directed primarily at supporting sales and development of Wavelet compression technology. In 2000, the Company devoted substantial resources to development of its StreamHQ™ services and began development of its proprietary still and motion Wavelet technology, which has been completed as mathematical processes. In 2001, the Company redirected the Wavelet development effort toward the invention of a content protection technology that is grounded in similar science as Wavelet compression. The result is the Company's patent pending digital watermark technology for piracy deterrence. During 2002, as a result of cost cutting measures necessitated by the state of the market, the Company cut back on its marketing, sales and technical staff. In 2004, the Company resumed development of its patent pending digital watermark technology.

In fiscal 2003 the Company's research and development expenditures were approximately $66,000. During fiscal 2005 and 2004, the Company's research and development expenditures were $169,000 and $276,000, respectively.

9

**Intellectual Property**

USA Video's success is dependent, in part, upon its proprietary technology. The Company generally relies upon patents, trademarks, and trade secret laws to establish and maintain its proprietary rights in its technology products and services.

USA Video applied for a U.S. patent for its VOD technology on February 1, 1990. Corresponding overseas applications were filed in several countries in 1992. USA Video was granted the US Patent #5,130,792 in July 1992. In June 2000, the U.S. Patent Office reinstated the patent, which had expired because of an administrative oversight that led to late payment of fees due in 1995.

In 1999, USA Video was granted patents on its VOD technology in five European countries: England, France, Germany, Italy and Spain. In 2001 and 2002, USA Video was granted a patent in Canada and Japan, respectively, on its VOD technology. The technological characteristics of the European Patents are based on the U.S. Patent, covering systems for transmitting video programs to remote locations over a switched telephone network, and are similar in scope to the U.S. Patent claims.

On June 19, 2001, United States Patent Application No. 09/884,787, "*Method and Apparatus for Digitally Fingerprinting Videos*", was officially filed with the U.S. Patent and Trademark Office. This patent is for "*MediaSentinel™*".

**Employees**

As of March 22nd, 2006, the Company employed four people, including its two senior executive officers, one technology and one administrative employee. The Company considers the relationships with its employees to be good.

Competition for technical personnel in the industry that USA Video competes is intense. The Company's future success will depend, in part, on its continued ability to contract or hire, assimilate, and retain qualified personnel. To date, USA Video believes it has been successful in recruiting qualified contractors or employees, but there is no assurance that the Company will continue to do so in the future.

**Risk Factors**

Set forth below and elsewhere in this Report are risks and uncertainties that could cause actual results to differ materially from the results contemplated by the forward–looking statements contained in this Report.

**THE COMPANY'S LIMITED OPERATING HISTORY MAKES IT DIFFICULT TO EVALUATE ITS BUSINESS AND PROSPECTS.**

USA Video has a very limited operating history and has made very limited sales of its products and services and was in the development stage through December 31, 1999. USA Video's business and prospects must be considered in light of the risks encountered by companies in their early stages of development, particularly companies in new and rapidly evolving markets such as streaming media. Some of these risks relate to the Company's ability to:

---

10

- maintain or develop relationships with suppliers and marketing partners;

- establish a customer base;

- continue to develop and upgrade its technology, products and services;

- provide superior customer service;

- respond to competitive developments; and

- retain and motivate qualified personnel.

**THE COMPANY HAS INCURRED SUBSTANTIAL LOSSES; IT EXPECTS TO INCUR LOSSES IN THE FUTURE, AND MAY NEVER ACHIEVE PROFITABILITY.**

To date, USA Video has not been profitable, has not generated significant revenue from operations, and has incurred substantial losses. For the year ended December 31, 2005, USA Video had a net loss of $958,250. As of December 31, 2005, the Company had an accumulated deficit of $34,235,941 and a working capital deficit of $279,811. The Company intends to continue to expend significant financial and management resources on the development of its proposed products and services, and other aspects of its business. As a result, the Company expects operating losses and negative cash flows to increase for the foreseeable future. Consequently, USA Video will need to generate significant revenues to achieve and maintain profitability. The Company may be unable to do so. If USA Video's revenues grow more slowly than anticipated or if operating expenses increase more than expected, or are not reduced sufficiently, it may never achieve profitability. Because of factors discussed in this paragraph, USA Video's auditors, in their report on the Company's financial statements, have expressed substantial doubt concerning the Company's ability to continue as a going concern.

**IF USA VIDEO IS UNABLE TO OBTAIN SUBSTANTIAL ADDITIONAL FINANCING IT MAY NOT BE ABLE TO REMAIN IN BUSINESS.**

USA Video requires substantial working capital to fund its business. The Company has had significant operating losses and negative cash flow from operations since inception of its current business and expects to continue to do so for the foreseeable future. The

Company's capital requirements will depend on several factors, including the rate of market acceptance of its products and services, the ability to establish and expand a client base and the growth and effectiveness of its sales and marketing efforts. USA Video estimates it will require approximately $1 Million to $1.5 Million in financing to meet its working capital needs over the remainder of 2006 and substantial additional financing thereafter. Further, if capital requirements vary materially from those currently planned, the Company may require additional financing. The Company has no arrangements or commitments for any financing. Financing may not be available when needed on terms favorable to the Company, or at all. If adequate funds are not available or are not available on acceptable terms, the Company may be unable to further develop or enhance its products and services, take advantage of future opportunities or respond to competitive pressures, or ultimately, to continue in business.

**THE COMPANY'S OPERATING RESULTS IN FUTURE PERIODS ARE EXPECTED TO BE SUBJECT TO SIGNIFICANT FLUCTUATIONS, WHICH WOULD LIKELY AFFECT THE TRADING PRICE OF ITS COMMON SHARES.**

USA Video's quarterly and annual operating results are likely to fluctuate significantly in the future due to a variety of factors, many of which are outside of its control. Some of these factors include:

11

- its ability to attract and retain customers;

- the introduction of new video transmission services or products by others;

- price competition;

- the continued development of and changes in the streaming media market;

- its ability to remain competitive in its product and service offerings;

- its ability to attract new personnel; and

- U.S. and foreign regulations relating to the Internet.

As a result of the factors listed above, and others, period–to–period comparisons of USA Video's operating results may not be meaningful in predicting its future performance. It is possible that the Company's operating results will not meet market expectations in some future quarter or quarters, which would likely result in a significant decline in its stock price.

**THE STREAMING MEDIA BUSINESS IS HIGHLY COMPETITIVE, AND USA VIDEO'S FAILURE TO COMPETE SUCCESSFULLY WOULD LIMIT ITS ABILITY TO RETAIN AND INCREASE ITS MARKET SHARE.**

The streaming media market is new, rapidly evolving and extremely competitive. The Company expects competition to intensify in the future. The Company competes with companies that provide all or certain aspects of the Company's services, including other streaming media providers, content encoders, video production companies, Internet data management companies, and others, and expects that additional competition in the future will be provided by those types of providers and others. The Company's current market share is insignificant.

The video streaming market is currently dominated by a small number of larger companies, including Real Networks, Microsoft, Yahoo and several others, some of which offer source–to–destination streaming media solutions. Most of USA Video's current and potential competitors have longer operating histories, larger customer bases, greater name recognition and significantly greater financial, marketing and other resources than the Company. In addition, larger, well–established and well–financed entities may acquire, invest in or form joint ventures with online competitors as the use of the Internet and other online services increases. In addition, new technologies and the expansion of existing technologies are expected to result in additional competition.

USA Video may not be able to compete successfully against current and future competitors, and any inability to do so could decrease its revenues, contribute to the Company not achieving profitability and adversely affect is ability to establish, maintain and increase its market share.

**THE MARKET FOR USA VIDEO'S PRODUCTS AND SERVICES IS RELATIVELY NEW AND IS EVOLVING, AND THE COMPANY'S SUCCESS WILL DEPEND ON ITS ABILITY TO ADAPT TO CHANGING MARKET CONDITIONS.**

USA Video's future financial performance will depend in large part on the growth in demand for its streaming media services and products. This market is new and emerging, is rapidly evolving, is characterized by an increasing number of market entrants and will be subject to frequent and continuing changes in customer preferences and technology. As is typical in new and evolving markets, demand and market acceptance for the

12

Company's products and services is subject to a high level of uncertainty. Because the market for the Company's products is evolving, it is difficult to assess or predict with any assurance the size or growth rate, if any, of this market. There can be no assurance that a significant market for the Company's products will develop, or that it will develop at an acceptable rate or that new competitors will not enter the market. In addition, even if a significant market develops for such products, there can be no assurance that the Company's products will be successful in such market. If a significant market fails to develop, develops more slowly than expected or attracts new competitors, or if USA Video's products do not achieve market acceptance, the Company's business prospects, financial condition and results of operations will be materially adversely affected.

**USA VIDEO IS SUBJECT TO RAPID TECHNOLOGICAL CHANGE, WHICH COULD RENDER THE COMPANY'S PRODUCTS AND SERVICES OBSOLETE.**

USA Video's future success will depend in part on its ability to offer products and services that incorporate leading technology and address the increasingly sophisticated and varied needs of its current and prospective customers. The Company's market is characterized by rapidly changing and unproven technology, evolving industry standards, changes in customer needs, emerging competition and frequent new service introductions. Future advances in technology may not be beneficial to or compatible with USA Video's business. In addition, the Company may not be able to incorporate technological advances into its products and services in a cost-effective and timely basis. Keeping pace with the technological advances may require substantial expenditures and lead time, particularly with respect to acquiring updated hardware and infrastructure components of its systems. The Company may require additional financing to fund such acquisitions. Any such financing may not be available on commercially reasonably terms, if at all, when needed.

**USA VIDEO IS DEPENDENT UPON VENDORS AND OTHER THIRD PARTY SERVICE PROVIDERS, AND WILL BE COMPETING WITH SOME OF THESE COMPANIES.**

USA Video is, and will continue to be dependent on vendors and other providers to supply the hardware, software and co-location resources that comprise the Company's products and services. The Company has no long-term or exclusive contracts or arrangements with any of these vendors or providers. The Company cannot be certain that its current and proposed vendors and service providers will continue to do business with the Company, or that it will be able to establish relationships with new vendors and service providers, if necessary. If the Company is unable to establish and maintain satisfactory relationships and arrangements with these third parties, the Company's business could be harmed. In addition, USA Video will be dependent upon its third party vendors and other suppliers to adequately test their products before release, and to provide support for the products after delivery. The failure of any of these third party providers to do so could have a material adverse effect on USA Video's business.

Further, USA Video currently competes with, and expects to compete with in the future, providers of some of its technology or system components. USA Video's inability to, at the same time, effectively cooperate and compete with these companies could harm its business.

**IF USA VIDEO DOES NOT CONTINUOUSLY IMPROVE ITS TECHNOLOGY IN A TIMELY MANNER, ITS PRODUCTS COULD BE RENDERED OBSOLETE.**

The markets for USA Video products and services are characterized by:

13

- rapidly changing technology;

- evolving industry standards;

- frequent new product and service introductions; and

- changing customer demands.

These changes and developments may render the Company's products and technologies obsolete in the future. As a result, the Company's success depends on its ability to adapt to these changes, particularly to develop or adapt products and services or to acquire new products and services that can compete successfully. There can be no assurance that USA Video will be successful in these efforts.

**USA VIDEO'S SERVICES ARE COMPLEX AND THE COMPANY MAY NOT BE ABLE TO PREVENT DEFECTS THAT COULD DECREASE THEIR MARKET ACCEPTANCE, RESULT IN PRODUCT LIABILITY OR HARM ITS REPUTATION.**

USA Video's streaming media products services are complex, and the steps the Company takes to ensure that they are free of errors or defects, particularly when first introduced or when new versions or enhancements are released, may not be successful. USA Video cannot guarantee that current versions or enhanced versions or its products will be free of significant software defects or bugs. Despite the Company's testing, and testing by its third–party vendors and providers, current or future products may contain serious defects. Serious defects or errors could result in lost revenue or a delay in market acceptance of the Company's products and could seriously harm its business and operating results. Errors in its products may be caused by defects in third–party hardware or software incorporated into its products. If so, the Company may be unable to fix these defects without the cooperation of these third–party providers. Because these defects may not be as significant to these providers as they are to USA Video, the Company may not receive the rapid co–operation that it may require. Errors, defects or other performance problems with the Company's products could also harm its customers' businesses or result in potential product liability claims. Even if unsuccessful, a product liability claim brought against USA Video would likely be time–consuming, costly and harmful to its reputation. Nor can there be any assurance that the Company's product liability insurance coverage will be sufficient to satisfy any successful claim.

**ANY LOSS OF THE COMPANY'S PERSONNEL OR INABILITY TO ADD NEW PERSONNEL COULD HARM THE COMPANY'S BUSINESS.**

USA Video's future success depends significantly on the continued services and performance of its senior management. The Company's performance also depends on its ability to retain and motivate its other key personnel. The loss of the services of any member of USA Video's senior management team or other key employees could cause significant disruption in the Company's business. USA Video has no long-term employment agreements with senior management and does not currently maintain any "*key person*" life insurance. The Company's future success also depends on its ability to identify, attract, hire, train, retain and motivate other highly skilled technical, managerial, operations, sales and marketing and customer service personnel. Competition for such personnel is intense, and USA Video may not successfully attract, assimilate or retain sufficiently qualified personnel. The failure to retain and attract the necessary personnel could impede the Company's future success.

---

14

**BECAUSE ONE CUSTOMER ACCOUNTS FOR ALL OF USA VIDEO'S REVENUE, IF IT LOSES THE CUSTOMER, ITS REVENUE WOULD CEASE.**

One customer accounted for 100% of USA Video's revenue for the year ended December 31, 2005. The Company expects a small number of customers will continue to account for a substantial portion of its revenue for the foreseeable future. USA Video's inability to increase the number of its customers or the loss of any one major customer could limit the Company's ability to maintain or increase its market share, or could cause revenue to drop quickly and unexpectedly.

**USA VIDEO'S BUSINESS MAY SUFFER IF IT CANNOT PROTECT ITS INTELLECTUAL PROPERTY.**

USA Video seeks to protect its proprietary rights through a combination of patents, trade secret and trademark laws, confidentiality procedures and contractual provisions with employees and third parties. Despite its efforts to protect its proprietary rights,

unauthorized parties may attempt to copy aspects of the Company's products or obtain and use information that it considers as proprietary. Litigation may be necessary to enforce USA Video's intellectual property rights, to protect its trade secrets and to determine the validity and scope of the proprietary rights of others. Any litigation could result in substantial costs and diversion of management and other resources with no assurance of success and could seriously harm USA Video's business and operating results.

## THERE IS NO ASSURANCE THAT USA VIDEO'S PATENTS WON'T BE CHALLENGED, INVALIDATED OR CIRCUMVENTED

There can be no assurance that USA Video's current or future patents, if any, will not be challenged, invalidated, or circumvented, or that any rights granted thereunder will provide competitive advantages to the Company. In addition, there can be no assurance that patents will be issued from pending applications, or that claims allowed on any future patents will be sufficiently broad to protect USA Video's technology. In addition, the laws of some foreign countries may not permit the protection of USA Video's proprietary rights to the same extent as do the laws of the United States. USA Video intends to enforce its proprietary rights through the use of licensing agreements and, when necessary, litigation. Although USA Video believes the protection afforded by its patents, patent applications, and trademarks has value, the rapidly changing technology in the video transmission industry makes the Company's future success dependent primarily on the innovative skills, technological expertise, and management abilities of its employees rather than on patent and trademark protection.

## USA VIDEO'S PRODUCTS MAY INFRINGE THE INTELLECTUAL PROPERTY RIGHTS OF OTHERS, CAUSING IT TO INCUR SIGNIFICANT COSTS OR PREVENT IT FROM LICENSING ITS PRODUCTS.

Other companies, including USA Video's competitors, may have or obtain patents or other proprietary rights that would prevent, limit or interfere with the Company's ability to make, use or license its products. The Company cannot be certain that its products do not and will not infringe patents or other proprietary rights of others. USA Video may be subject to legal proceedings, including claims of alleged infringement by it of the intellectual property rights of third parties. If a successful claim of infringement is brought against USA Video and it fails to or is unable to license the infringed technology on commercially reasonable terms, the Company's business and operating results could be significantly harmed. Companies in the technology market are increasingly bringing suits alleging infringement of their proprietary rights, particularly patent rights. Although USA Video is not currently subject to any litigation or claims, any future claims, whether or not valid, could result in substantial costs and diversion of resources with no assurance of success. Intellectual property litigation or claims could force USA Video to do one or more of the following:

---

15

- cease selling, incorporating or using products or services that incorporate the challenged intellectual property;

- obtain a license from the holder of the infringed intellectual property right, which license may not be available on commercially reasonable terms, or at all; or

- redesign its products or services.

If USA Video is forced to take any of these actions, its business could be substantially harmed.

## USA VIDEO'S SUCCESS DEPENDS ON THE CONTINUED GROWTH IN DEMAND FOR E–BUSINESS APPLICATIONS.

USA Video's primary business strategy involves the development of products and services that enable users to transmit video over the Internet. As a result, its future sales and any future profits will be substantially dependent upon the widespread acceptance and use of the Internet as an effective medium of business by consumers and businesses. To be successful, consumers and businesses that historically have used traditional means of commerce to transact business must continue to accept and utilize the Internet as a medium for conducting business and exchanging information. Consumers and businesses may reject the Internet as a viable commercial medium for a number of reasons, including potentially inadequate network infrastructure, slow development of enabling technologies, insufficient commercial support and privacy concerns. In addition, delays in the development or adoption of new standards and protocols required to handle increased levels of Internet activity or increased government regulation could cause the Internet to lose its viability as a commercial medium. If the demand for e–business applications does not grow or grows more slowly than expected, demand for USA Video's products and services would be reduced and its revenue would suffer.

## GOVERNMENT REGULATION AND LEGAL UNCERTAINTIES COULD ADD ADDITIONAL COSTS AND RISKS TO DOING BUSINESS ON THE INTERNET AND COULD HARM THE COMPANY'S BUSINESS.

USA Video is not currently subject to direct regulation by any governmental agency, other than regulations applicable to businesses generally, export control laws and laws or regulations directly applicable to electronic commerce. However, due to the increasing popularity and use of the Internet, it is possible that a number of laws and regulations may be adopted with respect to the Internet covering issues such as: user privacy, pricing, content, copyrights, distribution, and characteristics and quality of products and services.

Furthermore, the growth and development of the market for electronic commerce may prompt calls for more stringent consumer protection laws that may impose additional burdens on those companies conducting business online. The adoption of additional laws or regulations may decrease the growth of the Internet or other online services, which could, in turn, decrease the demand for the Company's products and services and increase its cost of doing business.

The applicability to the Internet of existing laws governing issues such as property ownership, copyrights, encryption and other intellectual property issues, taxation, libel, export or import matters, obscenity and personal privacy is uncertain. The vast majority of such laws were adopted prior to the advent of the Internet and related technologies. As a result, they do not contemplate or address the unique issues of the Internet and related technologies. Changes to such laws intended to address these issues, including some recently proposed changes, could create uncertainty in the Internet marketplace. Such uncertainty could reduce demand for the Company's products and services or increase the cost of doing business due to increased costs of litigation or increased service delivery costs.

---

16

### THE COMPANY'S SHARE PRICE HAS BEEN AND COULD BE HIGHLY VOLATILE, WHICH COULD RESULT IN SUBSTANTIAL LOSSES TO INVESTORS.

The trading price of the Company's common shares has been and is likely to continue to be highly volatile and could be subject to wide fluctuations in response to a number of factors including: variations in quarterly operating results; new products or services offered by the Company or its competitors; conditions or trends in the Internet and online commerce industries; changes in the economic performance and/or market valuations of other Internet and online service companies; and other events or factors, many of which are beyond the Company's control. In addition, the stock market in general, and the market for Internet–related and technology companies in particular, has experienced extreme price and volume fluctuations, including large price drops in 2003, 2002 and 2001, that have often been unrelated or disproportionate to the operating performance of such companies. These broad market and industry factors may materially adversely affect the market price of the Company's common shares, regardless of the Company's actual operating performance. In the past, following periods of volatility in the market price of a company's securities, securities class–action litigation has often been instituted against such companies. Such litigation, if instituted, could result in substantial costs and a diversion of management's attention and resources.

### ANTI–TAKEOVER PROVISIONS IN USA VIDEO'S CHARTER DOCUMENTS COULD PREVENT OR DELAY A CHANGE IN CONTROL OF THE COMPANY.

USA Video's Articles of Continuance and bylaws contain anti–takeover provisions that could discourage, delay or even prevent an acquisition of the Company at a premium price or at all. Any of these provisions might prevent the market price of the USA Video common shares from increasing in response to takeover attempts, and could prevent the Company's shareholders from realizing a premium over the then–prevailing market price for the common shares.

### USA VIDEO INTENDS TO ISSUE ADDITIONAL EQUITY SECURITIES, WHICH MAY DILUTE THE INTERESTS OF CURRENT SHAREHOLDERS OR CARRY RIGHTS OR PREFERENCES SENIOR TO THE COMMON SHARES.

USA Video intends to issue additional equity securities in order to raise working capital. Accordingly, existing shareholders may experience additional dilution of their percentage ownership interest in the Company. In addition, the new equity securities may have rights, preferences or privileges senior to those of existing holders of the Company's common shares.

### LIMITED LIABILITY OF EXECUTIVE OFFICERS AND DIRECTORS MAY DISCOURAGE SHAREHOLDERS FROM BRINGING A LAWSUIT AGAINST THEM.

USA Video's bylaws contain provisions that limit the liability of directors for monetary damages and provide for indemnification of officers and directors. These provisions may discourage shareholders from bringing a lawsuit against officers and directors for breaches of fiduciary duty and may also reduce the likelihood of derivative litigation against officers and directors even though such action, if successful, might otherwise have benefited the shareholders. In addition, a shareholder's investment in USA Video may be

adversely affected to the extent that costs of settlement and damage awards against officers or directors are paid by USA Video pursuant to the indemnification provisions of the bylaws.

17

**REQUIREMENTS OF THE SEC WITH REGARD TO LOW–PRICED "*PENNY STOCKS*" MAY ADVERSELY AFFECT THE ABILITY OF SHAREHOLDERS TO SELL THEIR SHARES IN THE SECONDARY MARKET.**

"*Penny stocks*" are low–priced, and usually highly speculative, stock selling at less than $5.00 per share. USA Video's securities are subject to Rule 15g–9 under the *Securities Exchange Act of 1934*, which imposes additional sales practice requirements on broker–dealers who sell such securities to persons other than established customers and "*accredited investors*" (generally, an individual with a net worth in excess of $1,000,000 or an annual income exceeding $200,000, or $300,000 together with his or her spouse). For transactions covered by this rule, a broker–dealer must make a special suitability determination for the purchaser and have received the purchaser's written consent to the transaction prior to sale. The rule also requires the delivery, prior to the transaction, of a risk disclosure document mandated by the SEC relating to the penny stock market. The broker–dealer must also disclose the commissions payable for the transaction, current quotations for the stock, and, if applicable, the fact that it is the sole market maker in the stock. Consequently, the rule may adversely affect the ability of broker–dealers to sell USA Video's securities and may adversely affect the ability of shareholders to sell their shares in the secondary market.

**USA VIDEO DOES NOT ANTICIPATE PAYING DIVIDENDS TO SHAREHOLDERS IN THE FORESEEABLE FUTURE.**

USA Video has not paid dividends on its common shares and intends, for the foreseeable future, to invest any earnings in the further development of its business. Accordingly, shareholders should not expect to receive any dividends on their shares.

**Item 2. Properties.**

USA Video headquarters and executive offices are located in Old Lyme, Connecticut consisting of 1,250 square feet on a month to month lease for $1,440 per month.

USA Video also leases 800 square feet of office space located in Vancouver, British Columbia, with a five year lease that expires March 2009. The annual base rent is $20,000.

**Item 3. Legal Proceedings.**

On April 10, 2003, USA Video announced that its subsidiary, USA Video Technology Corporation, had filed a lawsuit in U.S. District Court for the District of Delaware against Movielink, LLC. USA Video alleges that Movielink, a Delaware company, has infringed and continues to infringe on its patented online movie delivery System.

On January 28, 2005, the Court issued an opinion and order granting summary judgment in favor of Movielink, based on the Court's conclusion that the record contained insufficient evidence that the Movielink system "*initiates connections*" (a requirement for infringement of the Company's patent) in light of the Court's construction of the term "*initiates*." USA Video filed a motion for reconsideration on February 11, 2005, asking the Court to reconsider its ruling on that point, to decide the remaining aspects of the claim construction and the other pending motions, and to permit USA Video's case to proceed to trial. Movielink filed its opposition to the Company's motion for the reconsideration on February 28, 2005. The parties are presently awaiting the Court's decision.

In May 2005 the Honorable Judge Kent A. Jordon of the U.S. District Court for the District of Delaware, denied the Company's motion for reconsideration, which leaves standing the court's previous order of summary judgment against the Company in its patent infringement litigation against Movielink LLC. In June 2005 the Company filed a notice of appeal in the District of Delaware. The appeal is from the District Court's decision granting Movielink's motion for summary judgment of non-infringement, and the Company's motion for reconsideration. The U.S. Court of Appeals for the Federal Circuit, which has jurisdiction over patent litigation appeals, will hear the appeal.

If USA Video were to lose its appeal, the litigation would be concluded in the District Court. In that event, USA Video would be liable for Movielink's "*costs*" under the Federal Rules of Evidence (including such items as deposition transcription costs, but not attorneys' fees), which could involve a loss in excess of $5,000. Additionally, Movielink has signaled its intention to argue that USA Video initiated and has maintained the litigation in bad faith. In the event that Movielink were to prevail on such an argument, USA Video could be exposed to a judgment for Movielink's attorney's fees – an amount which USA Video's legal counsel is not in a position to estimate but which certainly would exceed $5,000.

The Company is party to a default judgment entered against one of the Company's subsidiaries. During the year ended December 31, 1995, a claim was made to the Company for the total amount payable under the terms of the lease with the Company's subsidiaries for office space in Dallas Texas through 2002. The Company's management is of the opinion that the amount payable under the terms of this judgment is not estimable or determinable at this time and may be substantially mitigated by the landlord renting the property to another party. The range of possible loss is from $–0– to approximately $500,000.

### Item 4. Submission of Matters to a Vote of Security Holders.

No matter was submitted to a vote of the Company's security holders during the fourth quarter of the fiscal year covered by this report.

## PART II

### Item 5. Market for Registrant's Common Equity and Related Stockholder Matters.

There is a limited public market for the common shares of the Company. The common shares trade on the TSX Venture Exchange (the "*TSX*") under the trading symbol "US", and on the NASD OTC Bulletin Board under the symbol "*USVO*".

The following table shows the high and low sales prices (in Canadian dollars) of the common shares as reported by the TSX for the periods indicated.

|  | TSX *(Symbol "US")* | |
| --- | --- | --- |
| Period | High (Cdn $) | Low (Cdn $) |
| First Quarter 2004 | 0.90 | 0.29 |
| Second Quarter 2004 | 0.45 | 0.18 |
| Third Quarter 2004 | 0.375 | 0.18 |
| Fourth Quarter 2004 | 0.415 | 0.225 |
| First Quarter 2005 | 0.55 | 0.11 |
| Second Quarter 2005 | 0.13 | 0.07 |
| Third Quarter 2005 | 0.125 | 0.08 |
| Fourth Quarter 2005 | 0.12 | 0.065 |

The following table shows the high and low prices of the common shares on the NASD OTC Bulletin Board. The following quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not necessarily represent actual transactions:

**OTC Bulletin Board** *(Symbol "USVO")*

| Period | High (US $) | Low (US $) |
|---|---|---|
| First Quarter 2004 | 0.72 | 0.22 |
| Second Quarter 2004 | 0.36 | 0.14 |
| Third Quarter 2004 | 0.29 | 0.14 |
| Fourth Quarter 2004 | 0.35 | 0.18 |
| First Quarter 2005 | 0.09 | .044 |
| Second Quarter 2005 | 0.06 | 0.11 |
| Third Quarter 2005 | 0.07 | 0.10 |
| Fourth Quarter 2005 | 0.05 | 0.09 |

As of March 22nd, 2006, there were 145,123,096 common shares outstanding, held by 1,571 shareholders of record.

To date, the Company has not paid any dividends on its common shares and does not expect to declare or pay any dividends on such common shares in the foreseeable future. Payment of any dividends will depend upon future earnings, if any, the financial condition of the Company, and other factors as deemed relevant by the Company's Board of Directors.

All sales of securities made by USA Video during the year ended December 31, 2005 that were not registered under the Securities Act have been disclosed in USA Video's report on Form 10−Q for the periods ended March 31, 2005, June 30, 2005 and September 30, 2005 or in this Form 10−K. The sales did not involve the use of an underwriter and no commissions were paid in connection with the sale of any of these securities.

### Item 6.  Selected Financial Data.

The following table presents selected historical financial data.  The consolidated statement of operations data for the years ended December 31, 2003, 2004 and 2005, and the balance sheet data as of December 31, 2004 and 2005 are derived from USA Video's consolidated financial statements included elsewhere in this report, which have been audited by Goldstein Golub Kessler LLP independent auditors.  The selected financial data should be read in conjunction with USA Video's consolidated financial statements, including the related notes, and the information in Item 7, "*Management's Discussion and Analysis of Financial Condition and Results of Operations.*"

| Item | December 31 | | | | |
| | 2005 $ | 2004 $ | 2003 $ | 2002 $ | 2001 $ |
|---|---|---|---|---|---|
| Revenue | 18,800 | 4,700 | 3,920 | 156,976 | 124,006 |
| Net loss | (958,250) | (1,403,838) | (697,412) | (2,113,138) | (3,760,821) |
| Loss per share | (0.01) | (0.01) | (0.01) | (0.02) | (0.04) |
| Total assets | 89,599 | 89,501 | 112,538 | 317,144 | 1,382,178 |
| Long−term obligations | — | — | — | — | — |
| Cash dividends per share | — | — | — | — | — |

### Item 7.  Management's Discussion and Analysis of Financial Conditions and Results of Operation.

**Overview of the Company**

USA Video was a development−stage company from January 1, 1992 to December 31, 1999, during which time it engaged primarily in the development of its end−to−end hardware systems and proprietary Video−on−Demand and Wavelet compression technologies, and had very limited sales. In 2000, the Company made the first of its end−to−end systems, and invested heavily in further development of its StreamHQ™ streaming media system. Due to current market conditions, management has implemented consolidation procedures to reduce the expense of operations.

As more fully discussed below the Company has not been profitable, and has not had significant revenues. USA Video cannot predict its revenue levels for the next 12 months, or thereafter, nor when, or if, its operations will become profitable. The Company's expenses will continue to decrease as it consolidates selling, general and administrative expenses. USA Video will require additional financing, both for the remainder of fiscal 2006 and thereafter, to continue to operate and expand its business. There is no assurance that such financing will be available on commercially reasonable terms, if at all.

## Results of Operations

### Revenues

Revenues for the year ended December 31, 2005 ("*fiscal 2005*") were $18,800, compared with $4,700 for the year ended December 31, 2004 ("*fiscal 2004*") and revenues of $3,920 for the year ended December 31, 2003 ("*fiscal 2003*"). All revenues for fiscal 2005 and fiscal 2004 were derived from the provision of engineering services. The Company had one customer, which accounted for 100% of the revenues in fiscal 2005, fiscal 2004, and fiscal 2003.

The revenues increased marginally in fiscal 2005 and 2004 due to the Company's continuing efforts to upgrade and market MediaSentinel™ and related products.

### Expenses

Total operating expenses for fiscal 2005 were $1,215,334, compared with $1,404,234 for fiscal 2004 and $814,167 for fiscal 2003. For fiscal 2005, cost of sales was $5,000, as compared with $3,379 for fiscal 2004 and $2,885 for fiscal 2003.

Research and development costs for fiscal 2005 were $168,571, as compared to $276,302 for fiscal 2004 and $66,350 for 2003. The decrease in fiscal 2005 was due primarily to management's decision to focus on marketing of MediaSentinel™.

Selling, general and administrative expenses were $1,043,440 for fiscal 2005, as compared to $1,124,609 for fiscal 2004, and $628,180 for fiscal 2003. Selling, general and administrative expenses consisted of marketing expenses, consulting fees, office, professional fees, and other expenses to execute the Company's business plan and for day−to−day operations. The primary components of the increases/decreases from fiscal 2005 to fiscal 2004 were:

- a $35,933 increase in fiscal 2005 in marketing expenses, as the Company revamped marketing objectives and strategies to concentrate on the release of MediaSentinel™ late in the third quarter of fiscal 2004. The marketing staff continues to identify and assess appropriate market segments, develop business arrangements with prospective partners, create awareness of new products and services, and communicate to the industry and potential customers;

---

21

- an increase of $11,779 from fiscal 2004 for public relations, due to management's decision to contract an outside firm;

- a $158,272 decrease in professional fees in fiscal 2005 was due to the transition of the patent infringement lawsuit to the court of appeals.

The year−to−year increases in fiscal 2004 resulted from the Company's increased efforts to bring products to market. The decreases resulted from the consolidation efforts of management. The primary components of the increases/decreases from fiscal 2004 to fiscal 2003 were:

- a $68,363 increase in fiscal 2004 in marketing expenses, as the Company revamped marketing objectives and strategies to concentrate on the release of MediaSentinel™ late in the third quarter of fiscal 2004. The marketing staff continues to identify and assess appropriate market segments, develop business arrangements with prospective partners, create awareness of new products and services, and communicate to the industry and potential customers;

- an increase of $8,280 from fiscal 2003 for transfer agent fees, due to an increase in stock activity; and

- a $242,619 increase in professional fees in fiscal 2004 was due to the due diligence required to prepare for the patent infringement lawsuit.

Additional expenses included depreciation and amortization of $3,323 for fiscal 2005 and fiscal 2004 for the amortization of the patents, compared to $19,391 for fiscal 2003, which also includes depreciation for machinery and equipment necessary for the development of new products and services prior to fiscal 2002. Non–cash compensation charges for fiscal 2005 were $216,560, for fiscal 2004 were $158,960 and for fiscal 2003 were $14,430, due mostly to issuance of common shares and share purchase warrants to the Company's officers, directors and employees at a price or exercise price below the market price of the common shares at the time of issuance and the issuance of stock options to contractors. Because the rules of the TSX require that the offering price for privately placed securities of listed companies be set at the market price when the offering is first announced, rather than upon closing, the sale price of the common shares and the exercise price of the warrants were below the market price of the common shares on the date of issuance.

Other increases in expenses included utilities and telephone, travel and promotion, insurance and rent due to decision to continue development and marketing of MediaSentinel™.

Impairment Loss on Long–Lived Assets are the result of the Company's inability to raise revenues in accordance with the corporate business plan, the Company operated at a loss for fiscal 2003 and fiscal 2002. As a result, the Company commenced an impairment review of its long–lived assets in accordance with SFAS 144 *"Accounting of the Impairment or Disposal of Long–Lived Assets"*. As a result of this impairment review, the Company recorded an impairment loss of $100,246 during fiscal 2003 to reduce the carrying value of these assets to their estimated fair value.

During the period ended December 31, 2005, the Company settled accounts payable obligations of approximately $288,000 for $45,000, and recorded a gain of $243,000.

22

**Net Losses**

To date, the Company has not achieved profitability and expects to incur substantial losses for the foreseeable future. The Company's net loss for fiscal 2005 was $958,250, compared with a net loss of $1,403,838 for fiscal 2004, and $697,412 for fiscal 2003.

**Liquidity and Capital Resources**

At December 31, 2005, the Company's cash position was $25,253, an increase of $15,912 from December 31, 2004. The Company had a working capital deficit of $279,811 and an accumulated deficit of $34,235,941 at December 31, 2005.

The Company's principal source of cash during fiscal 2005 was proceeds of $946,273 received from private placements and the exercise of warrants of equity securities and $37,500 from exercise stock options. This was offset by $967,861 of cash used in operating activities.

The Company has historically satisfied its capital needs primarily by issuing equity securities to its officers, directors, employees and a small group of investors, and from short–term bridge loans from members of management. During fiscal 2005, the Company completed four private placements, resulting in gross proceeds to the Company of $825,375.

The first offering completed on February 24, 2005 was a private placement of 1,500,000 units at a price of $0.10 per unit for total proceeds of $150,000. Each unit consisted of one common share and one share purchase warrant to purchase one additional common share at $0.13 per share, exercisable until February 24, 2007. The offer and sale of the units were exempt from registration under Rule 506 of Regulation D of the Securities Act. The Company limited the manner of the offering and provided disclosure regarding the offering and the Company to the investors. One director of the Company, four employees of the Company and three additional unaffiliated non–accredited investors and six unaffiliated accredited investors purchased the securities. The Company believes that a portion of these sales were also exempt under Regulation S under the Securities Act, as the sales were made in offshore transactions to non–U.S. persons.

The second offering completed on July 11, 2005 was a private placement of 5,600,000 units at a price of $0.055 per unit for total proceeds of $308,000. Each unit consisted of one common share and one share purchase warrant to purchase one additional common share at $0.08 per share, exercisable until July 11, 2007. The offer and sale of the units were exempt from registration under Rule 506 of Regulation D of the Securities Act. The Company limited the manner of the offering and provided disclosure regarding the offering and the Company to the investors. One director/employee of the Company, one employee of the Company and seven additional unaffiliated non−accredited investors and nine unaffiliated accredited investors purchased the securities. The Company believes that a portion of these sales were also exempt under Regulation S under the Securities Act, as the sales were made in offshore transactions to non−U.S. persons.

The third offering completed on September 28, 2005 was a private placement of 4,175,000 units at a price of $0.065 per unit for total proceeds of $271,375. Each unit consisted of one common share and one share purchase warrant to purchase one additional common share at $0.084 per share, exercisable until September 28, 2007. The offer and sale of the units were exempt from registration under Rule 506 of Regulation D of the Securities Act. The Company limited the manner of the offering and provided disclosure regarding the offering and the Company to the investors. One director/employee of the Company, one employee of the Company and two additional unaffiliated non−accredited investors and seven unaffiliated accredited investors purchased the securities. The Company believes that a portion of these sales were also exempt under Regulation S under the Securities Act, as the sales were made in offshore transactions to non−U.S. persons.

---

23

The fourth offering completed on December 7, 2005 was a private placement of 1,600,000 units at a price of $0.06 per unit for total proceeds of $96,000. Each unit consisted of one common share and one share purchase warrant to purchase one additional common share at $0.06 per share, exercisable until December 6, 2007. The offer and sale of the units were exempt from registration under Rule 506 of Regulation D of the Securities Act. The Company limited the manner of the offering and provided disclosure regarding the offering and the Company to the investors. Six unaffiliated accredited investors purchased the securities. The Company believes that a portion of these sales were also exempt under Regulation S under the Securities Act, as the sales were made in offshore transactions to non−U.S. persons.

The Company also received proceeds of $120,898 from the exercise of outstanding warrants and $37,500 from the exercise of stock options in fiscal 2005.

The Company's independent registered public accounting firm, in their report accompanying the Company's audited financial statements at and for the year ended December 31, 2005, have stated that there is substantial doubt about the Company's ability to continue as a going concern. As of December 31, 2005, the Company had $25,253 in cash. The Company will require an additional $1.0 million to $1.5 million to finance operations for the fiscal 2006 and intends to obtain such financing through sales of its equity securities. The threat to the Company's ability to continue as a going concern will be removed only when revenues have reached a level that sustains the Company's business operations.

Assuming the aforementioned $1.0 million to $1.5 million in financing is obtained, continuing operations for the longer−term will be supported through anticipated growth in revenues and through additional sales of the Company's securities. Although longer−term financing requirements may vary depending upon the Company's sales performance, management expects that the Company will require additional financing of $2.0 million to $3.0 million for fiscal 2007. The Company has no binding commitments or arrangements for additional financing, and there is no assurance that management will be able to obtain any additional financing on terms acceptable to the Company, if at all.

**Item 7A. Quantitative and Qualitative Disclosure About Market Risk.**

USA Video believes its exposure to overall foreign currency risk is not material. USA Video does not manage or maintain market risk sensitive instruments for trading or other purposes and is not exposed to the effects of interest rate fluctuations as it does not carry any long−term debt.

USA Video reports its operations in US dollars and its currency exposure, although considered by USA Video as immaterial, is primarily between the US and Canadian dollars. Exposure to other currency risks is also not material as international transactions are settled in US dollars. Any future financing undertaken by USA Video will be denominated in US dollars. As USA Video increases its marketing efforts, the related expenses will be primarily in US dollars. In addition, 90% of USA Video's bank deposits are maintained in U.S. dollars.

# EXHIBIT E
# (PART 2 OF 2)

**Item 8. Financial Statements and Supplementary Data.**

The financial statements and supplementary financial information required to be filed under this item are presented on pages F–1 through F–21 of this Report and are incorporated herein by reference.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None

---

24

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

As of December 31, 2005, the Company evaluated the effectiveness of the design and operation of its disclosure controls and procedures. Disclosure controls and procedures are the controls and other procedures that the Company designed to ensure that it records, processes, summarizes and reports in a timely manner the information it must disclose in reports that it files with or submits to the SEC. The Company's Chief Executive Officer and Chief Financial Officer participated in this evaluation. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that, as of the date of their evaluation, the Company's disclosure controls and procedures were effective.

There have been no changes in the Company's internal control over financial reporting that occurred during the Company's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**PART III**

**Item 10. Directors and Executive Officers of the Registrant.**

The following table sets forth the name, age, position, and period of service in his present position of each director and executive officer of USA Video:

| Name | Age | Position | Period of Service |
|------|-----|----------|-------------------|
| Edwin Molina | 50 | Director, Chief Executive Officer and President | Since 1998 |
| Anton J. Drescher | 49 | Director, Chief Financial Officer and Secretary | Since 1994 |
| Maurice Loverso (1) | 45 | Director | Since 2003 |
| Rowland Perkins (1) (2) | 52 | Director | Since 2005 |

> (1)  *Member of the Audit Committee*
> (2)  *Appointed as director January 10, 2005*

Rowland Perkins was appointed as director effective January 10, 2005. Anton Drescher, Edwin Molina, Maurice Loverso, and Rowland Perkins were elected directors of USA Video in September 2005.

**Executive Officers and Directors of the Company:**

**Edwin Molina – President, Chief Executive Officer and Director**

Mr. Molina served as a Senior Administrator with USA Video from June 1992 to June 30, 1998, when he was appointed President, Chief Executive Officer and a director. Mr. Molina was also a Senior Administrator with Adnet USA LLC, a private California

company involved in Internet advertising, from May 1996 to June 1998.

25

**Anton J. Drescher – Chief Financial Officer, Secretary and Director**

Mr. Drescher has been Chief Financial Officer of USA Video since December 1994. During the past 5 years to present, Mr. Drescher has provided administrative and consulting services in his capacity as President and a Director of Harbour Pacific Capital Corp. since 1998 and Westpoint Management Consultants Ltd. of Vancouver, British Columbia, Canada since 1978. Mr. Drescher also currently serves as a director and/or officer of the following TSX listed companies: International Tower Hill Mines Ltd. since October 1991, Quest Ventures Inc. since December 1998; Landmark Minerals Inc. since February 2003, Waymar Resources Ltd. since June 2005. Mr. Drescher obtained a Diploma in Financial Management from the British Columbia Institute of Technology in June 1974. He also obtained his Certified Management Accountant's designation in October 1981.

**Maurice Loverso – Director**

Mr. Loverso has been an independent director of USA Video since May 2003. He has been President of 3336298 Canada Inc. since 1996, providing financial consultation services to small capital public and private companies and has been a director of Group Intercapital Inc. since 1996, assisting a small cap venture capital firm with financial advice. Previously, from 1992 to 1995, he served as President of Almic Industries, a manufacturer of bathroom vanities and accessories and provided financial consultant services to USA Video from 1992 to 1994. From 1998 to 1999, he was a director of QR Canada Capital Inc., a public company listed for trading on the TSX.

**Rowland Perkins – Director**

Mr. Perkins was appointed as an independent director of USA Video as of January 10, 2005. He has been President and a director of eBackup Inc., of Calgary, Alberta, since 2001. He was previously Alberta Regional Manager of Securitinet Storage Solutions from 1999 to 2001, Vice–President of Simul Corp. from 1997 to 1999 and President of Franchise Network from 1994 to 1997. Mr. Perkins currently serves as a director of the following TSX listed companies: Quest Ventures Inc. since January 2005, International Tower Hill Mines Ltd. since 1998 and Waymar Resources Ltd. since June 2005.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the *Securities Exchange Act of 1934*, as amended ("*Section 16*"), requires that reports of beneficial ownership of capital stock and changes in such ownership be filed with the SEC by Section 16 "*reporting persons*," including directors, certain officers, and holders of more than 10% of the outstanding common shares. The Company is required to disclose in this Annual Report on Form 10–K each reporting person whom it knows to have failed to file any required reports under Section 16 on a timely basis during the fiscal year ended December 31, 2005.

To the Company's knowledge, based solely on a review of copies of Forms 3, 4 and 5 furnished to it and written representations that no other reports were required, during the fiscal year ended December 31, 2005, the Company's officers, directors and 10% shareholders complied with all Section 16(a) filing requirements applicable to them except as follows:

None

26

**Code of Ethics**

The Company has adopted a Code of Ethics and Corporate Disclosure Policy that applies to the directors, officers and employees and Corporate Governance Guidelines that applies to the directors and officers of the Company. A copy of the Code of Ethics, Corporate Disclosure Policy and Corporate Governance Guidelines are posted on the Company's website at http://www.usvo.com. These documents are also available in print to any shareholder who requests a copy by sending a written request to our corporate secretary at #507, 837 West Hastings Street, Vancouver, British Columbia, V6C 3N6.

**Audit Committee**

The Audit Committee assists the Company's Board of Directors in its oversight of the quality and integrity of the accounting, audit and reporting practices of the Company. The Audit Committee's role includes discussing with management the Company's processes to manage business and financial risk and for compliance with significant applicable legal, ethical and regulatory requirements. The Audit Committee is responsible for the appointment, replacement, compensation and oversight of the independent auditor engaged to prepare or issue audit reports on the financial statements of the Company. The Audit Committee relies on the expertise and knowledge of management and the independent auditor in carrying out its oversight responsibilities.

The Audit Committee of the Board of Directors consists of Maurice Loverso and Rowland Perkins (who was appointed effective January 10, 2005). Rowland Perkins serves as Chairman. The Board of Directors had determined that each Audit Committee member has sufficient knowledge in financial and accounting matters to serve on the Committee and that each member is an *"audit committee financial expert"* as defined by SEC rules.

**Item 11. Executive Compensation.**

The following table sets forth compensation awarded to, earned by or paid to USA Video's Chief Executive Officer (CEO), and to other persons serving as executive officers of the Company as of December 31, 2005, whose salary and bonus for such year exceeded $100,000 (collectively, the *"Named Executive Officers"*) for the last three completed fiscal years.

| | | Summary Compensation Annual Compensation | | | | Long Term Compensation | | |
| | | | | | | Awards | Payouts | |
| Name and Principal Position | Year | Salary | Bonus | Other Annual Compensation | Restricted Stock Award(s) | Securities Underlying Options/SARs (#) | LTIP Payouts | All Other Compensation |
| | | $ | $ | $ | $ | $ | $ | $ |
| Molina, Edwin *CEO* | 2005 | 75,600 | –0– | 20,550 (1–2) (3) | –0– | 3,000,000 (8) | –0– | –0– |
| | 2004 | 49,600 | –0– | 11,625 | –0– | | –0– | –0– |
| | 2003 | 36,000 | –0– | 5,650 (4–7) | –0– | 2,000,000 (9–10) –0– | –0– | –0– |
| Drescher, Anton *CFO* | 2005 | 57,529 (11) | –0– | 1,000 (12) | –0– | 1,000,000 (19) | –0– | –0– |
| | 2004 | 46,870 (11) | –0– | 14,625 (13–14) | –0– | | –0– | –0– |
| | 2003 | 40,399 (11) | –0– | 4,900 (15–18) | –0– | 2,000,000 (20) –0– | –0– | –0– |
| Loverso, Maurice *Director* | 2005 | –0– | –0– | –0– | –0– | 50,000 (21) | –0– | –0– |
| | 2004 | –0– | –0– | –0– | –0– | | –0– | –0– |
| | 2003 | –0– | –0– | –0– | –0– | 250,000 (22) –0– | –0– | –0– |
| Perkins, Rowland *Director* | 2005 | –0– | –0– | –0– | –0– | | –0– | –0– |
| | 2004 | –0– | –0– | –0– | –0– | 200,000 (23–24) | –0– | –0– |
| | 2003 | –0– | –0– | –0– | –0– | –0– –0– | –0– | –0– |

27

(1) In July 2005, Mr. Molina purchased 250,000 units (each comprised of one common share and one warrant to acquire one common share at $0.055 per share) at $0.08 per unit. This compensation resulted from the difference between the $0.055 purchase price and the $0.08 warrant exercise price and the fair market price of $0.09 of the common shares on the date of issuance of the units.

(2) In September 2005, Mr. Molina purchased 300,000 units (each comprised of one common share and one warrant to acquire one common share at $0.065 per share) at $0.084 per unit. This compensation resulted from the difference between the $0.065 purchase price and the $0.084 warrant exercise price and the fair market price of $0.09 of the common shares on the date of issuance of the units.

(3) In January 2004, Mr. Molina purchased 25,000 units (each comprised of one common share and one warrant to acquire one common share at $0.20 per share) at $0.255 per unit. This compensation resulted from the difference between the $0.20 purchase price and the $0.255 warrant exercise price and the fair market price of $0.46 of the common shares on the date of issuance of the units.

(4) In February 2003, Mr. Molina purchased 250,000 units (each comprised of one common share and one warrant to acquire one common share at $0.0657 per share) at $0.0657 per unit. This compensation resulted from the difference between the $0.0657 purchase price and the $0.0657 warrant exercise price and the fair market price of $0.07 of the common shares on the date of issuance of the units.

(5) In April 2003, Mr. Molina purchased 100,000 units (each comprised of one common share and one warrant to acquire one common share at $0.075 per share) at $0.068 per unit. This compensation resulted from the difference between the $0.068 purchase price and the $0.075 warrant exercise price and the fair market price of $0.078 of the common shares on the date of issuance of the units.

(6) In May 2003, Mr. Molina purchased 50,000 units (each comprised of one common share and one warrant to acquire one common share at $0.1175 per share) at $0.088 per unit. This compensation resulted from the difference between the $0.088 purchase price and the $0.1175 warrant exercise price and the fair market price of $0.102 of the common shares on the date of issuance of the units.

(7) In September 2003, Mr. Molina purchased 100,000 units (each comprised of one common share and one warrant to acquire one common share at $0.095 per share) at $0.08 per unit. This compensation resulted from the difference between the $0.08 purchase price and the $0.095 warrant exercise price and the fair market price of $0.09 of the common shares on the date of issuance of the units.

(8) In July 2005, Mr. Molina was granted a stock option to purchase up to 1,000,000 shares of common stock at an exercise price of $0.10 per share, exercisable on or before July 11th, 2007.

(9) In December 2005, Mr. Molina was granted a stock option to purchase up to 2,000,000 shares of common stock at an exercise price of $0.10 per share, exercisable on or before December 23rd, 2007.

(10) In December 2004, Mr. Molina was granted a stock option to purchase up to 2,000,000 shares of common stock at an exercise price of $0.25 per share, exercisable on or before December 3rd, 2006. On June 15th, 2005, the exercise price of this stock option was reduced to $0.10 per share.

(11) Represents consulting fees paid to Mr. Drescher through Harbour Pacific Capital Corp., a consulting firm wholly-owned by him, for his services as an executive officer of the Company.

(12) In January 2005, Mr. Drescher purchased 50,000 units (each comprised of one common share and one warrant to acquire one common share at $0.10 per share) at $0.13 per unit. This compensation resulted from the difference between the $0.10 purchase price and the $0.13 warrant exercise price and the fair market price of $0.12 of the common shares on the date of issuance of the units.

(13) In January 2004, Mr. Drescher purchased 25,000 units (each comprised of one common share and one warrant to acquire one common share at $0.20 per share) at $0.255 per unit. This compensation resulted from the difference between the $0.20 purchase price and the $0.255 warrant exercise price and the fair market price of $0.46 of the common shares on the date of issuance of the units.

28

(14) In November 2004, Mr. Drescher purchased 40,000 units (each comprised of one common share and one warrant to acquire one common share at $0.15 per share) at $0.195 per unit. This compensation resulted from the difference between the $0.15 purchase price and the $0.195 warrant exercise price and the fair market price of $0.21 of the common shares on the date of issuance of the units.

(15) In February 2003, Mr. Drescher purchased 250,000 units (each comprised of one common share and one warrant to acquire one common share at $0.0657 per share) at $0.0657 per unit. This compensation resulted from the difference between the $0.0657 purchase price and the $0.0657 warrant exercise price and the fair market price of $0.07 of the common shares on the date of issuance of the units.

(16) In April 2003, Mr. Drescher purchased 100,000 units (each comprised of one common share and one warrant to acquire one common share at $0.075 per share) at $0.068 per unit. This compensation resulted from the difference between the $0.068 purchase price and the $0.075 warrant exercise price and the fair market price of $0.078 of the common shares on the date of issuance of the units.

(17) In May 2003, Mr. Drescher purchased 50,000 units (each comprised of one common share and one warrant to acquire one common share at $0.1175 per share) at $0.088 per unit. This compensation resulted from the difference between the $0.088 purchase price and the $0.1175 warrant exercise price and the fair market price of $0.102 of the common shares on the date of issuance of the units.

(18) In September 2003, Mr. Drescher purchased 50,000 units (each comprised of one common share and one warrant to acquire one common share at $0.095 per share) at $0.08 per unit. This compensation resulted from the difference between the $0.08 purchase price and the $0.095 warrant exercise price and the fair market price of $0.09 of the common shares on the date of issuance of the units.

(19) In December 2005, Mr. Drescher was granted a stock option to purchase up to 1,000,000 shares of common stock at an exercise price of $0.10 per share, exercisable on or before December 23rd, 2007.

(20) In December 2004, Mr. Drescher was granted a stock option to purchase up to 2,000,000 shares of common stock at an exercise price of $0.25 per share, exercisable on or before December 3rd, 2006. On June 15th, 2005, the exercise price of this stock option was reduced to $0.10 per share.

(21) In December 2005, Mr. Loverso was granted a stock option to purchase up to 50,000 shares of common stock at an exercise price of $0.10 per share, exercisable on or before December 23rd, 2007.

(22) In December 2004, Mr. Loverso was granted a stock option to purchase up to 250,000 shares of common stock at an exercise price of $0.25 per share, exercisable on or before December 3rd, 2006. On June 15th, 2005, the exercise price of this stock option was reduced to $0.10 per share.

(23) In January 2005, Mr. Perkins was granted a stock option to purchase up to 150,000 shares of common stock at an exercise price of $0.10 per share, exercisable on or before January 10th, 2007.

(24) In December 2005, Mr. Perkins was granted a stock option to purchase up to 50,000 shares of common stock at an exercise price of $0.10 per share, exercisable on or before December 23rd, 2007.

The following table sets forth certain information concerning grants of stock options to the Named Executive Officers during the year ended December 31, 2005.

29

### OPTION/SAR GRANTS IN LAST FISCAL YEAR

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rate of Stock Price Appreciation for Option Term | | |
| | Number of Securities Underlying Options/SARs Granted | % of Total Options/SARs Granted to Employees in Fiscal Year | Exercise Price ($/Share) | Market Price on Date of Grant ($/Share) | Expiration Date | 0% ($) | 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|---|---|
| Molina, Edwin | 1,000,000 | 38% | 0.10 (2) | 0.08(2) | 07/22/2007 | –0– | –0– | –0– |
| | 2,000,000 | | 0.10 (3) | 0.07 (3) | 12/23/2007 | –0– | –0– | –0– |
| Drescher, Anton | 1,000,000 | 13% | 0.10 (3) | 0.07 (3) | 12/23/2007 | –0– | –0– | –0– |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| L o v e r s o , Maurice | 50,000 | 1% | 0.10 (3) | 0.07 (3) | 12/23/2007 | –0– | –0– | –0– |
| P e r k i n s , Rowland | 150,000 50,000 | 3% | 0.10 (1,4) 0.10 (3) | 0.38(1,4) 0.07(3) | 01/10/2007 12/23/2007 | –0– –0– | –0– –0– | –0– –0– |

(1)  In January 2005 a stock option was granted to Rowland Perkins, a director, to purchase up to 150,000 common share on or before January 10, 2007, at an exercise price of $0.35 per share and an employee exercised a portion of his stock option to purchase 100,000 common shares. On January 10th, 2005, the date the option was originally granted, the market price was $0.38 per share.

(2)  A total of 1,675,000 stock options were granted to directors, employees and consultants in July 2005. All stock options to employees and consultants expire on July 22, 2007.  On July 22nd 2005, the date the option was originally granted, the market price was $0.08 per share.

(3)  A total of 4,810,000 stock options were granted to directors, employees and consultants in December 2005. All stock options to employees and consultants expire on December 23, 2007.  On December 23rd, 2005, the date the option was originally granted, the market price was $0.07 per share.

(4)  On June 15th, 2005, the exercise price of this stock option was reduced from $0.25 per share to $0.10 per share.

The following table sets forth certain information concerning exercises of stock options by the Named Executive Officers during the year ended December 31, 2005 and stock options held at year end.

**Aggregated Option / SAR Exercises in Last Fiscal Year and FY-End Option / SAR Values**

| Name | Shares Acquired on Exercise (#) | Value Realised ($) | Number of Securities Underlying Unexercised Options / SARs at Fiscal year End (#) Exercisable/ Unexercisable | | Value of Unexercised In-the-Money Options / SARs at Fiscal Year End ($) Exercisable/ Unexercisable | |
|---|---|---|---|---|---|---|
| Molina, Edwin | –0– | –0– | 0 / 0 | | N/A | / $0 |
| Drescher, Anton | –0– | –0– | 0 / 0 | | N/A | / $0 |
| Loverso, Maurice | –0– | –0– | 0 / 0 | | N/A | / $0 |
| Perkins, Rowland | –0– | –0– | 0 / 0 | | N/A | / $0 |

(1)  On December 31, 2005, the average of the high and low bid prices of the common shares on the OTC BB was $0.055.

**Compensation of Directors**

Directors receive no compensation for their service as such.

**Employment Contracts**

USA Video does not have an employment contract with Mr. Molina and the other Named Executive Officer.  The Company has no obligation to provide any compensation to Mr. Molina or any other Named Executive Officer in the event of his resignation, retirement or termination, or a change in control of the Company, or a change in any Named Executive Officers' responsibilities following a change in control.

USA Video may in the future create retirement, pension, profit sharing and medical reimbursement plans covering its Executive Officers and Directors.

**Item 12.  Security Ownership of Certain Beneficial Owners and Management.**

The following table sets forth as of March 22nd, 2006, the number of outstanding common shares of USA Video beneficially owned by (i) each person known to USA Video to beneficially own more than 5% of its outstanding common shares, (ii) each director, (iii) each Named Executive Officer, and (iv) all officers and directors as a group.

| Name | Shares Owned | Percentage of Class |
|---|---|---|
| Edwin Molina (1) | 11,870,234 | 7.68% |
| Anton J. Drescher (2) | 11,186,885 | 7.25% |
| Maurice Loverso (3) | 300,000 | 0.19% |
| Rowland Perkins (4) | 212,500 | 0.14% |
| All Executive Officers and Directors as a Group (four persons) | 23,569,619 | 15.26% |

(1) Includes 675,000 common shares underlying warrants and 5,000,000 common shares underlying stock options that are currently exercisable by Mr. Molina. Mr. Molina's address is 83 Halls Road, Old Lyme, Connecticut.

(2) Includes 90,000 common shares underlying warrants and 3,000,000 common shares underlying stock options that are currently exercisable by Mr. Drescher. Mr. Drescher's address is 83 Halls Road, Old Lyme, Connecticut.

(3) Includes 300,000 common shares underlying stock options that are currently exercisable by Mr. Loverso. Mr. Loverso's address is 83 Halls Road, Old Lyme, Connecticut.

(4) Includes 200,000 common shares underlying stock options that are currently exercisable by Mr. Perkins. Mr. Perkin's address is 83 Halls Road, Old Lyme, Connecticut.

**Item 13. Certain Relationships and Related Transactions.**

In 2005, the Company paid consulting fees of $57,529 to Harbour Pacific Capital Corp., a company controlled by Anton J. Drescher, in consideration of Mr. Drescher's services as an executive officer of the Company.

31

In February 2005, USA Video completed a private placement of 1,500,000 units (each unit consisting of one common share and one warrant to purchase an additional common share at $0.13 per share) at a price of $0.10 per unit, of which 1,350,000 units were sold to outside investors and 150,000 units were sold to officers, directors, and employees of the Company. Because the rules of the TSX require that the offering price for privately placed securities of listed companies be set when the offering is first announced rather than upon closing, the sale price of the units and the exercise price of the warrants were below the market price of $0.12 of the common shares on the date of issuance. Units were sold to the following officers and directors of the Company, in the amounts indicated: Edwin Molina (−0− units) and Anton J. Drescher (50,000 units). The Company will charge operations for any differential between the fair value and the purchase price of the common stock and for any differential between the fair value of the common stock underlying the warrants and the exercise price of the warrants.

In July 2005, USA Video completed a private placement of 5,100,000 units (each unit consisting of one common share and one warrant to purchase an additional common share at a price of $0.08 per share) at a price of $0.055 per unit, of which 4,600,000 units were sold to outside investors and 500,000 units were sold to officers, directors and employees of the Company. Because the rules of the TSX require that the offering price for privately placed securities of listed companies be set when the offering is first announced rather than upon closing, the sale price of the units and the exercise price of the warrants were below the market price of $0.09 of the common shares on the date of issuance. Units were sold to the following officers and directors of the Company, in the amounts indicated: Edwin Molina (250,000 units) and Anton J. Drescher (−0− units). The Company will charge operations for any differential between the fair value and the purchase price of the common stock and for any differential between the fair value of the common stock underlying the warrants and the exercise price of the warrants.

In September 2005, USA Video completed a private placement of 4,175,000 units (each unit consisting of one common share and one warrant to purchase an additional common share at a price of $0.084 per share) at a price of $0.065 per unit, of which 3,675,000 units

were sold to outside investors and 500,000 units were sold to officers, directors and employees of the Company. Because the rules of the TSX require that the offering price for privately placed securities of listed companies be set when the offering is first announced rather than upon closing, the sale price of the units and the exercise price of the warrants were below the market price of $0.09 of the common shares on the date of issuance. Units were sold to the following officers and directors of the Company, in the amounts indicated: Edwin Molina (300,000 units) and Anton J. Drescher (−0− units). The Company will charge operations for any differential between the fair value and the purchase price of the common stock and for any differential between the fair value of the common stock underlying the warrants and the exercise price of the warrants.

In December 2005, USA Video completed a private placement of 1,600,000 units (each unit consisting of one common share and one warrant to purchase an additional common share at a price of $0.084 per share) at a price of $0.06 per unit, of which 1,600,000 units were sold to outside investors and −0− units were sold to officers, directors and employees of the Company. Because the rules of the TSX require that the offering price for privately placed securities of listed companies be set when the offering is first announced rather than upon closing, the sale price of the units and the exercise price of the warrants were below the market price of $0.07 of the common shares on the date of issuance.

32

## Item 14.  Principle Accountant Fees and Services

### Audit and Non−Audit Fees

The following table presents fees for the professional audit services rendered by Goldstein Golub Kessler LLP for the audit of the Company's annual financial statements for the years ended December 31, 2005 and 2004 and fees billed for other services rendered by Goldstein Golub Kessler LLP during those periods.

| Year ended December 31 | 2005 | 2004 |
| --- | --- | --- |
| Audit fees | $ 35,500 | $ 30,500 |
| Audit−related fees (1) | −0− | −0− |
| Tax fees (2) | −0− | −0− |
| All other fees (3) | −0− | −0− |
| Total | $ 35,500 | $ 30,500 |

(1)  Audit−related fees consist of assurance and related services that are reasonably related to the performance of the audit of the Company's financial statements. The category includes fees related to the performance of audits and attest services not required by statute or regulation, audits of the Company's benefit plans, due diligence related to acquisitions, agreed−upon procedures, and accounting consultations regarding the application of generally accepted accounting principals to proposed transactions.

(2)  Tax fees consist of the aggregate fees billed for professional service rendered by Goldstein Golub Kessler LLP for tax compliance, tax advice, and tax planning (domestic and international).

(3)  Other fees consist primarily of the aggregate fees billed for professional services rendered by Goldstein Golub Kessler LLP related to a business continuity engagement.

The Audit Committee reviews all audit and non−audit related fees at least annually. The Audit Committee pre−approved all audit and non−audit related services in fiscal 2005. The Audit Committee had concluded that the provision of the non−audit services listed above is compatible with maintaining the independence of Goldstein Golub Kessler LLP.

Through September 30, 2005, Goldstein Golub Kessler LLP (the ''Firm'') had a continuing relationship with American Express Tax and Business Services Inc. (''TBS'') from which it leased auditing staff who were full time, permanent employees of TBS and through which its partners provided non−audit services. Subsequent to September 30, 2005 this relationship ceased and the Firm established a similar relationship with RSM McGladrey, Inc.  The Firm has no full time employees, and, therefore, none of the audit services performed were provided by permanent, full−time employees of the Firm. The Firm manages and supervises the audit and audit staff and is exclusively responsible for the opinion rendered in connection with its examination.

**PART IV**

**Item 15. Exhibits, Financial Statements to Shareholders and Reports on Form 8-K.**

(a)(1)    Financial Statements Independent Auditors' Reports Consolidated Balance Sheets Consolidated Statements of Operations
Consolidated Statements of Comprehensive Operations Consolidated Statements of Stockholders' Equity Consolidated
Statements of Cash Flows Notes to Consolidated Financial Statements

33

(a)(2)    All schedules are omitted because they are not applicable or the required information is shown in the financial statements or
the notes thereto included in this Report.

(b)      Reports on Form 8-K

During the last quarter of the fiscal year covered by this Report, the Company filed the filing reports on Form 8-K:

(i)       On October 7th, 2005, the Company announced it had retained the law firm Goldstein & Faucett LLP, to handle
enforcement of USVO's pioneering VOD technology patent rights, including USVO's present lawsuit against
Movielink LLC. Goldstein & Faucett is a Houston, Texas intellectual property boutique which focuses on enforcing
patents via patent infringement suits and licensing.

(ii)      On November 2nd, 2005, the Company announced that a special anti-piracy event was being held for a select group
of television and film distribution companies where Lightning Media would premier *SmartMark Enhanced
Duplication*, their new Anti-Piracy Protection service that is available when clients duplicate their television and
film titles to digital video. The event is on the 3rd of November at Lightning Media's facilities in Hollywood, CA.

(iii)     On November 4th, 2005, the Company announced that it had unveiled its new SmartMark™ anti-piracy logo, which
helps educate the public about piracy, visually marking movies and television shows that have been protected with
the Company's SmartMark technology. It serves as a warning to those who contemplate the theft of intellectual
property that the content marked with the logo is protected by robust forensics data utilized by law enforcement to
bring the pirates to justice.

(iv)      On November 9th, 2005, USA Video Technology Corporation, a wholly-owned subsidiary of the Company
("*USVO*") filed its Appeal Brief in the Federal Circuit court of Appeals in Washington, DC. The appeal is from the
District Court's decision granting Movielinks' motion for summary judgment of non-infringement, and USVO's
motion for reconsideration. The U.S. Court of Appeals for the Federal Circuit, which has jurisdiction over patent
litigation appeals, will hear the appeal.

(v)       On November 9th, 2005, the Company announced that FilmMates Entertainment would protect its entire film library
against piracy using the Company's SmartMark™ anti-piracy technology. The library was to be SmartMarked at
Lightning Media's post-production facility in Hollywood. Lightning Media is a Certified SmartMark Anti-Piracy
Provider using the Registrant's MediaSentinel™ Workstation to SmartMark digital video and protect its clients'
properties from piracy.

(vi)      On November 29th, 2005 the Company released its "SmartMarks™ In Action" video on its website. The video
discusses the problems of piracy, what SmartMarks are, and how SmartMarks combat piracy, showing the movie
trailer for the SmartMarked release "Aunt Agatha's Apartment," from FilmMates Entertainment.

34

(vii)    On November 30th, 2005 the Company announced an association with DIC Entertainment (DIC), a leading children's media company. DIC has SmartMarked its new full–length animated television special INSPECTOR GADGET'S BIGGEST CAPER EVER: THE CASE OF THE FLYING LIZARD. The SmartMarked film premiered at the Cartoons on the Bay 2005 International Festival of Television Animation in Positano, Italy earlier this year.

(viii)    On January 12th, 2006 the Registrant announced that FilmMates Home Video Entertainment would be using the Company's SmartMark™ anti–piracy technology to protect its films for distribution. FilmMates recently entered into a home video distribution agreement with Vivendi Universal Visual Entertainment, a wholly owned subsidiary of Universal Music Group. *American Reunion, Living Life,* and *Rent Control* are the first three films scheduled for distribution. These three films will be made available for home video in early spring 2006, with distribution scheduled for the U.S., Puerto Rico, and Canada. In addition, FilmMates' *Sherlock a Case of Evil* will be SmartMarked for Internet and home video distribution in Japan.

(ix)    On February 15th, 2006, India's National Public Broadcaster, and one of the world's largest terrestrial television networks, **Doordarshan,** has chosen to use MediaSentinel™ to protect their content distribution in a three month trial program. Doordarshan would be among the first of the world's largest networks and the first public broadcaster to deploy piracy deterrence technology to protect profits by thwarting pirates. MediaSentinel is an anti–piracy workstation developed by the Company. Doordarshan is the television division for **Prasar Bharati** (Broadcasting Corporation of India).

(x)    On February 23th, 2006 the Company announced that it had completed a major upgrade of its MediaSentinel™ anti–piracy watermarking workstation. The new MS300 MediaSentinel Workstation has been redesigned around a friendlier user interface, a fully automated SmartMarking process, and an enhanced system security architecture. MediaSentinel is of use in production and post–production houses, stock footage library houses, broadcasters and digital cinema markets.

(xi)    On March 10th, 2006 Doordarshan, India's national public broadcaster and one of the world's largest terrestrial television networks, has taken the lead on a three month trial basis to apply technology to strengthen worldwide efforts to identify video pirates. The trial with Doordarshan was initiated by First Serve Entertainment, which represents the Company, and exclusively markets and sells MediaSentinel technology in Asia–Pacific and the Middle East and non–exclusively in other parts of the world.

(c)    Exhibits

3.1    Articles of Continuance (Wyoming) filed February 16, 1995 *(incorporated by reference from Exhibit 3.1 to the registrant's Form 10).*

3.2    Articles of Amendment (Alberta) filed January 3, 1995 *(incorporated by reference from Exhibit 3.2 to the registrant's Form 10).*

3.3    Articles of Amendment (Alberta) filed June 28, 1993 *(incorporated by reference from Exhibit 3.3 to the registrant's Form 10).*

---

35

3.4    Articles of Amendment (Alberta) filed April 6, 1992 (incorporated by reference from Exhibit 3.3 to the registrant's Form 10).

3.5    Articles of Amendment (Alberta) filed September 1, 1989 *(incorporated by reference from Exhibit 3.5 to the registrant's Form 10).*

3.6    Articles of Incorporation (Alberta) filed April 18, *1986 (incorporated by reference from Exhibit 3.6 to the registrant's Form 10).*

3.7    Bylaws *(incorporated by reference from Exhibit 3.7 to the registrant's Form 10).*

4.3   Share Option Plan *(incorporated by reference from Exhibit 4.3 to the registrant's Form 10).*

10.4  Alliance Partner Agreement dated November 11, 1999, between Exodus Communications, Inc. and registrant *(incorporated by reference from Exhibit 10.4 to the registrant's Form 10).*

21.   Subsidiaries of the Registrant:

| Name | State of Incorporation |
|------|------------------------|
| USA Video (California) Corporation | Nevada |
| USA Video Corporation | Texas |
| Old Lyme Video Productions Inc. | Wyoming |
| USA Video Technology Corporation | Wyoming |
| USVO, Inc. | Connecticut |

31.1  Certification of the Chief Executive Officer Pursuant To Rule 13a−14 Or 15d−14 of the *Securities Exchange Act Of 1934,* as adopted pursuant to Section 302 of the *Sarbanes−Oxley Act of 2002*

31.2  Certification of the Chief Financial Officer Pursuant To Rule 13a−14 Or 15d−14 of the *Securities Exchange Act of 1934,* as adopted pursuant to Section 302 of the *Sarbanes−Oxley Act of 2002*

32.1  Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the *Sarbanes−Oxley Act of 2002*

32.2  Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the *Sarbanes−Oxley Act of 2002*

---

36

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the *Securities Exchange Act of 1934*, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**USA VIDEO INTERACTIVE CORP.**

Date: March 22nd, 2006

By: /s/ *Edwin Molina*
Edwin Molina
Chief Executive Officer

Pursuant to the requirements of the *Securities Exchange Act of 1934*, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|-----------|-------|------|
| /s/ *Edwin Molina*<br>Edwin Molina | Chief Executive Officer, Director | March 22nd, 2006 |
| /s/ *Anton J. Drescher*<br>Anton J. Drescher | Chief Financial Officer, (principal financial officer and principal accounting officer), Director | March 22nd, 2006 |
| /s/ *Maurice Loverso* | Director | March 22nd, 2006 |

Maurice Loverso

/s/ *Rowland Perkins*          Director                    March 22nd, 2006

Rowland Perkins

---

37

Exhibit 31.1

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER PURSUANT TO RULE 13A–14 OR 15D–14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES–OXLEY ACT OF 2002**

I, Edwin Molina, certify that:

1.   I have reviewed this annual report on Form 10–K of USA Video Interactive Corp.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.   The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15(d)–15(f)) for the Registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.   The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date:    March 22nd, 200606

/s/ *Edwin Molina*
Edwin Molina,

Chief Executive Officer

38

Exhibit 31.2

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER PURSUANT TO RULE 13A−14 OR 15D−14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES−OXLEY ACT OF 2002**

I, Anton J. Drescher, certify that:

1.  I have reviewed this annual report on Form 10−K of USA Video Interactive Corp.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15(d)−15(f)) for the Registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date:    March 22nd, 2006

/s/ *Anton J. Drescher*
Anton J. Drescher,
Chief Financial Officer

39

Exhibit 32.1

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES−OXLEY ACT OF 2002

In connection with the Annual Report of USA Video Interactive Corp. (the "*Company*") on Form 10−K for the year ended December 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "*Report*"), I, Edwin Molina, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the *Sarbanes−Oxley Act of 2002* that:

1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the *Securities Exchange Act of 1934*, and

2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By:   /s/ *Edwin Molina*
        Edwin Molina,
        Chief Executive Officer
        March 22nd, 2006

---

40

Exhibit 32.2

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES−OXLEY ACT OF 2002

In connection with the Annual Report of USA Video Interactive Corp. (the "*Company*") on Form 10−K for the year ended December 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "*Report*"), I, Anton J. Drescher, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the *Sarbanes−Oxley Act of 2002* that:

1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the *Securities Exchange Act of 1934*, and

2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By:   /s/ *Anton J. Drescher*
        Anton J. Drescher,
        Chief Financial Officer
        March 22nd, 2006

USA VIDEO INTERACTIVE CORP.
AND SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 2005

F–2

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm                F–3

Consolidated Financial Statements:

  Balance Sheets                                                       F–4
  Statements of Operations                                            F–5
  Statements of Stockholders' Equity (Deficiency)                     F–6
  Statements of Cash Flows                                            F–7
  Notes to Consolidated Financial Statements                   F–8 – F–22

F–3

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors
USA Video Interactive Corp.

We have audited the accompanying consolidated balance sheets of USA Video Interactive Corp. and Subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity (deficiency), and cash flows for each of the three years in the period ended December 31, 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, these consolidated financial statements referred to above present fairly, in all material respects, the financial position of USA Video Interactive Corp. and Subsidiaries as of December 31, 2005 and 2004 and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has suffered recurring losses from operations, has not generated significant revenue from operations and has a net working capital deficiency and a stockholders' deficiency that raise substantial doubt about its ability to continue as a going concern. Management's plan in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**GOLDSTEIN GOLUB KESSLER LLP**
New York, New York

March 7, 2006

### Comments by Auditors for Canadian Readers on U.S. – Canada Reporting Differences

In Canada, reporting standards for auditors do not require the addition of an explanatory paragraph (following the opinion paragraph) or a reservation of opinion when the consolidated financial statements are affected by conditions and events that cast substantial doubt on the Company's ability to continue as a going concern. Such doubt is accounted for and disclosed in accordance with United States generally accepted accounting principles.

Our report to the Board of Directors dated March 7, 2006, is expressed in accordance with the standards of the Public Company Accounting Oversight Accounting Board (United States), which requires an explanatory paragraph in the auditor's report.

**GOLDSTEIN GOLUB KESSLER LLP**
New York, New York

March 7, 2006

### See Notes to Consolidated Financial Statements

---

F–4

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

| | 2005 | 2004 |
|---|---|---|
| December 31, | | |
| ASSETS | | |

| | | |
|---|---:|---:|
| **Current Assets:** | | |
| Cash and cash equivalents | $ 2,253 | $ 9,341 |
| Prepaid expenses and other current assets | 9,825 | 18,536 |
|     Total current assets | 35,078 | 27,877 |
| | | |
| Property and Equipment − at net | − | − |
| | | |
| Intangible assets, net | 35,181 | 38,504 |
| | | |
| Prepaid rent | 19,340 | 23,120 |
| | | |
| Deferred Tax Assets, net of valuation allowance of $8,824,000 and | | |
|   $8,517,000, respectively | − | − |
|     **Total Assets** | $ 89,599 | $ 89,501 |

**LIABILITIES AND STOCKHOLDERS' DEFICIENCY**

| | | |
|---|---:|---:|
| **Current Liabilities:** | | |
| Accounts payable and accrued expenses | $ 314,729 | $ 556,714 |
| Due to related parties | 160 | 160 |
|     Total current liabilities | 314,889 | 556,874 |
| | | |
| Commitments and Contingencies | | |
| | | |
| **Stockholders' Deficiency:** | | |
| Preferred stock − no par value; authorized 250,000,000 shares, none issued | | |
| Common stock and additional paid−in capital − no par value; authorized 250,000,000 | | |
|   shares, issued and outstanding 145,073,088 and 130,435,088 shares, respectively | 34,010,651 | 32,810,318 |
| | | |
| Accumulated deficit | (34,235,941) | (33,277,691) |
|   Stockholders' deficiency | (225,290) | (467,373) |
|     **Total Liabilities and Stockholders' Deficiency** | $ 89,599 | $ 89,501 |

*See Notes to Consolidated Financial Statements*

F−5

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

| Year ended December 31, | 2005 | 2004 | 2003 |
|---|---:|---:|---:|
| Revenue | $ 18,800 | $ 4,700 | $ 3,920 |
| | | | |
| **Expenses:** | | | |
| Cost of sales | 5,000 | 3,379 | 2,885 |
| Research and development | 168,571 | 276,302 | 66,350 |
| Selling, general and administrative | 1,043,440 | 1,124,609 | 628,180 |
| Depreciation and amortization | 3,323 | 3,323 | 19,391 |
| Impairment loss on long−lived assets | − | − | 100,246 |
|     Total expenses | 1,220,334 | 1,407,613 | 817,052 |

| | | | |
|---|---|---|---|
| Loss from operations | (1,201,534) | (1,402,913) | (813,132) |
| Other income (expense), net: | | | |
| Interest income (expense) (net of interest income of $208, $102 and $149, respectively) | (197) | (1,639) | (12,722) |
| Gain on settlement of accounts payable | 243,481 | 214 | 89,159 |
| Gain on sale of equipment | – | 500 | 24,626 |
| Other | – | – | 14,657 |
| | 243,284 | (925) | 115,720 |
| Net loss | $  (958,250) | $(1,403,838) | $  (697,412) |
| Net loss per share – basic and diluted | $      (.01) | $      (.01) | $      (.01) |
| Weighted–average number of common shares outstanding – basic and diluted | 136,985,153 | 122,737,060 | 110,020,144 |

*See Notes to Consolidated Financial Statements*

F–6

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIENCY)

| | Common Stock and Additional Paid–in Capital | | Accumulated Deficit | Stockholders' Equity (Deficiency) |
|---|---|---|---|---|
| | Shares | Amount | | |
| Balance at January 1, 2003 | 103,745,088 | $ 30,357,906 | $(31,176,441) | $  (818,535) |
| Issuance of common stock and common warrants for cash | 8,750,000 | 655,877 | – | 655,877 |
| Issuance of common stock upon exercise of warrants | 3,476,000 | 308,538 | – | 308,538 |
| Noncash compensation charges | – | 14,430 | – | 14,430 |
| Net loss | – | – | (697,412) | (697,412) |
| Balance at December 31, 2003 | 115,971,088 | 31,336,751 | (31,873,853) | (537,102) |
| Issuance of common stock and common stock warrants for cash | 1,250,000 | 212,500 | – | 212,500 |
| Issuance of common stock upon exercise of warrants | 13,214,000 | 1,102,107 | – | 1,102,107 |
| Noncash compensation charges | – | 158,960 | – | 158,960 |
| Net loss | – | – | (1,403,838) | (1,403,838) |
| Balance at December 31, 2004 | 130,435,088 | 32,810,318 | (33,277,691) | (467,373) |
| Issuance of common stock and common stock warrants for cash | 12,875,000 | 825,375 | – | 825,375 |
| Issuance of common stock upon exercise of warrants | 1,613,000 | 120,898 | – | 120,898 |
| Issuance of common stock upon exercise of stock options | 150,000 | 37,500 | – | 37,500 |
| Noncash compensation charges | – | 216,560 | – | 216,560 |
| Net loss | – | – | (958,250) | (958,250) |

| Balance at December 31, 2005 | 145,073,088 | $ 34,010,651 | $(34,235,941) | $ (225,290) |

*See Notes to Consolidated Financial Statements*

F–7

**USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| Year ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net loss | $ (958,250) | $(1,403,838) | $ (697,412) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 3,323 | 3,323 | 19,391 |
| Impairment loss on long–lived assets | – | – | 100,245 |
| Gain on sale of equipment | – | (500) | (24,626) |
| Gain on settlement of accounts payable | (243,481) | (214) | (89,159) |
| Noncash compensation charge | 216,560 | 158,960 | 14,430 |
| Changes in operating assets and liabilities: | | | |
| Decrease in accounts receivable | – | 1,400 | – |
| Decrease (increase) in prepaid expenses and other current assets | 8,711 | (1,791) | (6,172) |
| Decrease (increase) in prepaid rent | 3,780 | (23,120) | – |
| Increase (decrease) in accounts payable and accrued expenses | 1,496 | (89,591) | (346,821) |
| Decrease in due to related parties | – | (2,961) | (50,059) |
| **Net cash used in operating activities** | (967,861) | (1,358,332) | (1,080,183) |
| Cash flows from investing activities: | | | |
| Proceeds from equipment sales | – | 500 | 119,626 |
| Proceeds from sale of investments – related parties | – | – | – |
| **Net cash provided by investing activities** | – | 500 | 119,626 |
| Cash flows from financing activity – proceeds from the issuance of common stock and warrants | 983,773 | 1,314,607 | 964,415 |
| **Net cash provided by financing activities** | | | |
| Net increase (decrease) in cash and cash equivalents | 15,912 | (43,225) | 3,858 |
| Cash and cash equivalents at beginning of year | 9,341 | 52,566 | 48,708 |
| Cash and cash equivalents at end of year | $ 25,253 | $ 9,341 | $ 52,566 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid during the year for interest | $ 587 | $ 1,847 | $ 12,824 |

*See Notes to Consolidated Financial Statements*

F–8

**USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

1. **BUSINESS:**

USA Video Interactive Corp. (the "*Company*") is a designer of high–tech Internet streaming video–on–demand systems, services and solutions. At December 31, 2005 and for the two–year period then ended, substantially all of the Company's assets and substantially all its operations are located and conducted in the United States.

2. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:**

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As shown in the financial statements, the Company has incurred losses of $958,250, $1,403,838 and $697,412 for the years ended December 31, 2005, 2004 and 2003, respectively. In addition, the Company has a working capital deficiency of approximately $280,000 and a stockholders' deficiency of approximately $225,000 at December 31, 2005. These conditions raise doubt about the Company's ability to continue as a going concern. The Company's ability to continue as a going concern is dependent upon its ability to generate sufficient revenue and cash flow to meet its obligations as they come due, which management believes it will be able to do. To date, the Company has funded operations primarily through the issuance of common stock and warrants to outside investors and to the Company's management. The Company believes that its operations will generate additional funds and that additional funding from outside investors and the Company's management will continue to be available to the Company when needed. The financial statements do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary in the event the Company cannot continue as a going concern.

The accompanying consolidated financial statements include the accounts of the Company and its wholly–owned subsidiaries. All intercompany accounts and transactions have been eliminated.

The Company maintains cash in bank deposit accounts which, at times, may exceed federally insured limits. The Company has not experienced any losses on these accounts.

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

The Company considers all highly liquid investments with original maturities of three months or less to be cash equivalents.

Deferred rent represents payments made to a landlord at the inception of the lease. The amount is being amortized over the term of the lease (5 years).

F–9

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Property and equipment is stated at cost. Maintenance and repairs are expensed as incurred. When property is retired or otherwise disposed of, the cost and related accumulated depreciation are removed from the accounts and any resulting gain or loss is recognized in operations. Depreciation is computed on the straight–line method over the estimated useful lives of the assets.

Intangible assets consist of patents and patents pending owned by the Company for the Store and Forward Video System. The patents and patents pending are recorded at cost and are being amortized on a straight–line basis over 17 years.

At each balance sheet date, the Company evaluates the impairment of intangible assets. The factors used in evaluating the period of amortization include: (i) current operating results, (ii) projected future operating results, and (iii) other material factors that affect the continuity of the business and economic life of the asset.

Revenue from hardware product sales is recognized when the product has been shipped and the collection of payment is reasonably assured. Revenue recognized from these sales is net of applicable provisions for refunds, discounts and allowances. Engineering services sales are recognized upon the service having been provided.

Revenue from software sales is recognized when the product has been delivered. Revenue from multiple element contracts (hardware, software and engineering) is allocated to the various elements based on fair value. If objective evidence of fair value is not available, revenue from these contracts is deferred until the earlier of when objective evidence of fair value does exist or all elements of the contract have been delivered. Discounts will be applied to each element on a proportionate basis. No portion of the revenue will be recognized if the portion of the revenue

allocable to delivered elements is subject to forfeiture, refund or other concession.

Research and development costs are expensed as incurred.

The Company has elected to apply APB Opinion No. 25, *Accounting for Stock Issued to Employees* ("*APB Opinion No. 25*"), and related interpretations in accounting for its stock options and has adopted the disclosure–only provisions of Statement of Financial Accounting Standards ("*SFAS*") No. 123, *Accounting for Stock–Based Compensation*. If the Company had elected to recognize compensation cost based on the fair value of the options granted at the grant date as prescribed by SFAS No. 123, the Company's net loss and net loss per common share for the years ended December 31, 2005, 2004 and 2003 would have been as follows:

F–10

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| Year ended December 31 | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net loss<br>As reported | $ (958,250) | $(1,403,838) | $ (697,412) |
| Add: Stock compensation expense included in reported net loss | 41,000 | 53,250 | – 0 – |
| Deduct: Total stock based compensation expense determined under fair value based method for all awards | (350,750) | (867,143) | – 0 – |
| Pro forma | $ (1,268,000) | $(2,217,731) | $ (697,412) |
| Loss per common share<br>Basic and diluted:<br>As reported | $ (.01) | $ (.01) | $ (.01) |
| Pro forma | $ (.01) | $ (.02) | $ (.01) |

The fair value of each option grant was estimated at the date of grant using the Black–Scholes option pricing model with the following weighted–average assumptions:

| Year ended December 31 | 2005 | 2004 | 2003 |
|---|---|---|---|
| Expected dividend yield | – 0 – | – 0 – | N/A |
| Risk–free interest rate | 3.23% | 3.04% | N/A |
| Volatility | 144% | 144% | N/A |
| Expected life (years) | 2 | 2 | N/A |

F–11

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Income taxes are accounted for under the liability method. Under this method, deferred tax assets and liabilities are recorded based on the temporary differences between the financial statement and the tax bases of assets and liabilities and for operating loss carry forwards measured using the enacted tax rates in effect for the year in which the differences are expected to reverse. The Company periodically evaluates the reliability of its net deferred tax assets and records a valuation allowance if, based on the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

The assets and liabilities of the Company's foreign subsidiaries are translated into U.S. dollars at current exchange rates, and revenue and expenses are translated at average rates of exchange prevailing during the period. The aggregate effect of translation adjustments is immaterial at December 31, 2005 and 2004.

Basic loss per common share ("*EPS*") is computed as net loss divided by the weighted–average number of common shares outstanding during the period. Diluted EPS includes the impact of common stock potentially issuable upon the exercise of options and warrants. Potential common stock amounts of approximately 26,824,000, 10,407,000 and 17,431,000 for the years ended December 31, 2005, 2004 and 2003, respectively, have been excluded from the computation of diluted net loss per share as their inclusion would be anti–dilutive.

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "*Share Based Payments*" ("*SFAS 123(R)*"). SFAS 123(R) requires all share–based payments to employees, including grants of employee stock options, to be recognized in the financial statements based on their fair values. SFAS 123(R) is effective for the beginning of the first quarter of the Company's 2006 fiscal year. The new standard allows for two transition alternatives, either the modified–prospective method or the modified retrospective method. The Company has not completed its evaluation of SFAS 123(R) and therefore has not selected a transition method or determined the impact that adoption SFAS 123(R) will have on its results of operations.

Management does not believe that any other recently issued, but not yet effective, accounting standards if currently adopted would have a material effect on the accompanying financial statements.

F–12

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**3. MAJOR CUSTOMERS:** During the years ended December 31, 2005, 2004 and 2003 one customer accounted for 100% of total revenue.

**4. PREPAID EXPENSES AND OTHER CURRENT ASSETS:**

Prepaid expenses and other current assets consist of the following:

| December 31, | 2005 | 2004 |
|---|---|---|
| Prepaid Rent | $5,845 | $13,380 |
| Taxes Receivable | 3,578 | 4,754 |
| Other (none in excess of 5% of current assets) | 402 | 402 |
| | $9,825 | $18,536 |

**5. INTANGIBLE ASSETS:**

Intangible assets consist of the following:

| | Gross Carrying Amount | Accumulated Amortization |
|---|---|---|
| Patents and patents pending | $56,488 | $21,307 |
| **Aggregate Amortization Expense:** | | |
| For the year ended December 31, 2005 | | $3,323 |
| **Estimated Amortization Expense:** | | |
| For the year ending December 31, | | |
| 2006 | | $3,323 |
| 2007 | | 3,323 |

|      |       |
|------|-------|
| 2008 | 3,323 |
| 2009 | 3,323 |
| 2010 | 3,323 |

6. **PROPERTY AND EQUIPMENT:**    Property and equipment, at cost, consists of the following:

|                                |     |        |     |        | Estimated     |
|--------------------------------|-----|--------|-----|--------|---------------|
| December 31,                   |     | 2005   |     | 2004   | Useful Life   |
| Office Equipment               | $   | 16,069 | $   | 16,069 | 5 years       |
| Less accumulated depreciation  |     | 16,069 |     | 16,069 |               |
|                                | $   | − 0 −  | $   | − 0 −  |               |

F−13

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Depreciation and amortization expense amounted to $−0−, $−0− and $16,069 for the years ended December 31, 2005, 2004 and 2003, respectively.

During the year ended December 31, 2003, the Company recorded impairment losses of approximately $100,000 (Note 12).

At December 31, 2003 as a result of the Company recording an impairment loss, the cost of the property and equipment has been adjusted to reflect the new carrying amount.

7. **ACCOUNTS PAYABLE AND ACCRUED EXPENSES**    Accounts payable and accrued expenses consist of the following:

| December 31,                              | 2005      | 2004      |
|-------------------------------------------|-----------|-----------|
| Accounts payable                          | $ 163,286 | $ 187,301 |
| Accrued professional fees                 | 75,715    | 55,584    |
| Accrued payroll and related tax withholdings | 63,125 | 282,426   |
| Deferred revenues                         | −0−       | 18,800    |
| Amounts due for purchased computer equipment | 12,603 | 12,603    |
|                                           | $ 314,729 | $ 556,714 |

8. **COMMITMENTS AND CONTINGENCIES:**    The Company leases its Canadian office space under a non−cancelable operating lease, expiring in March 2009. The minimum rental commitment of this lease is approximately $20,000. The Company leases its United States office space on a month−to−month lease.  Rent expense amounted to $43,044, $44,975 and $42,215 for the years ended December 31, 2005, 2004 and 2003, respectively.

On April 10, 2003, the Company announced that a subsidiary had filed a lawsuit in U.S. District Court for the District of Delaware against Movielink, LLC.  The Company alleges that Movielink, a Delaware company, has infringed and continues to infringe on the Company's patented online movie delivery System.

On January 28, 2005, the Court issued an opinion and order granting summary judgment in favor of Movielink, based on the Court's conclusion that the record contained insufficient evidence that the Movielink system "*initiates connections*" (a requirement for infringement of the Company's patent) in light of the Court's construction of the term "*initiates*." The Company filed a motion for reconsideration on February 11, 2005, asking the Court to reconsider its ruling on that point, to decide the remaining aspects of the claim construction and the other pending motions, and to permit the Company's case to proceed to trial. Movielink filed its opposition to the Company's motion for the reconsideration on February 28, 2005. By order dated May 27, 2005, the Court denied our motion for reconsideration, thereby ending the litigation of substantive matters in the District Court. The Company, through counsel (the Firm of Goldstein & Faucett, LLP), filed a Notice of Appeal with the U.S. District Court of Deleware and the appeal has been docketed at the U. S. Court of Appeals for the Federal Circuit.

F–14

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company is party to a default judgment entered against one of the Company's subsidiaries. During the year ended December 31, 1995, a claim was made against the Company for the total amount payable under the terms of a lease with one of the Company's subsidiaries for office space in Dallas, Texas through 2002. The Company's management is of the opinion that the amount payable under the terms of this judgment is not estimable or determinable at this time and may be substantially mitigated by the landlord's renting the property to another party. The range of possible loss is from $–0– to approximately $500,000. Any settlement resulting from the resolution of this contingency will be accounted for in the period of settlement when such amounts are estimable or determinable.

9. **STOCK–HOLDERS' EQUITY:**

On February 14, 2003, the Company issued 2,200,000 units to investors at a price of $0.0657 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.0657 per share.

On February 14, 2003, the Company issued 550,000 units to employees at a price of $0.0657 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.0657 per share. The Company charged operations for approximately $2,400 representing the differential between the fair value and the purchase price of the common stock and for approximately $2,400 representing the differential between the fair value of the underlying common stock and the exercise price of the warrants.

On April 7, 2003, the Company issued 1,200,000 units to investors at a price of $0.068 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.075 per share.

On April 7, 2003, the Company issued 300,000 units to employees at a price of $0.068 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.075 per share. The Company charged operations for approximately $3,000 representing the differential between the fair value and the purchase price of the common stock and for approximately $900 representing the differential between the fair value of the underlying common stock and the exercise price of the warrants.

On May 30, 2003, the Company issued 1,300,000 units to investors at a price of $0.088 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.1175 per share. The Company charged operations for approximately $2,800 representing the differential between the fair value and the purchase price of the common stock.

F–15

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On May 30, 2003, the Company issued 200,000 units to employees at a price of $0.088 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.1175 per share.

On September 23, 2003, the Company issued 2,800,000 units to investors at a price of $0.08 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.095 per share.

On September 23, 2003, the Company issued 200,000 units to employees at a price of $0.08 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.095 per share. The Company charged operations for approximately $3,000 representing the differential between the fair value and the purchase price of the common stock.

From January 1, 2003 to December 31, 2003, the Company issued 3,476,000 shares of common stock upon the exercising of warrants with exercise prices ranging from $0.065 to $0.26 per common share.

On January 12, 2004, the Company issued 400,000 units to investors at a price of $0.200 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.255 per share.

On January 12, 2004, the Company issued 100,000 units to employees at a price of $0.200 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.255 per share. The Company charged operations for approximately $26,000 representing the differential between the fair value and the purchase price of the common stock and for approximately $20,000 representing the differential between the fair value of the underlying common stock and the exercise price of the warrants.

On November 24, 2004, the Company issued 660,000 units to investors at a price of $0.15 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.195 per share.

On November 24, 2004, the Company issued 90,000 units to employees at a price of $0.15 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $0.195 per share. The Company charged operations for approximately $5,000 representing the differential between the fair value and the purchase price of the common stock and for approximately $1,000 representing the differential between the fair value of the underlying common stock and the exercise price of the warrants.

F–16

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

From January 1, 2004 to December 31, 2004, the Company issued 13,214,000 shares of common stock upon the exercising of warrants with exercise prices ranging from $0.064 to $0.255 per common share.

On February 24, 2005, the Company issued 1,350,000 units to investors at $.100 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $.13 per share.

On February 24, 2005, the Company issued 150,000 units to employees at $.100 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $.13 per share. The company charged operations for approximately $3,000 representing the differential between the fair value and the purchase price of the common stock and for approximately $–0– representing the differential between the fair value of the underlying common stock and the exercise price of the warrants.

On July 11, 2005, the Company issued 5,100,000 units to investors at $.055 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $.08 per share.

On July 11, 2005, the Company issued 500,000 units to employees at $.055 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $.08 per share. The Company charged operations for approximately $17,500 representing the differential between the fair value and the purchase price of the common stock and for approximately $5,000 representing the differential between the fair value of the underlying common stock and the exercise price of the warrants.

On September 28, 2005, the Company issued 3,675,000 units to investors at $.065 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $.084 per share.

On September 28, 2005, the Company issued 500,000 units to employees at $.065 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $.084 per share. The Company charged operations for approximately $12,500 representing the differential between the fair value and the purchase price of the common stock and for approximately $3,000 representing the differential between the fair value of the underlying common stock and the exercise price of the warrants.

On December 7, 2005, the Company issued 1,600,000 units to investors at $.060 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $.084 per share.

F-17

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

During 2005, the Company issued 1,613,000 shares of common stock upon the exercising of warrants with exercise prices ranging from $.0657 to $.1175 per common share and issued 150,000 shares of common stock upon the exercising of stock options with exercise price of $.25.

In December 2004, the Company issued options to acquire 550,000 shares of common stock at $0.25 per share to consultants. The Company charged operations for the fair value of these options, approximately $106,000, and this amount is included in selling, general and administrative expenses in the accompany statement of operations.

In January 2005, the Company granted 150,000 options to a director of the Company to purchase 150,000 shares at a price of $0.29 to January 2007.

In April 2005, the Company granted 300,000 options to a consultant of the Company to purchase 300,000 shares at a price of $0.10 to April 2007. The Company charged operations for the fair value of these options, approximately $19,000, and this amount is included in selling, general and administrative expenses in the accompany statement of operations.

In May 2005, the Company granted 1,000,000 options to a consultant of the Company to purchase 1,000,000 shares at a price of $0.10 to May 2007. The Company charged operations for the fair value of these options, approximately $53,000, and this amount is included in selling, general and administrative expenses in the accompany statement of operations.

In June 2005, the Company amended previously granted options to purchase an aggregate of 5,000,000 shares of common stock granted to directors, employee and consultants of the Company to reduce the exercise price from $0.25 per share to $0.10 per share. No expense is recognized during the year ended December 31, 2005 since the strike price equals or exceeds the quoted market price.

In July 2005, the Company granted 1,175,000 options to employees and a director of the Company to purchase 1,175,000 shares at a price of $0.10 to July 2007.

F–18

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In July 2005, the Company granted 500,000 options to consultants of the Company to purchase 500,000 shares at a price of $0.10 to July 2007. The Company charged operations for the fair value of these options, approximately $27,000, and this amount is included in selling, general and administrative expenses in the accompany statement of operations.

In December 2005, the Company granted 3,100,000 options to directors of the Company to purchase 3,100,000 shares at a price of $0.10 to December 2007.

In December 2005, the Company granted 1,710,000 options to consultants of the Company to purchase 1,710,000 shares at a price of $0.10 to December 2007. The Company charged operations for the fair value of these options, approximately $77,000, and this amount is included in selling, general and administrative expenses in the accompany statement of operations.

10. **STOCK OPTIONS AND STOCK WARRANTS:**    The Company has a stock option plan under which options to purchase shares of common stock may be granted to certain officers, directors and service providers.

In June 2001, the Company adopted a new Stock Option Plan (the "*2001 Plan*"). The 2001 Plan authorizes the issuance of up to 8,400,000 of the Company's common shares, subject to adjustment under certain circumstances. The Company is listed on the TSX Venture Exchange ("*TSX*") and is subject to a limitation on the number of options a company may have. The 2001 Plan provides for the issuance of both incentive stock options and nonqualified options as those terms are defined in the *Internal Revenue Code of 1986*, as amended (the "*Code*"). The Company's previous option plan will remain in effect until all granted stock options are exercised, expired or canceled. In February 2006, the Company adopted a new Stock Options Plan (the "2005 Plan"). The 2005 Plan authorizes the issuance of up to 13,900,000 of the Company's common shares, subject to adjustment under certain circumstances. The Company is listed on the TSX Venture Exchange ("*TSX*") and is subject to a limitation on the number of options a company may have. The 2005 Plan provides for the issuance of both incentive stock options and nonqualified options as those terms are defined in the *Internal Revenue Code of 1986*, as amended (the "*Code*"). The Company's previous option plan will remain in effect until all granted stock options are exercised, expired or canceled.

A summary of the status of the Company's options and changes during the years is presented below:

F–19

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | 2005 | 2004 | 2003 |

Year ended December 31

| | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
|---|---|---|---|---|---|---|
| Outstanding at beginning of year | 5,000,000 | $0.25 | 25,000 | $0.50 | 25,000 | $0.50 |
| Granted | 7,935,000 | $0.10 | 5,000,000 | $0.25 | – 0 – | $0.00 |
| Exercised | 150,000 | $0.25 | – 0 – | $0.00 | – 0 – | $0.00 |
| Cancelled/expired | –0– | $0.00 | (25,000) | $0.50 | – 0 – | $0.00 |
| **Outstanding at end of year** | 12,785,000 | $0.10 | 5,000,000 | $0.25 | 25,000 | $0.50 |
| Options exercisable at year end | 12,785,000 | | 5,000,000 | | 25,000 | |
| Weighted average fair value of options granted during the year | | $0.10 | | $0.19 | | $0.50 |

The following table summarizes information about fixed stock options outstanding at December 31, 2005:

F–20

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | | Number Exercisable | Weighed Average Exercise Price |
| $0.10 | 12,785,000 | 1.45 | $0.10 | | 12,785,000 | $0.10 |

Warrants to purchase shares of common stock are as follows:

| Year ended December 31, | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | Number of Warrants | Range of Exercise Price | Number of Warrants | Range of Exercise Price | Number of Warrants | Range of Exercise Price |
| Outstanding at beginning of year | 5,407,000 | $0.0657 – $0.195 | 17,431,000 | $0.064 – $0.1175 | 21,800,000 | $0.064 – $0.80 |
| Issued | 12,875,000 | $0.055 – $0.130 | 1,250,000 | $0.135 – $0.195 | 8,750,000 | $0.0657–$0.1175 |
| Exercised | (1,613,000) | $0.0657 – $0.1175 | (13,214,000) | $0.64 – $0.255 | (3,476,000) | $0.064 – $0.26 |
| Expired | (2,630,000) | $0.075 – $0.1175 | (60,000) | $0.085 | (9,643,000) | $0.26 – $0.66 |
| **Outstanding at end of year** | 14,039,000 | $0.055 – $0.195 | 5,407,000 | $0.0657 – $0.195 | 17,431,000 | $0.064 – $0.1175 |

Warrants issued in 2005 and 2004 have a contractual life of two years from the date of issuance.

11. **INCOME TAXES:**    As of December 31, 2005 the Company had deferred tax assets resulting primarily from net operating loss carryforwards of approximately $26,000,000, which are available to offset future taxable income, if any, through 2025. As utilization of the net operating loss carryforwards is not assured, a 100% valuation allowance has been provided.

The components of the net deferred tax assets are as follows:

| December 31, | 2005 | 2004 |
|---|---|---|
| Net operating loss carryforwards | $ 8,824,000 | $ 8,517,000 |
| Valuation allowance | (8,824,000) | (8,517,000) |
| Net deferred tax assets | $    – 0 – | $    – 0 – |

F–21

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The reconciliation of the effective income tax rate to the federal statutory rate are as follows:

| Year ended December 31, | 2005 | 2004 |
|---|---|---|
| Federal statutory tax rate | 34% | 34% |
| Valuation allowance on net operating carryforwards | (34) | (34) |
| **Effective income tax rate** | **– 0 – %** | **– 0 – %** |

12. **IMPAIRMENT OF LONG–LIVED ASSETS :**    As the result of the Company's inability to raise revenues in accordance with the corporate business plan, the Company operated at a loss for the year ended December 31, 2003. As a result, the Company commenced an impairment review of its long–lived assets in accordance with Statement of Financial Accounting Standard ('SFAS") 144 "Accounting of the Impairment or Disposal of Long–Lived Assets". As a result of this impairment review, the Company recorded impairment losses of approximately $100,000 to reduce the carrying value of these assets to their estimated fair value.

F–22

USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

13. **QUARTERLY FINANCIAL INFORMATION (UNAUDITED):**  The following table summarizes selected quarterly data for the years ended December 31, 2005 and 2004:

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Full Year |
|---|---|---|---|---|---|
| **2004:** | | | | | |
| Revenue | $ 4,700 | $ – 0 – | $ – 0 – | $ – 0 – | $ 4,700 |
| Expenses | (269,411) | (293,955) | (320,023) | (525,149) | (1,408,538) |
| Net Loss | (264,711) | (293,955) | (320,023) | (525,149) | (1,403,838) |
| Net loss per common share | | | | | |
| Basic and Diluted | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.01) |
| **2005:** | | | | | |
| Revenue | $ 18,800 | $ – 0 – | $ – 0 – | $ – 0 – | $ 18,800 |
| Expenses | (280,507) | (217,840) | (233,776) | (244,927) | (977,050) |
| Net Loss | (261,707) | (217,840) | (233,776) | (244,927) | (958,250) |
| Net loss per common share | | | | | |
| Basic and Diluted | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.01) |

Created by 10KWizard   www.10KWizard.com

# Exhibit F

ORIGINAL

(41)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 03-368-KAJ |
| MOVIELINK, LLC, | ) ) | |
| Defendant. | ) ) | |

### ORDER

For the reasons stated in open court on January 8, 2004,

IT IS HEREBY ORDERED that defendant's Motion to Transfer Case to the

Central District of California (D.I. 28), is DENIED.

UNITED STATES DISTRICT JUDGE

January 9, 2004
Wilmington, Delaware